UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION

**CITY OF HATTIESBURG**                                                   **PLAINTIFF**

**vs.**                                     **CIVIL ACTION NO.: 2:13-cv-208KS-MTP**

**HERCULES, INC., a foreign corporation;**
**and ASHLAND, INC., a foreign corporation**                        **DEFENDANTS**
                                                **Oral Argument Requested**

<u>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

       Plaintiff, CITY OF HATTIESBURG ( "Hattiesburg" or "the City"), respectfully requests

that the Court deny the Defendants' Motion to Dismiss,[1] filed by Defendants ASHLAND, INC.

("Ashland") and HERCULES INCORPORATED ("Hercules") (collectively the "Defendants")

on November 15, 2013.

**I.**      <u>**INTRODUCTION**</u>

       Defendants owned and operated a chemical manufacturing plant ("Facility" or "Site") in

Hattiesburg for over ninety years.  As Defendants' Motion admits, waste from those operations

was disposed at that Facility for at least fifty years before Congress enacted modern

environmental laws.[2]  Defendants' Motion does not, however, mention that Defendants

continued to accumulate, manage, and dispose of waste at the Site until operations ceased in

2009.[3]  The vast majority of that waste has never been removed, remediated, or contained in any

way.  Decades of environmental investigation have documented extremely high concentrations

of potent toxins in the soils and shallow groundwater at the Site.  Recent testing has confirmed

---

[1]   [Doc. #30].
[2]   *Id.* at 2.
[3]   [Doc. #6 at ¶¶ 17-20].

that contamination is spreading from the Facility and into the City's sewer infrastructure and the surrounding neighborhood.  More ominously, samples taken from the City's drinking water aquifer also show the presence of Site contaminants.  Despite these well documented findings, no environmental agency has ever brought any action against Defendants for clear violations of environmental law or taken any steps to compel Defendants to clean up the contamination their operations left behind.  The City of Hattiesburg can no longer wait for some other entity to address these issues, and invokes the jurisdiction of the Court to protect its interests and the long-term health and welfare of its citizens.

Hattiesburg brings its citizen suit under two specific provisions of the Resource Conservation and Recovery Act ("RCRA").  Congress entrusted the federal district courts with exclusive jurisdiction over such claims, subject to specifically enumerated exceptions inapplicable here.  This Court has ample authority and competence to adjudicate the City's claims, and indeed, has an "unflagging obligation" to do so.  That portions of those claims implicate Mississippi regulations does not strip this Court of jurisdiction.  The potential complexity of the issues also provides no basis for abstention.  Congress recognized that local entities often have unique and compelling motivation to enforce environmental laws and ensure abatement of potentially hazardous environmental conditions in their backyards.  This is just such a case.  The City of Hattiesburg has every right to enforce Defendants' RCRA violations and seek abatement of the imminent and substantial endangerment to human health and the environment created by those transgressions.

Likewise, the City asserts a variety of additional claims, including negligence *per se*, violation of a city ordinance, and strict liability for ultra-hazardous activity.  Defendants' arguments for dismissal of those claims are legally flawed and should be rejected.  At the very least, the City is entitled to conduct needed discovery on those claims and have them resolved on

the basis of record evidence.  At this initial stage of these proceedings, the City's claims are properly pled and legally viable.  The Defendants' Motion to Dismiss should be denied in its entirety.

## II.   __STANDARD OF REVIEW__

A Rule 12(b)(6) motion to dismiss is "viewed with disfavor and is rarely granted." *Lowery v. Texas A&M Univ. Sys.*, 117 F.3d 242, 247 (5th Cir. 1997).  "The complaint is liberally construed in the plaintiff's favor, and all well-pleaded facts in the complaint are taken as true." *Priester v. Lowndes Cty*, 354 F.3d 414, 419 (5th Cir. 2004).  "The determining issue is not whether the plaintiff will ultimately prevail on the merits, but whether [the plaintiff] is entitled to offer evidence to support [the] claim." *Id.*  A court must not dismiss a plaintiff's claim "unless the plaintiff will not be entitled to relief under any set of facts or any possible theory that [the plaintiff] could prove consistent with the allegation in [the] complaint." *Id.*

The same standard of review applies to Defendants' Motion under both Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  *Dooley v. Principi*, 250 F. App'x 114, 115-16 (5th Cir. 2007).  A Rule 12(b)(1) Motion may only be granted if it is <u>certain</u> that the plaintiff <u>cannot</u> prove a plausible set of facts establishing subject-matter jurisdiction.  *Burns v. Astrue*, 1:10CV483-LG-RHW, 2012 WL 2133593, at *2 (S.D. Miss. May 16, 2012) (citing *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008)).  In reviewing a motion to dismiss under Rule 12(b)(1), a court must:

> take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff. . . .  [U]nder Rule 12(b)(1), the court may find a plausible set of facts by considering any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Lane,* 529 F.3d at 557.  However, even though a court may consider extrinsic evidence when addressing a motion to dismiss under Rule 12(b)(1), the court "must limit itself to the contents of the pleadings, including attachments thereto" when ruling on a 12(b)(6) motion.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Under Rule 12(b)(6), the court may only look outside those pleadings when the exhibits "are referred to in the plaintiff's complaint and are central to [the] claim."  *Id.* at 498-99.

The extrinsic evidence submitted by Defendants should not be considered for any portion of the Rule 12(b)(6) motion.[4]  Because only the argument advanced in heading "C" of Defendants' Motion implicates a potential jurisdictional issue under Rule 12(b)(1), the Court should limit any consideration of extrinsic evidence to that argument.  To the extent the Court deems it necessary to consider extrinsic evidence relating to any other argument raised by Defendants' Motion, that Motion should be converted to a motion for summary judgment pursuant to Fed. R. Civ. P. 12(d).  Hattiesburg requests that it be allowed to conduct discovery and supplement its filings with additional extrinsic evidence prior to the Court's consideration of any summary judgment motion.

## III.    <u>SUMMARY OF FACTS</u>

As set forth *supra*, the facts pleaded in the City's Complaint[5] and Amended Complaint[6] are to be accepted as true.  The following is a brief summary of the facts pertinent to the Court's determination.

---

[4]    The extrinsic evidence submitted by Defendants is quite limited and one-sided.  As such, it does not begin to establish the full factual background relevant to the City's claims.  Hattiesburg intends to offer additional evidence fully supporting its claims at the appropriate time.  Because a 12(b)(6) motion must be resolved based on the well-pleaded allegations of the complaint, now is not that time.

[5]    [Doc #1].

[6]    [Doc #6].

SITE HISTORY

Hercules operated the plant located at 613 West 7th Street in Hattiesburg, Forrest County, Mississippi from 1923 until approximately 2009, at which time the Facility ceased operations.  In 2008, Ashland purchased Hercules, including the Facility.  [Doc #6 at ¶¶ 9-10].  The Facility is approximately 168 acres in size and is surrounded by residential, commercial, and industrial properties, and sewer and water lines owned and maintained by the City run around, under, and adjacent to the Facility and the surrounding area.  *Id.* at ¶ 11.  Shallow groundwater at the Facility is encountered from five (5) to twenty-two (22) feet below ground surface; the deep aquifer from which the City draws its drinking water is at least partially separated from the shallow groundwater by a thick clay layer.  *Id.* at ¶ 13.

Over nearly nine decades, operations at the Facility included the management of numerous chemicals now classified by federal law as hazardous.  *See Id.* at ¶¶ 14-15.  During the course of the operation, the Facility operated a wastewater treatment system which collected water from all process areas of the plant in an unlined impoundment basin.  *Id.* at ¶ 18.  Periodically, Hercules removed contaminated sludge from the impoundment basin and re-deposited it into unlined "sludge pits" on the Facility's northwestern corner.  *Id.* at ¶¶ 19-20.

REGULATORY HISTORY

The site has been under periodic regulatory scrutiny for over three decades.  In 1979 and 1981, the Mississippi Bureau of Pollution Control (predecessor to the Mississippi Department of Environmental Quality ("MDEQ")) noted that the containment of toxic chemicals at the Facility was unsound.  *Id.* at ¶ 26.  In 1993, an EPA inspection revealed 37.7 acres of contaminated soil and 895,600 cubic feet of contaminated surface impoundments.  *Id.* at ¶ 27.  Two decades before the City's suit was filed, EPA concluded that migration of contaminants via the groundwater

pathway was a concern given the presence of drinking water wells in the area.  *Id.*  In 1997, MDEQ requested on-site groundwater monitoring at the Facility.  *Id.* at ¶ 28.  Over the years, testing has shown the presence of hazardous constituents, including (but not limited to) benzene, carbon tetrachloride, chloroform, methylene chloride, and l ,2-dichloroethane, in on-site groundwater above the Maximum Contaminant Levels (MCLs) and the MDEQ Tier 1 groundwater Target Remediation Goals (TRGs).  *Id.*  In 1999, EPA detected the presence of dioxathion (a component of the pesticide Delnav manufactured for decades at the Site) in the groundwater.  *Id.* at ¶ 29.  From 1999 through 2009, a number of investigations were conducted, revealing the presence of numerous hazardous constituents at very high concentrations.  *Id.* at ¶¶ 30, 33, 35-39.

In May 2011, EPA issued a RCRA 3013(a) Administrative Order ("3013 Order") for the Facility, requiring Hercules to conduct additional on-site and off-site investigation, testing, and analysis.  *Id.* at ¶ 40.  The results of testing pursuant to the 3013 Order have confirmed that free product, specifically a mixture of 73 percent diphenyl oxide and 27 percent 1,1-biphenyl, is present in the groundwater monitoring well installed in the public right-of-way located adjacent to West 8th Street.  *Id.* at ¶ 44.  Alarmingly high concentrations of other contaminants, including known and suspected human carcinogens such as benzene and carbon tetrachloride, have also been detected in the shallow groundwater underneath and adjacent to the Site.  *Id.* at ¶ 107.  Testing confirms that some of those contaminants are entering the City sewer lines.  *Id.* at ¶ 109.  Finally, samples from on and off-Site wells drawing from the deep aquifer – from which the City draws its drinking water – have tested positive for Site-related contaminants.  *Id.* at ¶ 111.

(LACK OF) REMEDIATION HISTORY

In January 2005, Hercules submitted a Corrective Action Plan to MDEQ, which recommended institutional controls, including deed restrictions, and monitored natural

attenuation to address the significant contamination, including groundwater contamination, at the Facility.  *Id.* at ¶ 31.  Other more effective measures were rejected as too costly.  *See Id.*  In January 2008, Hercules entered a Restricted Use Agreed Order which did little more than document that the site was contaminated and prohibit future non-industrial uses of the Site.  *See Id.* at ¶ 32.  Under the 3013 Order, Defendants continue to evaluate the nature and extent of the contamination, but have not taken any affirmative steps to address the confirmed contamination that has impacted groundwater beneath the Facility and beyond.  *Id.* at ¶ 45.

For the defendants to assert, as they do in their Motion, that until 2011 they did not even consider migration of the Site toxins a risk is naïve at best.  EPA recognized the potential risk of off-site migration – including potential contamination of the City's drinking water supply – by at least 1993.  *Id.* at ¶ 27.  This is not a new problem.  The investigations have produced clear results – toxic contaminants are present in the shallow groundwater, have reached the drinking water aquifer, and will remain a threat for the foreseeable future unless substantial area-wide remediation is undertaken.

## IV.   <u>ARGUMENT</u>

For years, Defendants operated the Facility in direct violation of a number of specific statutory and regulatory requirements designed to protect human health and the environment, specifically including the requirement to apply for and obtain a Treatment, Storage and Disposal (TSD) permit under RCRA (which, in turn, would have required extensive containment measures and subjected the Facility to RCRA's site-wide corrective action provisions).  Instead, their illegal handling of toxic waste resulted in the release of numerous toxic, dangerous constituents and wastes into the environment.  Those toxins have never been removed, remediated, or otherwise addressed by the defendants, and continue to migrate away from the Facility and

towards Hattiesburg's citizens, infrastructure, and drinking water supply.

Having ignored the provisions of RCRA designed to prevent the release of hazardous constituents, Defendants now attempt to avoid the enforcement provisions that are an integral part of that statute. Defendants assert two contradictory arguments: (1) that this Court should abstain from exercising the clear jurisdiction Congress has conferred upon it to hear citizen suits and instead allow EPA to handle any enforcement; and (2) that federal hazardous waste law has been completely supplanted by Mississippi law, thereby negating the statutory provisions allowing citizen enforcement of RCRA violations and stripping this Court of jurisdiction over the City's claims. As explained below, neither argument has merit. Nor have defendants met the stringent burden necessary to support dismissal of the City's claims for negligence per se, violation of a city ordinance, and strict liability for ultra-hazardous activity.

## A.   PRIMARY JURISDICTION DOCTRINE SHOULD NOT APPLY WHEN CONGRESS AUTHORIZES THE SPECIFIC SUIT FILED BY THE CITY.

This Court has exclusive jurisdiction over RCRA citizen suits pursuant to 42 U.S.C. § 6972(a)(2). Federal district courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given" to them. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Therefore, abstention from a RCRA citizen suit on the grounds of primary jurisdiction "is the exception rather than the rule." *Riley v. Simmons*, 45 F.3d 764, 770 (3d Cir. 1995). "[M]ost courts to address the issue have found the doctrine to be inapposite to RCRA actions." *Trident Inv. Mgmt., Inc.-Meyer Inv. Properties, Inc. v. Bhambra*, 95 C 4260, 1995 WL 736940, at *2 (N.D. Ill. Dec. 11, 1995); *Stoll v. Kraft Foods Global, Inc.*, 1:09-cv-0364, 2010 WL 3702359, at *6 (S.D. Ind. Sept. 6, 2010) (exercising primary jurisdiction "would amount to an abdication of Congressionally-vested responsibility."). Therefore, failing to hear this case would "unilaterally strip [Hattiesburg] of rights" explicitly granted by Congress "to enforce

[RCRA's] provisions except in certain circumstances not present here." *Wilson v. Amoco Corp.*, 989 F. Supp. 1159, 1170 (D. Wyo. 1998).

Defendants' primary jurisdiction argument relies on an analysis of factors regarding this Court's competency to adjudicate the claim, but fails to address the most basic tenants of the doctrine's application. The doctrine of primary jurisdiction only applies where three requirements are met:

> (1) the court has original jurisdiction over the claim before it; (2) the adjudication of that claim requires the resolution of predicate issues or the making of a preliminary finding; and (3) the legislature has established a regulatory scheme whereby it has committed the resolution of those issues or the making of those findings to an administrative body.

*Northwinds Abatement, Inc. v. Emp'rs Ins. of Wausau*, 69 F.3d 1304, 1311 (5th Cir. 1995).

There is no doubt that this Court has original jurisdiction over Hattiesburg's citizen suit, because a federal statute specifically authorizes such claims. *See* 42 U.S.C. § 6972(a)(2). However, there is no predicate issue for EPA to resolve before the Court can decide this case – the facts regarding statutory violations and imminent and substantial endangerment have already been established by years of investigation. The only issues left involve applying legal standards to established facts – which, of course, is the customary function of courts. As for the third prong, far from committing the resolution of Hattiesburg's RCRA claims to the EPA, Congress has established a statutory scheme that specifically contemplates citizen enforcement unless certain criteria have been met. Defendants do not and cannot argue the existence of any of the statutory criteria that might bar this suit. Therefore, this Court should deny the Defendant's Motion and exercise the jurisdiction conferred upon it by statute.[7]

---

[7]   Even if the Court were to conclude that the primary jurisdiction doctrine might apply in this case, at this stage of the litigation, not enough information is known regarding the plans or intentions of any agency overseeing the Site to warrant dismissal of Hattiesburg's claims. These facts must be further

1.        **No statutory bar to a citizen suit applies in this case.**

Defendants' Motion wholly ignores the majority rule, including precedent from within the Fifth Circuit, that the application of the primary jurisdiction doctrine is "inappropriate except in truly extraordinary circumstances or that it is wholly inapplicable in light of RCRA's express delineation of what agency action will preclude a citizen suit." *Stewart-Sterling One LLC v. Tricon Global Resturants, Inc.*, Civ.A. 00-477, 2002 WL 1837844, at *5 (E.D. La. Aug. 9, 2002) (citing *PMC, Inc. v. Sherwin–Williams Co.,* 151 F.3d 610, 619 (7th Cir. 1998) *cert. denied*, 525 U.S. 1104 (1999)  (limiting a court's discretion to use the primary jurisdiction doctrine in RCRA citizen suits because the statute itself establishes the jurisdictional balance between courts and EPA)).  As quoted by *Stewart-Sterling*, in *PMC*, Judge Posner wrote, "appl[ying] the doctrine of primary jurisdiction . . . would be an end run around RCRA. . . .  [Although] there may be room for applying the doctrine[ ] . . . in cases in which a state has a formal administrative proceeding in progress that the citizens' suit would disrupt, [t]here is nothing like that here." *Id.*  (alterations in original).

Likewise, "[w]here Congress creates specific exceptions to a broadly applicable provision, the 'proper inference . . . is that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.'" *Med. Ctr. Pharmacy v. Mukasey*, 536 F.3d 383, 396 (5th Cir. 2008) (quoting *United States v. Johnson*, 529 U.S. 53, 58 (2000)).  "Congress has specified the conditions under which the pendency of other proceedings bars suit under RCRA . . . ." *Stewart-Sterling One*, 2002 WL 1837844, at *5 (quoting *PMC*, 151 F.3d at 619).

---

developed prior to this Court even entertaining the assertion that primary jurisdiction doctrine should apply.  As recognized in some of the very cases that Defendants cite, the appropriate stage for a court to resolve the question of primary jurisdiction is at the summary judgment stage rather than the motion to dismiss stage.  *Spears v. Chrysler LLC*, 3:08CV331, 2011 WL 540284 (S.D. Ohio Feb. 8, 2011) (citing *Holder v. Gold Fields Mining Corp.*, 506 F. Supp. 2d 792 (N.D. Okla. 2007); *Schwartzman, Inc. v. Atchison, T. & S.F. Ry.*, 857 F. Supp. 838 (D.N.M. 1994)).  Therefore, this Court is well within its discretion to deny the defendants' motion as it pertains to the question of primary jurisdiction solely on the grounds that now is not the appropriate time to take up the issue.

Therefore, "applying the doctrine [of primary jurisdiction] would be inconsistent with RCRA's statutory language . . . [since] Congress has expressly set forth those situations in which a citizen suit . . . is precluded." *Craig Lyle Ltd. Partnership v. Land O'Lakes, Inc.*, 877 F. Supp. 476, 483 (D. Minn. 1995) (recognized by *Stewart-Sterling One*, 2002 WL 1837844, at *5).

　　None of Hattiesburg's claims fall within any of the enumerated exceptions to a citizen suit set forth in RCRA section 6972, and Defendants do not suggest otherwise.  Section 6972(a)(1)(A) authorizes a suit where an entity is in violation of RCRA or its implementing regulations.  Congress specified that no citizen suit may be brought pursuant to section 6972(a)(1)(A) if EPA or a state agency "has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition, or order."  42 U.S.C. § 6972(b)(1)(B).  Neither EPA nor the State of Mississippi has pursued a civil or criminal action against Defendants; therefore, the bar does not apply.

　　Section 6972(a)(1)(B) authorizes a citizen suit where any entity contributes to the "storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment."  Congress has set forth four specific exceptions, none of which apply here, to bar a citizen suit brought under 42 U.S.C. § 6972(a)(1)(B).  First, a citizen suit is not allowed if EPA "has commenced and is diligently prosecuting an action under section 6973 [of RCRA] or under section 106 of [CERCLA]."  42 U.S.C. § 6972(b)(2)(B)(i).  Second, a citizen suit is barred if EPA "is actually engaging in a removal action under section 104 of [CERCLA]."  42 U.S.C. § 6972(b)(2)(B)(ii).  Likewise, if EPA has initiated a Remedial Investigation and Feasibility Study pursuant to CERCLA section 104 and is diligently pursing that remediation, citizen suits are not available.  42 U.S.C. § 6972(b)(2)(B)(iii).  Finally, no citizen suit may proceed if EPA has either "obtained

a court order (including a consent decree) or issued an administrative order under section 106 of [CERCLA] or section 6973 of [RCRA]" and EPA is diligently proceeding with remedial action. 42 U.S.C. § 6972(b)(2)(B)(iv).  Defendants do not argue that any of the statutory exceptions to the RCRA citizen suit provisions apply because none of the factual predicates for these exceptions exist.  Under a plain reading of the statute, the City's RCRA citizen suit claims are expressly authorized by Congress and viable under the facts alleged in the Amended Complaint.

Over approximately the past 33 years, EPA and the State of Mississippi have periodically attempted to investigate and assess the environmental issues surrounding the Facility.  However, even though those investigations have revealed serious RCRA violations, no enforcement action has ever been brought against Defendants.  Nor has any environmental agency compelled any comprehensive remedial action to remove, contain, or clean up the extremely high levels of contamination uncovered during those investigations.  Because no environmental agency has taken action to enforce the law or abate the ongoing migration of toxic chemicals from the Facility toward Hattiesburg's citizens, infrastructure, and drinking water supply, this action is expressly authorized by federal law and necessary to protect human health and the environment. The City of Hattiesburg is entitled to maintain this citizen suit under RCRA, and none of the express statutory exceptions prevent this Court from exercising its clear jurisdiction over those claims.

> **2.    Adjudication of the City's RCRA claims will not conflict with existing orders, usurp the role of EPA, or involve this Court with matters outside its competence.**
>
> > **a.    EPA's 3013 Order does not bar a citizen suit nor does it provide the relief requested by the City.**

The defendants correctly assert that "the advisability of invoking primary jurisdiction is greatest where the issue is already before the agency."  *Friends of Sante Fe Cty. v. LAC*

*Minerals, Inc.*, 892 F. Supp. 1333, 1350 (D.N.M. 1995) (quoting *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 420 (5th Cir. 1976)).  Yet, no agency enforcement action exists, so Defendants cannot argue that issues of enforcement are before any agency. Instead, they mischaracterize EPA's 3013(a) Order and seem to suggest that EPA's ongoing oversight of the investigation compelled by that order somehow prohibits this Court from adjudicating the City's RCRA claims.  That is incorrect.  A citizen suit brought under RCRA is "*not barred* if EPA is prosecuting an action or has issued an administrative order under RCRA Sections 3008 or *3013*."  Memorandum from Thomas L. Adams, Jr., Asst. Administrator for Enforcement and Compliance Monitoring, and J. Winston Porter, Asst. Administrator for Solid Waste and Emergency Response, EPA, at 4, *available at* http://www2.epa.gov/sites/production/ files/documents/rcras7002citiz-mem.pdf (attached hereto as "Exhibit A") (emphasis added).

Defendants assert that adjudication of the City's RCRA claims would duplicate or conflict with the 3013 Order issued by EPA.  But the 3013 Order simply requires the defendants to investigate the scope of the contamination on and off the Site.  A 3013 Order is <u>not</u> an enforcement order and does not compel compliance or require remediation.  42 U.S.C. § 6934. While the 3013 investigation is not yet complete, it has generated significant information. Hattiesburg has seen enough data from that and previous investigations to know that RCRA has been violated and that an imminent and substantial endangerment may exist.  Additional information gathered under the 3013 Order can only shed additional light on the scope and extent of that endangerment.

Two years have passed since the 3013 Order was issued, and each and every day during those two years the contamination from the Site continued to spread away from the Site in an uncontrolled manner.  While the City appreciates the efforts of EPA to investigate the site, it is time for this Court to utilize its judicial enforcement power to provide the immediate relief to the

City available under RCRA.  Requiring Defendants to remediate the Facility and surrounding area of Hattiesburg to mitigate an imminent and substantial endangerment will not conflict with any existent order, but merely constitute the next logical step building upon the investigations conducted to date.

> **b.   EPA's statutory right of intervention negates any possibility that the Court will usurp the proper role of the agency.**

The citizen suit provision of RCRA "belongs to a genre common to environmental laws under which citizen suits serve as goads to both EPA and polluters without displacing the federal agency as the principal enforcer." *Supporters to Oppose Pollution, Inc. v. The Heritage Group,* 973 F.2d 1320, 1324 (7th Cir. 1992).  The defendants fail to recognize this, suggesting instead that the potential for parallel judicial and administrative proceedings poses a substantial risk of an inconsistent or conflicting order.  But, pursuant to 42 U.S.C. § 6972(d), EPA may intervene in the City's suit as a matter of right.  At any time, if EPA chooses to enforce the RCRA violations that Hattiesburg raises here, the agency may intervene in Hattiesburg's claim and assert its position.  Likewise, if EPA concludes that the City's requested relief is somehow unwise, it has an absolute right to join these proceedings and make its views known to the Court.  Pursuant to the notice requirements of 42 U.S.C. § 6972, EPA is aware of the City's suit against Defendants, and has ample statutory authority to intervene in this action and seek any relief it deems appropriate.  But EPA is responsible for RCRA sites all over the country, and may or may not feel the need to join the City's citizen suit.  *See College Park Holdings, LLC v. Racetrac Petroleum, Inc.*, 239 F. Supp. 2d 1322, 1328 (N.D. Ga. 2002) (noting that because of the struggles between a state's environmental protection agency and the defendant, the "court-ordered relief might even be characterized as welcome" by the agency).  Because EPA is aware of this suit and can step in at any time, Defendants' arguments raising the specter of conflicting

orders or overlapping proceedings are misplaced.

    3.    **This Court is fully competent to resolve the environmental issues in the City's claim.**

Defendants insist that the environmental issues presented by the City's claims are so technical and complex that they are beyond the capabilities of this Court and should be handled by EPA.  While courts may not deal daily with the environmental issues raised by the City, that fact alone is "not a sufficient basis for denying jurisdiction."  *College Park Holdings*, 239 F. Supp. 2d at 1328 (citing *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 532 F.2d 412, 420 (5th Cir. 1976)); *Kraft Foods Global*, 2010 WL 3702359, at *6.).[8]  Not only are federal courts capable of adjudicating the issues brought by the City's claim, "Congress clearly contemplated that the environmental issues posed here are within the competency of the courts when it created a citizen suit provision."  *Interfaith Cmty. Org. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 311 (D.N.J. 2010).  Congress has even expressly said as much:  "Enforcement of pollution regulations is not a technical matter beyond the competence of the courts."  *College Park Holdings*, 239 F. Supp. 2d at 1328 (quoting S.Rep. No. 92–414, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3747); *Kraft Foods Global*, 2010 WL 3702359, at *6.  Acting in supplement to EPA's authority and capabilities, the Court is free to "elicit[] the expertise of the involved agencies while maintaining the court's substantial enforcement powers."  *College Park Holdings*, 239 F. Supp. 2d at 1328 (*Miss. Power & Light Co.*, 532 F.2d at 419).

Defendants insist that Hattiesburg seeks "remediation strategies, plans, and procedures

---

[8]    The *Kraft Foods Global* court soundly rejected the same non-binding authority, *Schwartzman, Inc. v. Atchinson, Topeka, & Santa Fe Ry.*, 857 F. Supp. 838 (D.N.M. 1994), relied upon by Defendants.  *Kraft Foods Global*, 2010 WL 3702359, at *6.  In denying the defendant's motion to dismiss, the court found that even though "the Court does not confront esoteric environmental issues on a daily basis," Congress has clearly signaled the subject matter of a RCRA suit was "well within the Court's domain." *Id.* (citing *College Park Holdings*, 239 F. Supp. 2d at 1328).

[that fall] outside the conventional experience of the Court." [Doc. #28 at 10].[9] This argument simultaneously understates the competence of this Court to address difficult issues and overstates the level of technical complexity involved in these claims. Contrary to Defendants' assertions, the injunctive relief necessary to protect the City and its citizens need not be particularly complex: a proper injunction might simply require Defendants to treat or remove all contaminated soil and groundwater on and off of the Facility and to take whatever steps are necessary and appropriate to prevent the further migration of the contaminants until such remediation is completed. In fact, the remedy sought by Hattiesburg is no different, conceptually, than an order requiring a defendant to abate a nuisance by any lawful means.

---

[9]   As former Associate Justice Stephen Breyer notes in his Introduction to the Federal Judicial Center's *Reference Manual on Scientific Evidence*:

> Scientific issues permeate the law. Criminal courts consider the scientific validity of, say, DNA sampling or voiceprints, or expert predictions of defendants' "future dangerousness," which can lead courts or juries to authorize or withhold the punishment of death. Courts review the reasonableness of administrative agency conclusions about the safety of a drug, the risks attending nuclear waste disposal, the leakage potential of a toxic waste dump, or the risks to wildlife associated with the building of a dam. Patent law cases can turn almost entirely on an understanding of the underlying technical or scientific subject matter. And, of course, tort law often requires difficult determinations about the risk of death or injury associated with exposure to a chemical ingredient of a pesticide or other product.

*Reference Manual on Scientific Evidence*, at 3 (Federal Judicial Center, 2d ed. 2000); *see also* Breyer, Stephen, The Interdependence of Science and Law, 280 Science 537 (1998). District courts throughout the United States are routinely tasked with performing a variety of statistical assessments (e.g., biostatistics; econometrics; psychometrics; multiple regression analyses; etc.) in any number of legal contexts (e.g., voting rights issues; capital punishment cases; etc.). Epidemiologic evidence is routinely offered to establish or dispute whether exposure to an agent caused a harmful effect or disease. *See In re Agent Orange Product Liability Litigation*, 611 F. Supp. 1223, 1240 (E.D.N.Y. 1985) (Vietnam veterans exposed to Agent Orange and dioxin contaminant brought suit for various diseases and birth defects in their offspring), *aff'd*, 818 F.2d 187 (2d Cir. 1987), cert. denied, 487 U.S. 1234 (1988). The same is equally and obviously true for toxicological evidence. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) (Plaintiffs relied on testimony of epidemiologists, toxicologists, pharmacologists, and similar persons to support claims that birth defects caused by drug, Bendectin). The economic issues presented by ordinary antitrust action (e.g., evidence concerning relevant markets, concentration of economic power, pricing structures, elasticity of demand, barriers to entry, marginal costs, and the effect of the challenged practices on competition and the claimants) are equally complex, if not more so. *See, e.g.*, *Ann. Manual Complex Lit.* § 30.2 (4th ed.). The list goes on and on. Simply put, there is nothing so complicated about the City's claims to take them "outside the conventional experience of the Court." [Doc #28 at 10]. In modern litigation, complexity is the norm.

16

Given the nuisance principles that underlie the RCRA statute, "the tasks involved in adjudicating environmental cases are well within the federal courts' accustomed domain." *Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 293 (1st Cir. 2006).  Consistent with the traditional role of courts in nuisance actions, Hattiesburg simply asks this Court to determine whether, as a matter of law, the Defendants violated RCRA and whether Site conditions may create an "imminent and substantial endangerment" to human health or the environment.  If so, the Court is certainly capable of tailoring injunctive relief to abate the migration of toxins towards Hattiesburg's citizens, infrastructure, and water supply.  Because the issues at hand lie squarely within this Court's purview – as expressly determined by Congress – this Court "must not abdicate its responsibility" on grounds that it lacks the subject-matter expertise to adjudicate the issues.  *Baykeeper v. NL Industries, Inc.*, 660 F.3d 686, 691 (3d Cir. 2011).

**B.    MISSISSIPPI LAW DOES NOT WHOLLY SUPPLANT FEDERAL LAW OR THIS COURT'S AMPLE POWER TO ADJUDICATE THE CITY'S RCRA CLAIMS.**

In their Motion, Defendants simultaneously assert that:  (1) this Court should abstain from exercising its original jurisdiction over this matter and defer to EPA's expertise; and (2) this Court completely lacks subject-matter jurisdiction because only Mississippi law can apply to this Site.   Defendants' arguments are inherently inconsistent, and, more importantly, fail to address either the significant differences between Mississippi's hazardous waste program and the federal RCRA program or the EPA's clear position on the availability of federal citizen suits in those states with authorized hazardous waste programs.  Defendants also fail to mention that Mississippi is not authorized to implement or enforce the entire universe of RCRA provisions.  Moreover, EPA takes the position – consistent with the express language of the statute – that federal citizen suits are available even in states that are fully authorized to administer all aspects

17

of RCRA.

1.        **Mississippi does not have authority to impose corrective action at the Site.**

Defendants couch their second argument on the notion that Mississippi has adopted its

own hazardous waste regulatory scheme, which is only partially true.[10]  [Doc. #28 at 14].  EPA

has only authorized Mississippi's state scheme as it relates to permitting, not corrective actions.

*See* Hazardous Waste Management Regulations, Miss. ADC 11-3:1.1, *et. seq.*; Mississippi: Final

Authorization of State Hazardous Waste Management Program Revision, 73 Fed. Reg. 45170-01

(Aug. 4, 2008) (amending 40 C.F.R. § 271).  In fact, MDEQ told EPA that the state is powerless

to pursue the full array of remedies available under federal law to address "wide-spread

contamination on the [Hercules] site":

> This triggers the potential necessity for site-wide corrective action under
> the federal Resource Conservation and Recovery Act ("RCRA"), and as
> you know, EPA has not delegated legal authority for the RCRA corrective
> action program to the State of Mississippi. . . . [W]e at MDEQ believe that
> the best interests of human health and the environment should be served
> by ensuring that **the hazardous waste disposal issues at this site are
> addressed by taking advantage of every legal avenue available.  This
> would include those legal remedies which are available under RCRA,
> but for which MDEQ lacks legal authority to pursue**."

Letter from Trudy D. Fisher, Executive Director, MDEQ, to J. Scott Gordon, EPA (March 4,

2011) (attached hereto as "Exhibit B") (emphasis added).  Likewise, the webpage for EPA

Region 4 reads in pertinent part that "[o]nly Mississippi has yet to apply for authorization to

implement RCRA Corrective Action.  Therefore, **the Region 4 RCRA Programs Branch is**

**responsible for RCRA Corrective Action in Mississippi.**"  Environmental Protection Agency,

*Region 4: Land Cleanup and Waste*, http://www.epa.gov/region04/rcra/gprabkgdrp.htm (last

---

[10]    It should be noted that Mississippi has not promulgated unique regulatory requirements to govern
hazardous waste issues.  Instead, Mississippi has simply adopted the federal regulations promulgated
under RCRA by wholesale reference and incorporation.  *See* Mississippi Hazardous Waste Management
Regulations, Parts 260 – 265, *available at* http://mdah.state.ms.us/arrec/digital_archives/series/files/
34/pdf/143.pdf.

updated Jan. 6, 2012) (emphasis added).[11]  Therefore, the basic premise of Defendants' argument – that MDEQ's authority wholly supplants that of EPA – is factually incorrect.

Defendants violated RCRA by managing hazardous waste at the Facility without a permit pursuant to 42 U.S.C. § 6925.  As a result, Defendants are subject to the site-wide corrective action requirements of RCRA.  42 U.S.C. § 6928.  Those corrective action requirements govern the regulatory process by which environmental agencies can compel remediation and clean-up of RCRA sites.  To obtain corrective action, EPA may issue a compliance order or may bring a civil action in United States District Court seeking an injunction.  42 U.S.C. § 6928(a)(1).  In a state having the authority to implement its own program under 42 U.S.C. § 6926, the state may bring that action.  However, because Mississippi does not have corrective action authority, it cannot completely displace EPA or the federal regulatory scheme under RCRA.

The cases cited in support of Defendants' position rely on the premise that "that states were intended to carry the main enforcement burden once their program was found to be equivalent to the federal program."  *City of Heath, Ohio v. Ashland Oil, Inc.*, 834 F. Supp. 971, 979 (S.D. Ohio 1993) (citing *Williamsburgh-Around-The Bridge Block Ass'n v. Jorling*, 89-CV-471, 1989 WL 98631 (N.D.N.Y. Aug. 21, 1989)).  Mississippi cannot carry the necessary enforcement burden – the state cannot order or otherwise require any corrective action needed to address the contamination issues at a RCRA facility.  This can be no surprise to Defendants.  In a July 8, 2013 letter to Hercules, EPA clearly set forth the limits of Mississippi's RCRA authority:

> Hercules is correct in noting that the State of Mississippi is authorized by the EPA to operate a RCRA hazardous waste program in lieu of the federal RCRA program, and has adopted many of the federal hazardous waste regulations by reference.  However, the EPA retains authority to

---

[11]  In contrast, "[w]hen EPA determines that state programs *are equivalent to the federal RCRA program*, the Corrective Action program may be delegated to the state." Environmental Protection Agency, RCRA Corrective Action, http://www.epa.gov/region1/cleanup/rcra/ index.html (last updated Sept. 13, 2013) (emphasis added).

implement the RCRA corrective action program within the State.
Letter from Colleen E. Michuda, Associate Regional Counsel, EPA, to Gary C. Rikard, Counsel for Hercules, Inc. (July 8, 2013) (attached hereto as "Exhibit C").[12]  Given this critical limitation, Mississippi alone cannot adequately address the "widespread contamination" spreading from the Site.  Defendants' failure to obtain a TSD permit (under either federal or state law) necessarily involves a failure to subject itself to site-wide corrective action requirements found only in federal law.  Therefore, federal law is squarely implicated by the City's claims, and this Court has subject-matter jurisdiction.

> **2.    This Court should defer to EPA's position that federal citizen suits are available even in states with fully authorized RCRA programs.**

Mississippi's lack of corrective action authority is not the only way in which its hazardous waste laws differ from RCRA.  Mississippi also does not provide for citizen suits – of any kind or under any circumstances – under its hazardous waste program.  However, EPA and numerous courts take the view that federal RCRA citizen suits remain viable even in states that are fully authorized to apply their own hazardous waste regulations.[13]  As such, "citizen's suits may be brought in states that have received authority to operate permit programs in lieu of the federal program."  *Lutz v. Chromatex, Inc.*, 725 F. Supp. 258, 261 (M.D. Pa. 1989) (citing EPA statement in 45 Fed. Reg. 85016 (Dec. 24, 1980)) (denying defendant's motion to dismiss); *United States v. Conservation Chemical Co.*, 660 F. Supp. 1236 (N.D. Ind. 1987); *Sierra Club v. United States Dept. of Energy*, 734 F. Supp. 946 (D. Colo. 1990).  No matter the robustness of Mississippi's RCRA statute, because it does not have a citizen suit provision, a citizen suit may

---

[12]    Interestingly, EPA's July 8, 2013 Letter includes detailed discussion of federal regulations, and not the Mississippi counterparts.  This is not surprising, as Mississippi law simply incorporates the relevant federal standards verbatim.  Only before this Court have Defendants insisted that Mississippi regulations apply.

[13]    Defendants' rely on EPA's determination that Mississippi is authorized to administer its own hazardous waste regulations, but apparently reject EPA's determination that federal citizen suits are universally available under RCRA, regardless of whether a state is authorized or not.

still be brought under RCRA Section 6972.  *Glazer v. American Ecology Entvl. Servs.*, 894 F. Supp. 1029, 1040 (E.D. Tex. 1995).  While a state cannot be required by EPA to have a citizen suit provision, "it is EPA's position that the citizen suit provision of RCRA is available to all citizens whether or not a state is authorized."  *Id.* (citing 49 Fed. Reg. 48300, 48304 (Dec. 12, 1984)).

EPA's position regarding the universal availability of federal citizen suits is both reasonable and consistent with the language of the statute.  Under RCRA, states can seek authorization to "administer and enforce a hazardous waste program pursuant to this subchapter."  42 U.S.C. § 6926(b).  Thus, state hazardous waste regulations only become effective through operation of the RCRA statute.  A citizen suit under RCRA Section 6972(a)(1)(A) can be brought to enforce the alleged violation of  "any permit, standard, regulation, condition, requirement, prohibition, or order *which has become effective pursuant to this chapter*."  42 U.S.C. § 6972(a)(1)(A) (emphasis added).  As Mississippi's hazardous waste regulations must be authorized by EPA through the statutory provisions of RCRA, those regulations necessarily "became effective" pursuant to RCRA and are appropriately subject to RCRA citizen suits under a plain reading of the statute.[14]

Because EPA's interpretation of the overriding applicability of RCRA's citizen suit provisions is reasonable, this Court cannot simply ignore the agency's position.  The United States Supreme Court has made clear that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."

---

[14]    To the extent Defendants' argument can be seen a simple matter of pleading – *i.e*., a contention that Hattiesburg's Amended Complaint failed to properly plead the Mississippi regulations – this is a distinction without a difference.  As noted above, Mississippi's hazardous waste regulations adopt and incorporate by reference the federal standards plead in the City's Amended Complaint, and Defendants and EPA have engaged in extensive correspondence regarding the federal regulations "for ease of reference."  To the extent the Court believes that it is necessary for the City to specifically plead the Mississippi regulations (which again do nothing more than incorporate the federal laws referenced in the Amended Complaint verbatim), then the City respectfully requests leave to amend its complaint.

*Chevron USA Inc. v. Natural Resources Defense Council, Inc.*, 467 US 837, 844 (1984).

"[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer . . . ." *Id.*; *Inst. for Tech. Dev. v. Brown*, 63 F.3d 445, 455 (5th Cir. 1995) ("[T]o chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views." (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 5698 (1980) (Brennan, J.))).  Even informal guidance can be given weight for interpreting a statute to the extent the guidance has the "power to persuade." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  If the agency's interpretation "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, [the court] should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Chevron USA Inc*., 467 U.S. at 845 (quoting *United States v. Shimer*, 367 U. S. 374, 382-83 (1961)).  Here, the EPA's position is entirely consistent with the express language of the statute and the clear intent of Congress.[15]  As such, it should be afforded full deference, and Defendants' contention that no RCRA citizen suit can be maintained in Mississippi should be rejected.

---

[15]   Congress has clearly determined that citizen enforcement of environmental laws is a necessary and useful mechanism to further the underlying goals of those statutes.  Accepting the defendants' argument would essentially negate that Congressional mandate for RCRA in Mississippi.  As one court has noted:

> [Applying citizen suits under section 6972 in absence of state citizen suit provision] is further supported by the important role that citizens' suits can play in the enforcement of RCRA.  The EPA must classify cases in order to maximize its scarce enforcement resources.  There are some violations that, by necessity, may not be pursued aggressively.  However, a RCRPA violation is only "small" to one who does not live near the offending hazardous waste facility.  Indeed, the instant action is a testament to Congress' wisdom in recognizing that those who live in close proximity to hazardous waste facilities often are the most diligent enforcers of RCRA's mandates.

*Sierra Club v. Chem. Handling Corp.*, 824 F. Supp. 195, 197-98 (D. Colo. 1993); *see also Ashoff v. City of Ukiah,* 130 F.3d 409, 412 (9th Cir. 1997) (quoting 61 Fed. Reg. 2584, 2593 (Jan. 26, 1996)).

**C.**   **THE DOCTRINE OF NEGLIGENCE *PER SE* DOES NOT REQUIRE STATUTORY AUTHORITY TO ASSERT A PRIVATE CAUSE OF ACTION.**

Defendants misapprehend the clear difference between asserting a claim for a private right of action under a statute and using the duty established by a statute as the standard of care in a claim for negligence *per se*.  Indeed, Defendants do not even mention the elements of negligence *per se* in their motion to dismiss.  Instead, in an apparent attempt to confuse the issues, Defendants discuss cases asserting a private right of action under a statute rather than claims of negligence *per se*.[16]  As a result, their arguments regarding whether the statutes at issue provide for a private cause of action entirely miss the mark.

Whether a statute provides for a private cause of action is <u>not</u> a necessary element of a claim for negligence *per se*.  Rather, to state a claim for negligence *per se* under Mississippi law, a plaintiff must only show:  (1) that the defendant violated a statute; (2) that the plaintiff is member of the class that the statute was designed to protect; (3) that the harm suffered by the plaintiff is the type of harm the statute was designed to prevent; and (4) proximate causation. *Madison v. Vintage Petroleum, Inc.*, 114 F.3d 514, 516-17 (5th Cir. 1997) (citing *Thomas v. McDonald*, 667 So. 2d 594 (Miss. 1995); *Palmer v. Anderson Infirmary Benevolent Ass'n*, 656 So. 2d 790 (Miss. 1995)) (finding that the plaintiff stated a claim for negligence *per se* against a non-diverse defendant who violated the Regulations for Control of Radiation in Mississippi and vacating the district court's judgment dismissing the non-diverse defendant).  *See also U.S.*

---

[16]   *See U.S. Technology Corp. v. Ramsay*, 5:08–cv–00218, 2011 WL 2471013, at *4 (holding that the defendants are entitled to a judgment as a matter of law on the plaintiff's claims under the Mississippi Solid Wastes Disposal Law and the Mississippi Air and Water Pollution Control Law Complaint and submitting the plaintiff's claim for nuisance *per se* to the jury); *U.S. Technology Corp. v. Ramsay*, Complaint at 8-15, 5:08-cv-00218, 2008 WL 2915012, (S.D. Miss. June 13, 2008) (including claims for "Violations of Mississippi Solid Waste Disposal Law," "Violations of Mississippi Air and Water Pollution Control Law," and Nuisance *per se*, but no claims for Negligence *per se*) (attached hereto as "Exhibit D").  *See also Norman v. Prestage Farms, Inc.*, 3:05CV64, 2007 WL 1031371, at *3 (N.D. Miss March 30, 2007) (noting on appeal that "[a] plain reading of the plaintiffs' complaint [from *Moore v. Prestage Farms, Inc.*] reveals that no cause of action for negligence is alleged . . . .").

*Technology Corp. v. Ramsay*, 5:08–cv–218, 2011 WL 2471013, at *3 (S.D. Miss. June 20, 2011) ("Mississippi law recognizes a private right of action for negligence *per se*:  The principle that violation of a statute constitutes negligence *per se* is so elementary that it does not require citation to authority.  When a statute is violated, the injured party is entitled to an instruction that the party violating the statute is guilty of negligence, and, if that negligence proximately caused or contributed to the injury, then the injured party is entitled to recover.").

The City has pled a valid claim for negligence *per se* by, among other things, asserting that the defendants violated at least two statutes – the Solid Wastes Disposal Law of 1974 and the Mississippi Air and Water Pollution Control Law – meant to protect entities such as the City from the type of harm suffered by the City and that the City incurred substantial damages as a result of Defendants' actions.  *See* [Doc. #6 at ¶¶ 63-69].  Nothing in Defendants' motion to dismiss suggests otherwise, and their argument that a statute must provide for a private cause of action to form the basis of a negligence *per se* claim is simply wrong.  Defendants' motion to dismiss the City's claim for negligence *per se* is due to be denied.

### D.   ENFORCEMENT OF THE CITY ORDINANCE DOES NOT REQUIRE A SPECIFIC STATUTORY GRANT OF AUTHORITY TO SUE.

Defendants assert that a "city ordinance is judicially enforceable only when the right of enforcement is granted by statute."  [Doc. #30 at p. 19].  However, the case relied upon by Defendants, *City of Hattiesburg v. L. & A. Contracting Co.*, 159 So. 2d 74 (Miss. 1963), does not support either that assertion or Defendants' unsupported statement that the City's complaint must allege that the City has a statutory grant of authority to sue.  In *L. & A. Contracting Co.*, the City of Hattiesburg sued L. & A. Contracting, seeking an injunction to prevent violations of the City's zoning regulations, and the trial court dismissed the City's complaint.  *Id.* at 74.  The Supreme Court of Mississippi reversed and found that a Mississippi statute expressly granted the city

24

power to enforce its zoning ordinances by bringing a suit for an injunction.  *Id.* at 75.  The court's decision did <u>not</u> hold that a city could only bring an action in court to enforce a city ordinance if there was a statute expressly granting the city authority to do so.  *See Id.*

Indeed, Mississippi statutes grant municipalities in Mississippi the power to enact and enforce ordinances and the power to sue and be sued.  Miss. Code §§ 21-17-1(1) & 21-17-5.  It would be nonsensical for a municipality to have the power to enact ordinances, but be powerless to use its ability to sue to enforce those ordinances in court.  The City has stated a claim for violation of its ordinance, and that claim should be permitted to go forward with the City's related claims in this Court.

### E.   THE CITY HAS STATED A VIABLE CLAIM FOR STRICT LIABILITY FOR ULTRA-HAZARDOUS CONDUCT.

Defendants argue that the City's claim for strict liability should be dismissed simply because Mississippi courts have currently only found strict liability for ultra-hazardous activity in cases involving explosives.  But, that rigid, inflexible view is not supported by the case law cited by Defendants, and is wrong as a matter of law.  A simple reading of the authorities relied upon by Defendants in their motion to dismiss establishes that the City has stated a viable claim for strict liability for ultra-hazardous activity and that Defendants' motion to dismiss the claim is due to be denied.

First, Defendants cite to only one case, *Donald v. Amoco Production Company*, 735 So. 2d 161 (Miss. 1999), that involved a motion to dismiss, and in that case, the Supreme Court of Mississippi <u>reversed</u> the lower court's dismissal of the plaintiff's strict liability claim.  In *Donald*, the plaintiff brought a claim for strict liability for an ultra-hazardous activity based on the defendants' transportation and disposal of radioactive waste.  *Id.* at 171.  Using reasoning similar to the Defendants' arguments here, the lower court dismissed the claim because

25

"Mississippi has only recognized this type of liability in the disposal and use of dynamite and other explosives." *Id.* The Supreme Court of Mississippi, however, rejected that reasoning and reversed the trial court's judgment dismissing the strict liability claim under Rule 12(b)(6). *Id.* at 172. Moreover, the Mississippi Supreme Court left open the issue of whether the transportation and disposal of radioactive wastes could be considered an ultra-hazardous activity. *Id.*

Apart from *Donald*, every other case relied upon by Defendants in their argument to dismiss the City's claim for strict liability for ultra-hazardous activity was decided by summary judgment, directed verdict, or trial. Those cases were generally decided only <u>after</u> the court analyzed a variety of case-specific factors to determine if the activity at issue constituted an ultra-hazardous activity. For example, the Northern District of Mississippi expressly noted that "just because the Mississippi Courts have only found transportation of explosives [in] populated areas as ultrahazardous activity does not mean there cannot be other ultrahazardous activities rendering appropriate a strict liability claim," and then went on to discuss the relevant factors to be considered before ruling on the defendants' motion for summary judgment. *Beck v. Koppers*, CIV.A. 303CV60PD, 2006 WL 288350, at *2 (N.D. Miss. Feb. 3, 2006).

The factors courts consider when determining if an activity is ultra-hazardous for purposes of imposing strict liability are:

> (a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes.

*Sprankle v. Bower Ammonia & Chemical Co.*, 824 F.2d 409, 415 (5th Cir. 1987) (quoting Restatement (Second) of Torts § 520) (analyzing each of the factors listed before ruling that the district court did not err by directing a verdict for the defendant on the plaintiff's strict liability

claim); *Beck*, 2006 WL 288350, at *2.  Evaluating those factors is a fact-intensive inquiry, and it requires far more than simply determining whether the allegations of the complaint involve explosives.  The City is entitled to conduct discovery before this Court adjudicates the City's strict liability for hazardous activity claim.

In the case at hand, the limited, pre-discovery facts available to the City show that Defendants have caused or contributed to contamination in the shallow groundwater underneath and around the Site.  The contaminants at issue are extremely hazardous, and have been confirmed in concentrations thousands of times – and even tens of thousands of times – above levels considered safe.  [Doc #6 at ¶¶ 38, 90].  That contamination was caused by operations having an extremely high probability (if not absolute certainty) of releasing dangerous toxins into a heavily populated area.  *Id.* at ¶¶ 14-17.  Specifically, defendants stored and processed toxic liquid wastes in unlined pits and basins that were patently incapable of preventing those wastes from escaping into the shallow groundwater.  *Id.* at ¶¶ 13, 106.  As a result, contaminants from the Site have been detected in City sewer lines and in the deep aquifer from which the City draws its drinking water.  *Id.* at ¶¶ 38-39.

These preliminary facts satisfy all of the factors necessary to show that the Defendants' storage and disposal of hazardous chemical wastes constitute an ultra-hazardous activity for purposes of imposing strict liability.  At the very least, those facts demonstrate that the City has stated a viable claim for strict liability for ultra-hazardous activity and that discovery regarding the claim should proceed.  Accordingly, Defendants' motion to dismiss the City's strict liability for ultra-hazardous activity is due to be denied.

## V.   __CONCLUSION__

Defendants' Motion to Dismiss should be denied.  There is no impediment to this Court's

exercise of jurisdiction over the City's RCRA claims, and those claims are not too complex for this Court to handle.  Likewise, the City has pled viable claims for negligence *per se*, violation of a city ordinance, and strict liability for ultra-hazardous activity.  All of the City's claims are properly before the Court, and ready to proceed through discovery.

Respectfully submitted, this 6th day of December, 2013.

/s  W. Larkin Radney IV
One of the Attorneys for PLAINTIFF,
City of Hattiesburg

OF COUNSEL:
W. Larkin Radney IV
John M. Johnson
William S. Cox, III
Clinton T. Speegle
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
The Clark Building
400 North 20th Street
Birmingham, AL  35203-3200
(205) 581-0700
(205) 581-0799 (Facsimile)

James C. King
Justin L. Jones
KING, WILEY, WILLIAMS & McKERALL, L.L.C.
1824 Third Avenue South
PO Box 1688
Jasper, AL 35502-1688
(205) 221-3500

Winston J. Thompson, III
Nichon Shannon
THE COCHRAN FIRM
610 East Amite Street
Jackson, Mississippi 39201
(601) 812-1000

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which served a copy upon registered participants.

Respectfully submitted,

<u>s/ W. Larkin Radney IV</u>
Of Counsel