City of Hattiesburg v. Hercules, Inc. et al.

Case No. 2:13-CV-208-KS-MTP

**Kevin Boyle, PhD.**

December 2, 2015

# eDeposition Services

(844) 533-DEPO
production@edeposition.com
www.edeposition.com

Ex. 1

Kevin Boyle, PhD.
December 2, 2015

---

Page 3

```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
                       EASTERN DIVISION
- - - - - - - - - - - - - - - -
CITY OF HATTIESBURG,                    :
                                        :
             Plaintiff,                 : CASE NO:
                                        :
vs                                      : 2:13-cv-208-KS-MTP
                                        :
HERCULES, INC., et al.,                 :
                                        :
             Defendant.                 :
- - - - - - - - - - - - - - - -


         VIDEOTAPED DEPOSITION OF KEVIN BOYLE, Ph.D.


DATE:          December 2, 2015
TIME:          9:00 a.m.
LOCATION:      55 East Main Street
               Christiansburg, VA 24073

REPORTER:      CECELIA BROOKMAN, RPR
               Registered Professional Reporter
```

1    APPEARANCES:
2
3    For the Plaintiff:
4            LIGHTFOOT FRANKLIN WHITE, LLC
             Attorneys at Law
             400 20th Street North
5            Birmingham, AL 35203
             205.581.0786
6            lradney@lightfootlaw.com
7            BY:  MR. W. LARKIN RADNEY IV, ESQ.
8
     For the Defendants:
9
             BAKER DONELSON BEARMAN, CALDWELL & BERKOWITZ, PC
10           Attorneys at Law
             4268 I-55 North
11           Jackson, MS 39211
             601.351.2414
12           ryarborough@bakerdonelson.com
13           BY:  MR. RICHARD F. YARBOROUGH, JR., ESQ.
14
     ALSO PRESENT:
15
             Mr. Steve Oakes, Videographer
16
17
18
19
20
21
22
23
24

---

Page 2

```
1                        INDEX
2    EXAMINATION BY:                           PAGE
3
     Mr. Yarborough                             5
4
5
6
                     *  *  *  *  *  *
7
8
9
                       EXHIBITS
10
     EXHIBIT NO.                                PAGE
11
12   Exhibit 1      Notice of deposition        5
13   Exhibit 2      Report by Dr. Boyle         6
14   Exhibit 3      References                  49
15   Exhibit 4      6/14/13 letter              95
16   Exhibit 5      Court order                 147
17
18
19
                     *  *  *  *  *  *
20
21
22
23
24
```

---

Page 4

```
1    (9:03 a.m.)
2
3              (Exhibits Nos. 1 and 2 were marked
4    for identification.)
5              THE VIDEOGRAPHER:  On the record at
6    9:03 a.m.  My name is Steve Oakes, the
7    videographer.  Today's date is December the
8    2nd, 2015.  We're taking the deposition of
9    Dr. Kevin Boyle.
10             We're in Montgomery County General
11   District Court, in Christiansburg, Virginia.
12   The style of the case is City of Hattiesburg
13   versus Hercules, Inc., et al.
14             Our court reporter is Cece, and if
15   you'd swear the witness in and the attorneys
16   please identify yourselves.
17             (The witness was duly sworn.)
18             MR. RADNEY:  Larkin Radney for the
19   City of Hattiesburg, plaintiff.
20             MR. YARBOROUGH:  Rick Yarborough for
21   the defendants Hercules and Ashland.
22
23
24
```

1 (Pages 1 to 4)

Kevin Boyle, PhD.
December 2, 2015

Page 5

1            KEVIN BOYLE, Ph.D.,
2  having been sworn by the Registered Professional
3  Reporter, Cecelia Brookman, to tell the truth, the
4  whole truth, and nothing but the truth, testified as
5  follows:
6
7            EXAMINATION
8  BY MR. YARBOROUGH:
9        Q.   At the outset, I don't think there
10 will be any stipulation other than deposition being
11 taken pursuant to the Federal Rules of Civil
12 Procedure, and I marked as Exhibit 1 the notice of
13 deposition.
14            Will you state your full name,
15 please.
16       A.   Kevin John Boyle.
17       Q.   Could you give me your address.
18       A.   275 Orchard Hill Lane, Newport,
19 Virginia.
20       Q.   And you hold a doctorate in
21 economics?
22       A.   Doctorate in agricultural economics.
23       Q.   Agricultural economics.  So I can
24 refer to you as Dr. Boyle?

Page 6

1        A.   Yes.
2        Q.   That's a Ph.D.?
3        A.   Yes.
4        Q.   Dr. Boyle, you have been retained by
5  counsel for the City of Hattiesburg, Mississippi, to
6  serve as an expert witness in this litigation, have
7  you not?
8        A.   Yes.
9        Q.   When were you retained?
10       A.   I don't remember the exact date, but
11 it was late August, beginning of September of this
12 year.
13       Q.   That's of this year?
14       A.   Yes.
15       Q.   I'm going to hand you which I earlier
16 provided you before we started your deposition, which
17 I marked as Exhibit 2, and ask you if you will
18 confirm that in connection with your retention, you
19 generated an expert report in this litigation?
20       A.   That's my expert report and my CV.
21       Q.   And I believe that the report is
22 dated September 28th, 2015; is that correct?
23       A.   That is correct.
24       Q.   Now, if you were retained in late

Page 7

1  August or in early September, I would take it that
2  you had about a month from the date of your retention
3  to the date of the generation of your report.
4        A.   That would be correct.
5        Q.   Since generating your report on
6  September 28th, have you done any other work on the
7  case?
8        A.   The only work I've done is preparing
9  for this deposition with counsel.
10       Q.   Let's talk about that.  And I'm not
11 interested in exact conversations with counsel, but
12 just general, what did you do to get ready for your
13 deposition today.  What did you view and who did you
14 speak with?
15       A.   I did not speak with anybody but
16 counsel, and I reviewed the basic material that I had
17 gone over in preparing my report, to refresh my
18 memory.
19       Q.   That would be your report and the
20 literature that you relied upon in generating your
21 report?
22       A.   That would be correct.
23       Q.   When was your meeting with counsel?
24       A.   Yesterday.

Page 8

1        Q.   And where was that held?
2        A.   At a hotel in Blacksburg.
3        Q.   And how long was that meeting?
4        A.   It was most of the day.
5        Q.   Was that the occasion that you
6  reviewed the materials that you just told me about?
7        A.   No, I reviewed the materials in
8  advance of that meeting, also.
9        Q.   So what was done yesterday in
10 addition to the review of materials?
11       A.   We went through the materials
12 together.
13       Q.   In this report that you prepared,
14 generally what you've done is taken the facts --
15 there have been certain facts that have been provided
16 you in this case, and you've assigned various degree
17 percentages of property diminution to certain
18 properties surrounding the Hercules site at
19 Hattiesburg?
20            MR. RADNEY:  Object to the form.
21 BY MR. YARBOROUGH:
22       Q.   That's generally what your report
23 was.
24            THE WITNESS:  Can I just have that

2 (Pages 5 to 8)

Kevin Boyle, PhD.
December 2, 2015

Page 9

1    read back to me, please.
2           (The record was read by the reporter
3    as requested.)
4           THE WITNESS:  I've taken information
5    related to the Hattiesburg case and used
6    them to calculate the percentage diminution.
7    BY MR. YARBOROUGH:
8       Q.   That's what I was asking just in a
9    general sense.  How many occasions have you prepared
10   an expert report in similar circumstances, in a
11   setting similar to this, prior to this one?
12      A.   What do you mean by similar?
13      Q.   Well, I mean, where you have gone in
14   and looked or assigned property diminutions around a
15   contaminated site in an environmental setting, and
16   issued an expert report in litigation.
17      A.   I have done two previous ones.
18      Q.   Two previous ones.  And are those
19   identified in your expert report?  Have you provided
20   information concerning those?
21      A.   One of those I have.
22      Q.   Tell me which one that is.
23      A.   That's the Duncan, Oklahoma, case.
24      Q.   And that was a case involving

Page 10

1    Halliburton?
2       A.   Correct.
3       Q.   And what about the second?
4       A.   The second one, I'm under a
5    confidentiality order, and it was never completed.
6       Q.   Where was -- you can't even tell me
7    where the site was?
8       A.   I don't think I'm supposed to say
9    anything about that case.
10      Q.   Can you tell me how long ago it was?
11      A.   10 to 15 years.
12      Q.   10 to 15 years ago?
13      A.   Yes.  That's a rough guess.
14      Q.   Did you prepare an expert report?
15      A.   I did not prepare a report that was
16   submitted.
17      Q.   But you did a similar type study as
18   what you did here?
19      A.   I did an analysis of property values.
20      Q.   And was that in the litigation
21   context?
22      A.   Yes.
23      Q.   And those are the only two occasions,
24   prior to your assignment in this case, where you have

Page 11

1    addressed, in a litigation setting, alleged property
2    diminution which may have resulted as a result of
3    contamination, environmental contamination?
4       A.   That is correct.
5       Q.   How many times have you testified in
6    court in your field of expertise?
7       A.   Twice.
8       Q.   And one of those had been in the
9    Duncan, Oklahoma, in connection with the Duncan,
10   Oklahoma, retention?
11      A.   No.
12      Q.   Tell me about your court involvement.
13      A.   My first court was in Vermont, where
14   a developer cut timber on the state's only wilderness
15   area, and bulldozed a road down to the lake for
16   access for rowing, and I testified on the damages to
17   the state from the illegal timber harvesting and
18   bulldozing of the road.
19      Q.   What state was that in?
20      A.   Vermont.
21      Q.   Approximately how long ago was that?
22      A.   That would be 10 to 15 years.
23      Q.   And was that before a judge or a
24   jury?

Page 12

1       A.   Judge and jury.
2       Q.   And what was the second occasion that
3    you have testified in court?
4       A.   The second was when the Clinton
5    administration closed down timber harvesting on the
6    Tongass National Forest.  There were two pulp and
7    paper companies operating in the area.  One was
8    insolvent, and their note was owned by a conglomerate
9    of Japanese industry banks, and they sued the U.S.
10   government for breach of contract, and I was a
11   witness for the U.S. government.
12      Q.   Are those the only two occasions
13   you've testified in court?
14      A.   Yes, they were.
15      Q.   And neither one of those involved the
16   issue of environmental contamination?
17      A.   Well --
18      Q.   Chemical contamination.
19      A.   Neither of them involved chemical
20   contamination.
21      Q.   So the issue that you've addressed in
22   your report, that you tendered here, would be totally
23   different from the issues that you addressed in your
24   prior two occasions in court?

3 (Pages 9 to 12)

Kevin Boyle, PhD.
December 2, 2015

Page 13

1    A.   Well, the basic conceptual framework
2  when you think about values as an economist, would be
3  similar, across them, basically operating from a
4  microeconomics framework that would be common to
5  underlying them.
6    Q.   But you weren't addressing a
7  situation anywhere analogous here, factually, in
8  terms of an impact of environmental contamination on
9  surrounding properties?
10    A.   I was not on contamination on
11  surrounding properties.
12    Q.   Thank you.  So I take it, then,
13  you've never have been tendered as an expert witness
14  in a court report proceeding in that particular area,
15  chemical contamination, impact on surrounding
16  properties?
17    A.   So I was -- if you mean by tendered,
18  I'd interpret that the same as retained?
19    Q.   Perhaps my question was clumsy.  Let
20  me say, you've never been accepted by a court in any
21  litigation where you sought to -- and recognized as
22  an expert in the field that you're addressing here in
23  this particular report, environmental contamination?
24  This is the first time?

Page 14

1    A.   I have been accepted in the courts in
2  terms of environmental contamination.
3    Q.   Chemical contamination?
4    A.   Chemical contamination, in NTBE cases
5  in New Jersey.
6    Q.   You didn't tell me about those.
7  Maybe my question was not precise enough.
8    So in addition to these two other
9  times you've testified in court, there's others?
10    A.   No.  When I interpret what your
11  question is, when you asked me if I was accepted,
12  there were cases in NTBE cases where there were
13  Daubert challenges that the judge ruled that my
14  testimony was acceptable, and that's the way I
15  interpreted your question.
16    Q.   Can you identify that particular case
17  for me?
18    A.   There's an NTBE case in New Jersey.
19  I don't remember the name of it offhand.  It's in my
20  deposition history, where there were 10 oil companies
21  that are in that case.  And then there's one in
22  Puerto Rico that's also my deposition.
23    Q.   Is this in a regulatory proceeding or
24  a civil proceeding?

Page 15

1    A.   Civil, I believe.  It's not a
2  regulatory.
3    Q.   Who were the plaintiffs bringing that
4  claim?
5    A.   The one in New Jersey is the Attorney
6  General of New Jersey and the DEQ, and then in
7  Puerto Rico, I am not sure exactly whether it's an
8  attorney general or the Department of Environmental
9  Quality.
10    Q.   And who retained you in these two
11  cases?  What entity retained you?
12    A.   I was working with a law firm of Jack
13  E. Dema.
14    Q.   What party were they representing?
15    A.   They were representing the State of
16  New Jersey and Puerto Rico in each of those cases.
17    Q.   That would be the plaintiffs, the one
18  initiating the litigation?
19    A.   Yes.
20    Q.   Has all of your retentions to date,
21  in the legal context, been on the side of the
22  plaintiff?
23    A.   No.
24    Q.   Which ones were not?

Page 16

1    A.   I've worked on a number of different
2  ones, and I'll have to go way back.  I don't remember
3  all of them.  The first case I've worked for the
4  defendant was Eagle Mine case in Colorado, which was
5  the first natural resource damage case, I believe
6  back in the mid 1980s.
7    Q.   And was that a case you just prepared
8  a report and never testified or gave a deposition?
9    A.   I never testified, gave a deposition
10  or provided a report in that one.
11    Q.   Didn't do any of that?
12    A.   No.
13    Q.   Any other retentions?
14    A.   I was retained by Exxon in the Exxon
15  Valdez case.
16    Q.   Did you prepare a report in that
17  case?
18    A.   There were documents prepared but
19  there was no final report prepared because that case
20  was settled.
21    Q.   I take it from your earlier testimony
22  regarding both of those, you were not -- you didn't
23  testify as an expert in connection with that
24  litigation?

4 (Pages 13 to 16)

Kevin Boyle, PhD.
December 2, 2015

Page 17

1    A.   The first one I was a research
2 analyst when I was in graduate school.  The second
3 one, it settled.  It didn't go to court.
4         Q.   Make sure I understand how many
5 depositions you've given.  Maybe we covered them.
6 Have we, in the matters that you've actually given a
7 deposition?  I take it would be -- is it three?
8    A.   No, there are more that I've given
9 depositions.
10        Q.   Approximately how many?
11   A.   I would have to check.  Probably
12 somewhere in the range of 10.
13        Q.   Within the last five years, how many
14 depositions have you given?
15   A.   Maybe in the range of five.
16        Q.   The percentage of your time over the
17 past five years would you say was involved being
18 retained as an expert in connection with litigation,
19 would it be a very small part, just only five times
20 in five years?
21   A.   I would say it's a small part of my
22 time.
23        Q.   Would you say it's a miniscule part
24 of your time, over the past five years?

Page 18

1    A.   I don't know what you mean by
2 miniscule.
3         Q.   It's certainly not a large component
4 of your body of work in your field of economics, is
5 it?
6    A.   No, most of my time is as a faculty
7 member.
8         Q.   I mean, you know that there are
9 individuals who spend the majority of their time in
10 court as expert witnesses.  That's how they earn a
11 living.  You're not one of those individuals, so to
12 speak?
13   A.   I don't earn my living as an expert
14 witness.
15        Q.   I understand you have a degree in
16 agricultural --
17   A.   Economics.
18        Q.   -- economics.  So you're an
19 economist?
20   A.   Correct.
21        Q.   Why don't you tell me what an
22 economist is.
23   A.   An economist is someone who basically
24 studies tradeoffs and decisions that individuals or

Page 19

1 firms, or governments or other types of entities
2 make, and the implied values, benefits and costs that
3 occur due to those decisions.
4         Q.   And do you hold any type of license
5 or is this just a degree that you hold?
6    A.   I have a Ph.D.
7         Q.   And was that in 1983, you said?
8    A.   I have to check.  I think it's '84.
9         Q.   And where did you receive that?
10   A.   University of Wisconsin.
11        Q.   Now, in your expert report that you
12 have there before you, am I correct that you predict
13 future diminution in value of properties around the
14 Hercules site at Hattiesburg?
15   A.   I predict the values that would be a
16 diminution in property values due to the
17 contamination of properties, the contamination that
18 arose from the Hercules facilities.
19        Q.   As I understand your report, and
20 correct me if I'm wrong, has this diminution, does it
21 presently exist?
22   A.   It may have started to but I don't
23 think that it would be fully manifested at this time.
24        Q.   Where do you get that idea, that it

Page 20

1 may have started?
2    A.   Well, there's some information about
3 contamination but the contamination has not been made
4 public, to my knowledge, so that everyone knows that
5 there could be potential contamination present in
6 their houses, that this was new information that has
7 just been developed in the past year.
8         Q.   I'm really not asking about
9 contamination, sir.  I'm asking about measured
10 diminution.  You say it may have started, the
11 diminution may have started.  What do you base that
12 on?  How would you go about measuring that as of
13 today; as of today, as we sit here today?
14   A.   I'm telling you -- you're saying --
15 you're not talking about contamination, but
16 contamination is basically the agent that would be
17 present to affect people's decisions.
18        Q.   I'm not arguing with you in any way,
19 but I need to get an answer to my question.  You said
20 that the diminution has already started to some small
21 degree.
22   A.   I said it may have started.
23        Q.   Tell me, why do you say that?  How
24 would you go about measuring that?

Kevin Boyle, PhD.
December 2, 2015

Page 21

1         A.   Well, there's two ways that you would
2    go about measuring it.
3         Q.   Let's go through those.
4         A.   So the way that I went about doing it
5    is you take studies that have been done to look at
6    actual changes in property values in other places,
7    that have experienced contamination, and the effects
8    are shown in the market, and you use that to predict
9    what would be or what the contamination diminution in
10   value would be at the site, and the hit for the
11   community in Hattiesburg.
12        Q.   And what would be the second way?
13        A.   And the second would be to do an
14   actual market study in Hattiesburg, but that would
15   not be possible at this time because the market has
16   not had a chance to show all of the effects.  And
17   then even if I wanted to do that, I would need
18   information on contamination in terms of every single
19   property in the community to do that market analysis,
20   and that information is not available.
21        Q.   Now, when you say -- did I understand
22   you to say it was impossible to do a market study
23   now?
24        A.   Right, because to do an economic

Page 22

1    analysis of the market, you would estimate a Hedonic
2    model.  Let me finish -- can I finish my answer?
3         Q.   Sure.
4         A.   So you'd estimate a Hedonic model.  A
5    Hedonic model would look at actual sales prices of
6    properties.  That model, to estimate, would need to
7    be based on the people had full information of the
8    contamination that was present.  But then I would
9    need a variable to put in the model for the
10   contamination, so you'd need to know what that
11   contamination condition was in each property, to
12   estimate that model.
13        Q.   Doctor, maybe we're talking about
14   apples and oranges here, but when you say it's
15   impossible to go out there today and do a market
16   analysis, that's simply not true, is it?  Couldn't a
17   licensed appraiser go out and do appraisals of
18   property around this site, and issue valid appraisals
19   as of this time?
20        A.   So you're changing what I said.  You
21   asked me what I would do as an economist, and I told
22   you that I would do two approaches.  Listen, I'm not
23   an appraiser.  I would do the established economic
24   approach which would be to estimate a model that

Page 23

1    showed those effects.  If those effects are not
2    there, you need to use information from another
3    market.
4              An appraiser could go out and do
5    appraisals as well, but the appraiser needs
6    comparable information, and still needs to have that
7    information have manifested itself in the market in
8    order to do an appraisal.
9         Q.   So you would supplant your expertise
10   or overlay that upon a licensed appraisal in terms of
11   criticizing his ability to do an appraisal at this
12   time?
13        A.   No.
14        Q.   What are you telling me now?
15        A.   I'm just telling you that you need
16   information in the market of the effects in order to
17   look at value.  Both appraisers and economists look
18   at value.  We just look at it different ways.  I'm
19   not testifying as an appraiser or supplanting an
20   appraiser.  I've worked with appraisers.  We provide
21   complementary information.
22        Q.   But again, in your expert report, do
23   you agree with me that you are predicting future
24   diminution in value of these properties that does not

Page 24

1    presently exist?
2         A.   I would say that the values have
3    already been influenced.  You'd need the transactions
4    to occur, with people having the knowledge to be able
5    to measure it.
6         Q.   Let's go at it this way.  You
7    predicted in your report that, just as an example,
8    that the single family residents have sustained or
9    will sustain roughly 15 percent diminution?
10        A.   That is the prediction in my report.
11        Q.   That diminution does not presently
12   exist, does it, if we were to do a market study?
13        A.   I would say that there is an effect,
14   but the full effect is not there because people are
15   not fully aware of the contamination at this point in
16   time.
17        Q.   I think that's what you've earlier
18   testified to and said in your report, so that's why I
19   asked the question.
20              So we're talking about a prediction
21   that you believe will take place in the future, that
22   will result in diminution of these property values?
23        A.   That will be manifested when the full
24   information of the contamination is available.

6 (Pages 21 to 24)

Kevin Boyle, PhD.
December 2, 2015

Page 25

1    Q.   In your report, you use -- I noticed
2  the word prediction or predict or predicted.  In
3  fact, it's the fifth word in your report there.  And
4  I went and Googled that, and one of the definitions I
5  found was an educated or informed guess.  Would you
6  agree with that definition of prediction?
7        A.   That's one type of prediction but
8  that's not the type of prediction that I did.
9        Q.   You wouldn't define, use the word
10  predict or prediction as an informed or educated
11  guess?
12        A.   I'm saying that's one type.  I used a
13  statistical model to make a prediction.  That's not
14  an informed guess.  That's using actual information
15  to make a prediction.
16        Q.   Now, you mentioned a couple times
17  that you have never worked as a real estate
18  appraiser.
19        A.   I don't know if I've mentioned a
20  couple times.  I'm not an appraiser.
21        Q.   Let me ask you, have you ever worked
22  as a real estate appraiser?
23        A.   No.
24        Q.   Have you ever had any training in

Page 26

1  real estate appraisal?
2        A.   No.
3        Q.   Have you ever had a license in real
4  estate appraisal?
5        A.   No.
6        Q.   Isn't it true -- are you aware that
7  most states require real estate appraisers to be
8  licensed?
9        A.   I understand that real estate
10  appraisers are licensed.
11        Q.   And that requires formal training and
12  examination, oversight under a supervisor prior to
13  licensure.  Are you aware of that?
14        A.   I'm aware of that.  I'm head of the
15  real estate program at Virginia Tech.  We teach our
16  students about appraisals.  We have appraisers come
17  in and talk to them about what they do, and I've done
18  work for appraisers.  Not appraising, but I just did
19  a study of customary and reasonable fees for Virginia
20  appraisers, to help them set their market fees to
21  meet the Dodd-Frank requirements.
22        Q.   But what your work as an economist is
23  markedly different than what a licensed real estate
24  appraiser does; is that correct?

Page 27

1        A.   I would not say it's markedly
2  different.  We do the same things to look at values.
3  Appraisers typically look at three similar sales.  As
4  an economist, we look at all sales in the market to
5  make our assessments.
6        Q.   What sales did you look at in the
7  Hattiesburg market, to make your assessment in your
8  report?
9        A.   In that one, what I did is I relied
10  on sales that had been done in other markets.  I
11  believe there are about 58 studies that have been
12  done.  And then a meta-analysis was done to summarize
13  those, and then you use that equation to make a
14  customized prediction of the impact in Hattiesburg.
15        Q.   What sales or other market data did
16  you utilize that were taken from the immediate
17  Hattiesburg area in conjunction with preparation of
18  your report and issuance of opinions you reached?
19  Would the answer be none?
20        A.   I did not use any Hattiesburg sales
21  in my report.  I used the meta-analysis to make that
22  customized or tailored prediction.
23        Q.   How many times have you been in
24  Hattiesburg?

Page 28

1        A.   Once.
2        Q.   And when was that?
3        A.   That was a few years ago.
4        Q.   That was not in any way involved with
5  this litigation, Hercules, Hattiesburg?
6        A.   That is correct.
7        Q.   So you've not even visited this
8  particular area in connection with your retention or
9  preparation of your report?
10        A.   I have not.
11        Q.   Never been around these properties?
12  Can you describe the neighborhood around the site?
13        A.   I basically looked at it on Google
14  Earth, and gone down and looked at the streets to
15  know what it looks like around there, and know that
16  the university is nearby, to the west, I believe, and
17  that there's some other industrial properties,
18  probably to the north, and residential to the south.
19        Q.   What's the name of the university
20  that's there?  Do you know?
21        A.   I forget the name of it right now.
22        Q.   Does the University of Southern
23  Mississippi sound right?
24        A.   Southern Mississippi.

7 (Pages 25 to 28)

Kevin Boyle, PhD.
December 2, 2015

Page 29

1          Q.   Could it be Ole Miss?
2          A.   No, it's not Ole Miss.
3          Q.   What about Mississippi State?
4          A.   It's not Mississippi State.
5          Q.   Do you know what counties in
6    Mississippi that the municipal boundaries of the City
7    of Hattiesburg lie?
8          A.   I don't remember the county names
9    right now.  I remember that there is a county line
10   that cuts nearby but I don't remember the name of the
11   county lines.
12         Q.   Do you know how many counties are
13   encompassed in the Hattiesburg city limits?
14         A.   I don't know that right now.
15         Q.   And you don't know the names of the
16   counties?
17         A.   I don't remember the names of the
18   counties.
19         Q.   When you have worked in these earlier
20   cases -- let me just ask you about the Duncan case,
21   in which -- this was a case that you'd been retained
22   earlier in litigation in a claim against Halliburton;
23   is that correct?
24         A.   Yes.

Page 30

1          Q.   And you were working for the
2    plaintiffs in that case?
3          A.   I was.
4          Q.   And those were property owners around
5    the Halliburton site?
6          A.   Yes.
7          Q.   Did you -- before you issued a
8    report -- did you issue a report in that case?
9          A.   Yes.
10         Q.   Before you issued a report in that
11   case, did you travel to Duncan?
12         A.   I did.
13         Q.   Did you visit the site?
14         A.   I did.
15         Q.   You felt in that situation, it was
16   important enough for you to go down -- where was
17   that -- when you initiated that trip, did you leave
18   the Virginia area and travel to Duncan, Oklahoma?
19         A.   Yes.
20         Q.   For the purpose of -- on of the
21   purposes was visiting that area of real estate that
22   was involved in the litigation?
23         A.   Yes.
24         Q.   And did you go out and look at the

Page 31

1    properties that were involved?
2          A.   I did.
3          Q.   Did you get any other information
4    that was local to the Duncan area, that assisted you
5    in preparation of your report in that case?
6          A.   I got information similar to -- in
7    Duncan, similar to this one that assisted me in the
8    case.  I'm not sure whether I got it on that trip or
9    this trip.
10              At that trip, I went around and
11   looked at properties because that was a different
12   case than this one.  In that case, what we were
13   looking at was, as you said, it was a class action,
14   and individual properties, and my results were going
15   to be combined or I had to rely on an appraiser who
16   was giving me the values of the individual properties
17   that the percentage diminution was applied to.
18              In this case, we weren't thinking
19   about individual properties, we were just thinking
20   about what the overall tax loss was to the community
21   of Hattiesburg.  So it was a different context in
22   what we were looking at specifically.
23         Q.   So in your trip to Duncan, you met
24   with some local real estate appraisers?

Page 32

1          A.   I met with some appraisers and
2    realtors and attorneys.
3          Q.   And during those meetings did you
4    obtain some market data that was generated there in
5    Duncan, Oklahoma, pertinent to these properties?
6          A.   Not at those meetings.  It was
7    provided to me subsequently.  And the market data was
8    different in that case because Halliburton was
9    buying, or in the process of buying up properties of
10   the plaintiffs, and we needed the sale prices of
11   those properties.  Then the appraised value was not
12   actual market sales but it was the appraisers going
13   in and appraising the properties without
14   contamination.
15         Q.   What you're telling me, as I
16   understand it, was that your retention in the Duncan,
17   Oklahoma, litigation was such that you felt like you
18   needed to go down and visit the site, meet with
19   attorneys and real estate people.  Was it some
20   brokers, real estate brokers that you mentioned?
21         A.   I didn't say brokers.  I do not know
22   what their specific designations were right at this
23   time.
24         Q.   But the Hattiesburg site is so

8 (Pages 29 to 32)

Kevin Boyle, PhD.
December 2, 2015

Page 33

1  different, you didn't need to do any of that.  Your
2  assignment of what the issue you were addressing in
3  Hattiesburg differed and that's why you didn't need
4  to goes to Hattiesburg?
5       A.   Can you ask that question?  There's a
6  lot of different parts to what you said there.
7       Q.   I'm not trying to confuse you.  What
8  I understood you to tell me, the issues you were
9  addressing in the Duncan, Oklahoma, litigation, you
10  needed to make a trip there and get certain
11  information that was there local, and that helped you
12  in doing the work that you were asked to do in the
13  Duncan, Oklahoma, litigation.  But here in the
14  Hattiesburg case, you didn't need to do that to
15  address the issues you were asked to address?
16       MR. RADNEY:  Object to the form.
17       THE WITNESS:  I was not collecting
18  data in there. I went down to understand
19  the layout of the community and where
20  properties were, because we were going to be
21  making predictions for individual
22  properties.
23       The difference here wasn't saying
24  anything about the Hattiesburg or Duncan

Page 34

1  contamination sites.  Here the difference
2  was I was asked to do a different
3  question in terms of just looking at the tax
4  losses to the City of Hattiesburg.
5  BY MR. YARBOROUGH:
6       Q.   So a trip to Hattiesburg would have
7  been meaningless to the work you were doing?
8       A.   I don't think it would have changed
9  my report at all.
10       Q.   Would it have provided you any
11  information you might have utilized had you been
12  there?
13       A.   I don't think going to Hattiesburg
14  would have changed my report.
15       Q.   It would have just been a waste of
16  time to go?
17       A.   I don't know whether it would have
18  been a waste of time.  I don't think it would have
19  influenced my report.
20       Q.   Because the local information there,
21  the market data and what have you, is not germane --
22  you don't view that as important.  You're looking at
23  what's happened at other sites in generating these
24  diminution values.  Is that what you're saying?

Page 35

1       A.   I'm not saying the market data isn't
2  germane.  I'm saying that when you have new
3  information in the market that people do not fully
4  have, then that market information cannot be relied
5  on in a credible economic analysis used in the
6  standard procedures of the literature.
7       Q.   How long were you in Duncan?  Did you
8  all make one trip?
9       A.   I made one trip.
10       Q.   How long were you there?  How many
11  days?
12       A.   I was just there one day.
13       Q.   And how many people, total, did you
14  meet with during that trip?
15       A.   Maybe about nine, 10.
16       Q.   In conjunction with your work in the
17  Hattiesburg case, you've told me earlier that since
18  you've not been to Hattiesburg, you wouldn't have met
19  with anyone there, but have you interviewed anyone
20  from the Hattiesburg area, be it a real estate
21  appraiser, a lender, a mortgage originator, a real
22  estate salesperson, someone in the field of real
23  estate, who addresses, as a result of their
24  profession and their work, property values in the

Page 36

1  Hattiesburg area?
2       A.   I have not interviewed anyone.
3       Q.   Would information like that -- so
4  information like that was not important to you in
5  your work, in connection with preparing your report
6  and giving your opinions in this case?
7       THE WITNESS:  Can I have that read
8  back to me.
9       (The record was read by the reporter
10  as requested.)
11       THE WITNESS:  What I'm saying is
12  information on the Hattiesburg market would
13  not have been appropriate for a credible
14  economic analysis because the information
15  that -- on the contamination that's not been
16  fully disbursed to people in the market.
17       When you do a Hedonic analysis, which
18  is the economic approach where you look at
19  how property prices are affected by
20  attributes of property, those -- there has
21  to be the reasonable knowledge that buyers
22  and sellers have that information in their
23  hands when they're making the transactions.
24       When the new information about the

9 (Pages 33 to 36)

Kevin Boyle, PhD.
December 2, 2015

Page 37

1    dust contamination from -- excuse me -- from
2    the dioxathion, toxaphene are in the attics
3    that just occurred this year, there's no way
4    that that information can be fully
5    assimilated into the market at this time.
6    BY MR. YARBOROUGH:
7        Q.   When will it be assimilated?  Can you
8    predict that?
9        A.   I cannot predict when it will be
10   assimilated.
11       Q.   I may have asked you this.  I'm
12   shifting gears here.  You told me you never worked as
13   a real estate appraiser.  Have you ever worked as a
14   real estate broker or real estate agent?
15       A.   I have not.
16       Q.   You never listed any houses for sale
17   or commercial properties, or things of that nature?
18   Never been licensed to do that?
19       A.   I've listed properties for sale, but
20   I've sold them on my own.
21       Q.   Not for any third party, not in a
22   professional sense?
23       A.   No.
24       Q.   Are you familiar with a -- this is a

Page 38

1    real estate question -- a membership designation
2    called MAI?
3        A.   Yes.
4        Q.   What does MAI stand for?
5        A.   MAI is, I believe, the highest
6    designation that an appraiser can have.
7        Q.   And I believe you said you, in your
8    work, you work with appraisers from time to time?
9        A.   Yes.
10       Q.   Have you worked with MAI appraisers?
11       A.   Yes.
12       Q.   And do you recognize their expertise
13   in the appraisal field?
14       A.   Yes.
15       Q.   That MAI, does it stand for the
16   appraisal institute?
17       A.   Yes.
18       Q.   Are you familiar with a designation
19   conferred by the appraisal institute, known as SRA?
20       A.   I have heard of SRA before.
21       Q.   Do you know what SRA stands for?
22       A.   I don't remember what that is right
23   at this time.
24       Q.   If I told you that it stood for

Page 39

1    senior residential appraiser, would that ring a bell
2    or not.  You just don't know?
3        A.   That's possible.  I don't have all
4    the different appraisal designations in my memory.
5        Q.   And you don't hold a designation,
6    either, as an MAI appraiser or a SRA appraiser?
7        A.   I answered that I'm not an appraiser
8    so I'm not any type of appraiser.
9        Q.   Have you ever heard of the acronym in
10   connection with appraisers called ASB?
11       A.   I have heard of the acronym but I'm
12   not remembering what the words are that go with it
13   right now.
14       Q.   What about the acronym USPAP?
15       A.   I don't remember hearing that one.
16       Q.   Let me ask you this.  I'm not trying
17   to test your acronym knowledge, necessarily, but are
18   you familiar, have you ever heard of the Uniform
19   Standards of Professional Appraisal Practice?
20       A.   Yes.
21       Q.   The USPAP.  Does that help?
22       A.   Yes, I'm familiar with them.
23       Q.   I may have asked you this, I'll move
24   on.  You don't hold any real estate license and never

Page 40

1    have?
2        A.   No.  You've asked and I've answered
3    that.
4        Q.   In any state?
5        A.   I do not hold a real estate license
6    in any state.
7        Q.   And never have?
8        A.   Never have, but I do have extensive
9    experience, from an economic perspective, studying
10   the effects of environmental conditions on property
11   values.  I have over two decades of experience as an
12   economist, publishing in the top journals in our
13   field and using that to support decision making.
14       Q.   Are you licensed by any state to
15   evaluate the effects of market values, of detrimental
16   conditions to real property?
17       A.   I've answered before that I don't
18   have any license.  As an economist there's no
19   licensures that we are provided or eligible for.
20       Q.   Would it be true that -- I guess it
21   would be a violation of law for you to travel to
22   Hattiesburg, examine a given property, and issue an
23   appraisal in terms of fair market value in the lender
24   context.  That would be improper for you to do in

10  (Pages 37 to 40)

Kevin Boyle, PhD.
December 2, 2015

Page 41

1    that you're not qualified to do that?
2         A.   A lender could not use an assessment
3    of value that I did as an economist.
4         Q.   And I think maybe you've answered my
5    question.  Let me ask it a little simpler.  If we
6    could reach an agreement on price and terms, and I
7    had one of these homes that's addressed in your
8    report, and I asked you if you could go down to
9    Hattiesburg and issue a formal appraisal for me, that
10   I would use in connection with either the sale of the
11   house or a loan on my house, it would be illegal for
12   you to do that, wouldn't it, because you're not
13   licensed to do that?
14        A.   I don't know whether it would be
15   illegal.  I could offer my opinion on the value.  I
16   wouldn't be presenting myself as an appraiser.  But I
17   do not believe, under Dodd-Frank, that the bank could
18   use that information.  They have very stringent rules
19   that they have to follow.
20        Q.   And the bank or any third party, an
21   interested buyer or something like that, you couldn't
22   take on a liability like that, not being a licensed
23   appraiser, could you?
24        A.   I don't understand what you're

Page 42

1    asking.
2         Q.   We'll move on, then.
3              Do you claim any expertise in the
4    field of environmental engineering?
5         A.   No.
6         Q.   What about the field of toxicology?
7         A.   No.
8         Q.   Public health issues?
9         A.   No, except for those are all fields
10   that I use their information in my analysis, which is
11   standard for most economists.
12        Q.   I understand you can read and use
13   information, but you don't hold yourself as an expert
14   in the field of public health, do you?
15        A.   No.
16        Q.   Do you claim any expertise in the
17   field of environmental laws and regulations?
18        A.   No.
19        Q.   And you're not an attorney?
20        A.   No.
21        Q.   Have you ever been employed by the
22   United States EPA?
23        A.   I am currently employed by the
24   U.S. EPA.

Page 43

1         Q.   I mean, employed as an employee?
2         A.   I'm employed as an employee of
3    U.S. EPA.
4         Q.   What do you do for the EPA?
5         A.   I am on the U.S. EPA science advisory
6    board, economics committee, and I'm on the clean air
7    scientific advisory committee for the U.S. EPA.
8         Q.   Is this an appointment?  Are you
9    compensated?
10        A.   It's an appointment that I'm
11   compensated for.
12        Q.   What portion of your time do you
13   spend, over the last year, in connection with those
14   apartments?
15        A.   Very small.  A few days.
16        Q.   Do you receive a W-2 form from the
17   EPA for what little work you do for them?
18        A.   I believe, yes, I do.
19        Q.   You don't know whether it's a W-2 or
20   1099?
21        A.   Oh, okay.  It's a 1099.  Sorry.
22        Q.   Would you be more like an outside
23   consultant as opposed to a W-2 employee?
24        A.   No.  I'm a special government

Page 44

1    employee, so I'm not a consultant.
2         Q.   Do they withhold wages from your
3    paycheck?
4         A.   Do you mean do they withhold taxes?
5         Q.   Yes, like on a W-2.
6         A.   No, they don't because I don't claim
7    any restrictions there.
8         Q.   You don't go around holding yourself
9    out to be an employee of the U.S. government, the
10   EPA, do you?
11        A.   No.  I was just answering your
12   question honestly, as you asked it before.
13        Q.   Same question about any state
14   counterpart of environmental agency, Department of
15   Environmental Quality, state environmental agencies.
16   Have you ever -- are you an employee of any of those
17   counterparts?
18        A.   Could you ask that question clearly,
19   please.
20        Q.   Have you ever been employed by a
21   state Department of Environmental Quality?
22        A.   No.
23        Q.   Do you hold a degree, license, or
24   certification in the field of statistics?

11 (Pages 41 to 44)

Kevin Boyle, PhD.
December 2, 2015

Page 45

1          A.   I don't hold a degree or a
2    certification but I've taken many classes in
3    statistics and econometrics, which is the economic
4    use of statistics, from when I was an undergraduate
5    through a graduate student, and statistics are the
6    core of what I do in applied economics.
7          Q.   Do you hold yourself out as a expert
8    statistician?  Do you go into court proffering
9    yourself as an expert in that field?
10          A.   I would not proffer myself as a
11   statistician, but I would offer testimony on
12   statistics, as an economist.
13          Q.   You told me at the outset of the
14   deposition, Dr. Boyle, that you were retained in, I
15   believe August or early September of this year?
16          A.   That's the best of my memory.  I
17   didn't go back and check that.
18          Q.   Who exactly retained you to do your
19   work in this case?
20          A.   The attorney.
21          Q.   Larkin, here?
22          A.   Yes.
23          Q.   Did you know him before this contact?
24          A.   No.

Page 46

1          Q.   Do you know how he got in touch with
2    you, to retain you?
3          A.   He learned of me through some other
4    individuals that know me.
5          Q.   Were those attorneys?
6          A.   Those are economists.
7          Q.   Before we return to your report
8    that's been marked as Exhibit 2, can you describe for
9    me, as you sit there, the information -- all the
10   information that you were provided with?  And I'd
11   like to segregate for a moment, articles and things
12   that you reviewed versus facts that you were provided
13   with, in connection with preparing your report.
14          A.   So I was provided information on
15   contamination with excerpts from Mr. Horsak's report.
16   I was provided with information on the number of
17   properties with --
18          Q.   Did you say number?
19          A.   Number of properties affected, which
20   was from Ms. Herrin's report.  And then other
21   information was from public sources such as
22   unemployment rates and interest rates.
23          Q.   Can you run through the subject of
24   the public sources?

Page 47

1          A.   Everything is right here in my
2    report.  Let me go back.
3          Q.   Interest rate, unemployment rate.
4          A.   So distance was also from Mr. Horsak.
5    Unemployment rate, interest rate.  Those are the key
6    pieces of information that I used.
7          Q.   Was the interest rate that you
8    utilized in any way affected, related to the City of
9    Hattiesburg, Mississippi, or is this some rate
10   nationally?  How did you select that?
11          A.   It was information on the local rate
12   in Hattiesburg.
13          Q.   I'm sorry, what rate?
14          A.   Local rates in the Hattiesburg area.
15          Q.   And you just found that online or in
16   some publication?
17          A.   That was information online.
18          Q.   And what about the employment rate?
19   Was that for the State of Mississippi or Hattiesburg?
20          A.   So that was U.S. Bureau of Labor
21   Statistics data for the Hattiesburg metropolitan
22   statistical area, and the interest rate was
23   Hattiesburg-Laurel, Mississippi.
24          Q.   So the factual information in its

Page 48

1    entirety that you utilized -- and again, I'm putting
2    aside your literature that you relied on, but just
3    the factual information you were provided, one were
4    contamination excerpts from the Horsak report; the
5    indication of the number of properties involved from
6    the Herrin report; the distance factor -- I don't
7    know that you said factor, but distance provided by
8    the Horsak report; and the information that you
9    generated yourself, from public sources, the interest
10   rate, unemployment rate.  Does that cover all of
11   them?
12          A.   That covers the information that's
13   not in the publications.  There's other factual
14   information in the publications.
15          Q.   So you took this information, and
16   applied your knowledge, learning, expertise and the
17   literature that you relied upon, and generated your
18   expert report?
19          A.   I think that's correct.  I used the
20   information -- my professional knowledge of this
21   information, yes.
22          Q.   That would be generally how any
23   expert report would be prepared.
24          A.   I don't want to -- that's the

12 (Pages 45 to 48)

Kevin Boyle, PhD.
December 2, 2015

Page 49

1  standard of what I do.  I don't want to testify for
2  other experts.
3       Q.  Well, I can stipulate to that's
4  generally the standard, in my experience.
5            What individuals have you spoken
6  with, other than the attorneys who retained you,
7  about the case and your work on the case?
8       A.  I have not spoken to anyone else
9  about the case.
10           I could use a bathroom break whenever
11  it's convenient for you.
12           MR. YARBOROUGH:  Any time.
13           THE VIDEOGRAPHER:  Off the record at
14  9:57 a.m.
15           (A recess ensued.)
16           (Exhibit No. 3 was marked for
17  identification.)
18           THE VIDEOGRAPHER:  On the record at
19  10:05 a.m.
20  BY MR. YARBOROUGH:
21       Q.  Okay.  Dr. Boyle, you testified
22  before our break about the factual matters that you
23  were provided with, in connection with your retention
24  and preparation of your report, and I'd like to turn

Page 50

1  now to the literature, economic literature that you
2  relied upon in preparing your report, and I've handed
3  you what we marked as Exhibit 3 and ask you whether
4  that is a listing, in particular, a highlighted
5  listing of the articles that you reviewed and relied
6  upon in preparing your report.
7       A.  It appears to be a listing of records
8  from my report, yes.
9       Q.  This was the only copy so I may want
10  to look over here, at it.  It appears that there are
11  approximately 12 or so articles, and did you author
12  any of these articles?  I recognize Boyle on a
13  couple.  Or is this another Boyle?
14       A.  Can I just look for a minute, because
15  there is another Boyle in some of them.  So not all
16  of them that are highlighted have Boyle on them, so I
17  didn't -- so I'm confused on that.
18       Q.  Let me ask you my question.  Did you
19  author any of these reports that you relied on?
20       A.  I did author some of them, but the
21  Boyle and Kyle is a different Boyle that's not
22  related to me.
23       Q.  Would you identify the articles that
24  you relied on, that you were either an author or

Page 51

1  co-author, read the name of it?
2       A.  So the articles that I'm an author or
3  co-author are ones that I cited in my background
4  experience, but they're not ones I relied on in
5  developing my report.
6       Q.  So none of your work, in terms of
7  authorship that you've done in your career, you've
8  authored any articles in your career that you
9  relied upon in issuing this report, your report here?
10       A.  I relied on the general knowledge
11  from them, but not specific information that was used
12  in the report.
13       Q.  Now, are these the same references,
14  generally speaking, that you utilized in connection
15  with the report that you generated in the Duncan,
16  Oklahoma, litigation?
17       A.  Some are the same, some of the ones
18  from Duncan are not there.  I'd have to compare, but
19  there are commonalities between them, and there are
20  differences.
21       Q.  Would the report, the paper in the
22  Journal of Real Estate Research prepared by Simons
23  and Saginor, be one of the principal reports you
24  relied upon in preparing your report, Simons and

Page 52

1  Saginor?
2       A.  Yes.
3       Q.  I realize all of these may have had
4  some role in your review.  Would that be one of the
5  ones that kind of stands out as the most important?
6       A.  I wouldn't say that.  It's an
7  important one that's fundamental to what I did.
8       Q.  And some of these are less important?
9       A.  Yes.
10       Q.  I see one here, The Effect of an
11  Aquatic Invasive Species on Lake Front Property
12  Values.
13       A.  That's one I'm a co-author on, I said
14  I didn't rely on.  That was just part of my general
15  experience, looking at property values.
16       Q.  We're going to talk about the Simons
17  and Saginor report a little bit later in your
18  deposition, but I wanted to move on.  I try not to
19  ask the same questions over, but I'm going to ask
20  this one, and I apologize if I have, but it's an
21  important one and I promise I won't ask you again.
22           You didn't collect any real sales or
23  market data from Hattiesburg in connection with the
24  preparation of your expert report?

Kevin Boyle, PhD.
December 2, 2015

1    THE WITNESS: Can I have that read
2  back to me, please.
3    (The record was read by the reporter
4  as requested.)
5    THE WITNESS: I did not collect any
6  sales. I'd consider some of the
7  information, like the interest rate and
8  unemployment rates part of what you consider
9  part of the market data.
10 BY MR. YARBOROUGH:
11    **Q.  In terms of real estate transactions,**
12 **lending transactions, sales listings in Hattiesburg,**
13 **things of that nature, you didn't obtain or collect**
14 **any real property information like that?**
15    A.  I did not collect any property sales
16 data.
17    **Q.  And I take it, then, you have no**
18 **information about sales, loan market activity in**
19 **Hattiesburg, Mississippi, whether it's vibrant or**
20 **poor, or midstream?  You don't have any information**
21 **about that?**
22    A.  I saw information on that in, just,
23 you know, some of the -- I did a background, looking
24 on the internet when I got going but it's not in my

1  report.  I didn't rely on it.
2    **Q.  You didn't rely on any of that.**
3    **Are you aware of any -- let's talk**
4  **about distance.  You mentioned the Horsak distance.**
5  **Why don't you tell me more about that, since we**
6  **haven't touched on that.**
7    A.  So my understanding is the distance
8  from Horsak that was provided, is the distance from
9  the fence line of the Hercules facility to the most
10 distant test site that detected dust with
11 contaminants, basically based on these pictures from
12 the Horsak report.
13    **Q.  So the record will be clear, let me**
14 **do a little backfilling, so somebody reading this**
15 **maybe will know what we're talking about.**
16    **Mr. Horsak is another expert that was**
17 **retained by the City of Hattiesburg in this case?**
18    A.  Is that a question?
19    **Q.  Yeah, I'm asking that.**
20    A.  That's my understanding, yes.
21    **Q.  And he has a science background in**
22 **chemical environmental, of some sort, background; is**
23 **that correct?  Or tell me what you know about him.**
24    A.  I'm not prepared to testify on his

1  expertise.  I reviewed his report after I did mine,
2  and you know, he stated his qualifications in that
3  report, but I'm not in the position to testify on
4  what his qualifications are.
5    **Q.  Fine.  You really don't know anything**
6  **about him.  Never worked with him before?**
7    A.  I've never worked with him before.
8    **Q.  Couldn't tell me whether he's**
9  **reliable or competent in his field.  You just don't**
10 **know anything about him?**
11    A.  All I know is what's provided in his
12 report, and the credentials that he provided in his
13 report.
14    **Q.  Now, what was it -- tell the court**
15 **and the jury, what was it exactly in his report that**
16 **you utilized and was important to you in addressing**
17 **the issues you were asked to address, in generating**
18 **your expert report?**
19    A.  It was that there was detects of dust
20 with contaminants of dioxathion and toxaphene, that
21 those were spread over a broad area, that they were
22 more likely than not to be detects, and basically,
23 the range of those detects.
24    **Q.  Let me see if I can break that down a**

1  **little bit.  Do you know exactly how many properties**
2  **were sampled, were sampled for contaminants in attic**
3  **dust?  Feel free to review your report.**
4    A.  I'm not sure I even said how many
5  were in my report.  I can go back and look, but I'm
6  not sure I did.  I know that there was two rounds of
7  sampling that were done, and that --
8    **Q.  If I suggested to you it was roughly**
9  **50 each time, approximately 105 properties, would**
10 **that sound about right?**
11    A.  I'd have to go back and check his
12 report just to be sure on that.
13    **Q.  If I represented that was the case,**
14 **can we go with that, for purposes of today?**
15    A.  If you want to assume that, I can
16 work with that assumption.
17    **Q.  It was 105 properties.  Do you know,**
18 **out of the -- were you provided information out of**
19 **the 105 properties -- did you review the analysis**
20 **report itself or did you just review what Mr. Horsak**
21 **had to say about that?**
22    A.  I've read his report, and so I know
23 that he reported the percentage that were detects for
24 each of the contaminants, and then the percentage

14 (Pages 53 to 56)

Kevin Boyle, PhD.
December 2, 2015

Page 57

1  that had at least one of them.
2      Q.   Do you recall what those percentages
3  were?
4      A.   I do not recall those percentages.
5      Q.   Is it in your report?
6      A.   I don't think I put those percentages
7  in my report.
8      Q.   It wasn't important to you what the
9  percentage was?
10      A.   No, because for an economic analysis,
11  it's -- the standard approach is to look at proximity
12  to contamination, and that's what was done in the 58
13  studies that Simons and Saginor relied on.  That's
14  what's done in other types of studies, and so what
15  his sampling did was establish the -- that there was
16  a proximity effect through the contamination.
17          The actual percentages were not
18  something that would go into a standard Hedonic
19  model.
20      Q.   So what you're telling me is -- what
21  I understand, you're not aware of the percentage of
22  properties that tested positive or the percentage
23  that were tested negative?
24      A.   I'm telling you that I just don't

Page 58

1  recall those percentages, but I have seen them, and I
2  do know that it's more likely than not that there was
3  a detect.
4      Q.   You know it was more likely than not
5  that what was a detect?
6      A.   That they detected one of the two
7  contaminants in the dust samples.
8      Q.   And how many of the 105 samples was
9  it more likely than not that they had a detection?
10      A.   That's not what I said.
11      Q.   That's what I understood you to say.
12      A.   No, I didn't say that there was more
13  likely than not in an individual one.  That's just
14  one observation.
15          If you'll look across all the data he
16  provided, it was more likely than not that the
17  samples would have a detect.  So more than 50 percent
18  of the samples had detects.
19      Q.   Is that a meaningful number to you,
20  that 50 percent number?  Does it have to be
21  50 percent or more?
22      A.   No.
23      Q.   What if we had 105 samples taken and
24  there was one detect of toxaphene and dioxathion in

Page 59

1  one of the properties?  Would your report be the
2  same?
3      A.   It probably would not be the same.
4      Q.   What if it were five detects of 105?
5      A.   The question is bad because it
6  depends on what the detects are and where they are,
7  and so that you'd have to have more information, and
8  look at them.
9      Q.   This Saginor report as, Simons and
10  Saginor report, isn't that exactly what they did?
11  They went in and looked at, was it 80 or so?
12      A.   Well, the condition here is actually
13  worse than what Saginor did, and Simons did, because
14  what's being done here is that there is known
15  contamination within people's homes.  And Simons and
16  Saginor, all they're doing is looking at the
17  proximity to an admitting source, not where there's
18  actual contamination.  If they had that information,
19  the studies to do it, the percentage diminutions
20  would be greater than what I reported in my report.
21      Q.   We'll go into attic dust in some
22  detail a little later.  I'm going to turn back to my
23  line of question concerning the percentage of
24  detects.

Page 60

1          You told me earlier that your report
2  would not be the same if it was one detect.  What
3  literature -- what number would it have to get to
4  before you could author your report and generate
5  opinions that you run, that are provided?
6      A.   There's no specific number, but what
7  I would rely on is the expert like Mr. Horsak, and
8  that individual's opinion on the extent of
9  contamination, where it was, the spatial
10  distribution.  There's no magic cutoff number.
11      Q.   You're able to read his report.  I'm
12  just curious.  In the literature you rely upon, had
13  he indicated that there were 20 detects out of 105,
14  would you have generated assigned diminution values
15  that you did here?
16      A.   It would have been -- would have
17  depended on what his conclusion was in terms of the
18  contamination.
19      Q.   So you're relying totally on
20  Mr. Horsak for all of your contamination factual
21  data?
22      A.   For the site, that would be correct.
23  That's not my area of expertise, so it's standard to
24  rely on other experts' information.

Kevin Boyle, PhD.
December 2, 2015

Page 61

1        Q.   And additionally, you would be
2    relying -- you're accepting at face value, without
3    question, the validity of the analytical testing and
4    the results that were reported?
5        A.   I have no reason to -- that's outside
6    of my expertise.
7        Q.   You haven't gone behind that.  You're
8    accepting what you see there is true, without any
9    question about it?
10        A.   I'm using that as the truth.
11        Q.   So would it be fair to say that your
12    report, to a large extent, is based on the
13    foundation, if you will, of the facts and data and
14    opinions generated by Horsak?
15        A.   That's part of the foundation.
16        Q.   And if that foundation were to
17    crumble, would you agree that your report would have
18    to be altered?
19        A.   If, for some reason, there was a
20    change.  For example, more testing was done, and it
21    showed that the detects were a farther range from the
22    2.25 miles then, you know, there would be an
23    adjustment.  It wouldn't be big, but there would be
24    an adjustment.

Page 62

1        Q.   The adjustment that you described
2    would be a larger number of properties?
3        A.   Yes.
4        Q.   If it turns out that some of the data
5    is analyzed and termed unreliable, and the number of
6    defects was less than Horsak reported, I guess it
7    would be minimized.  Would that be fair?
8        A.   It could possibly be a smaller
9    distance, if you take the ones that are -- far out
10    and -- but again, it would be a small -- small
11    adjustment.  But given that we have an equation to do
12    that, you know, you could do a reprediction.
13        Q.   Now, we got off into this line of
14    question, and I think you'll agree with me, I asked
15    you about Horsak and distance, and that's what we've
16    been talking about a little bit; is that correct?
17        Let me ask you another question.
18    What distance -- what was the distance -- can you
19    describe the geographical distance that was pertinent
20    to Mr. Horsak, in his review?
21        A.   What review are you talking about?
22        Q.   Well, in his report.  You mentioned
23    that distance was an important factor in your work.
24    What distance did you utilize?

Page 63

1        A.   That's a different question from what
2    you just asked me.
3        Q.   Okay.
4        A.   So to the current question, I used --
5    it's documented in the table here, 2.25 miles.
6        Q.   And where did you get that number?
7        A.   My understanding is that's the
8    distance that is from the fence line to the point
9    that would be the most distant detection.
10        Q.   And do you know what that most
11    distant detection was, what compound it was?
12        A.   I do not know.
13        Q.   It would be one of the two or both?
14        A.   One of the two or both.
15        Q.   By the two, we're talking about
16    either dioxathion or toxaphene?
17        A.   Correct.
18        Q.   Had a detection been made, the map
19    that you're looking at is on page, what, of your
20    report?
21        A.   What are you looking on?  I'm on
22    page 6.
23        Q.   Page 6 of your report, and that's a
24    map of the site and its immediate vicinity in

Page 64

1    Hattiesburg; is that correct?
2        A.   Yes.
3        Q.   Had the detection been 20 miles away,
4    would that have been the distance that you would have
5    utilized?
6        A.   If that was Mr. Horsak's conclusion,
7    I would have considered a distance that far.  I don't
8    have Simons and Saginor behind me, but they show that
9    this carries out a long distance.  But the other
10    factor is, is that -- the basic concern is
11    contamination, and it's a log relationship.  So it's
12    going up, and as you go out, it tapers off.  I mean,
13    it goes out but it wouldn't have much of an effect on
14    the damage calculation.  But you'd have to consider
15    that.
16        Q.   What distance, that logarithm that
17    you referenced, how far out is it when the bridge
18    does not have -- it loses its effect?  What's the
19    distance?
20        A.   Well, you know, I don't know where --
21    there's nothing like a threshold that specifically
22    loses its effect, but it just, you know, as you go
23    out, the curve flattens out, but it doesn't become
24    totally flat.

16  (Pages 61 to 64)

Kevin Boyle, PhD.
December 2, 2015

1     **Q.   If the -- instead of this two and a**
2  **half mile radius that we're talking about, is that**
3  **what it is, two and a half mile radius, 2.25?**
4     A.   2.25.
5     **Q.   If it had been a 500 mile radius and**
6  **there were detects out to 500 miles, and that was in**
7  **everything else about Horsak's report was the same,**
8  **except it showed detections all the way out, 500**
9  **miles from the site, and he said the same thing about**
10 **it, would you have accepted that report and used that**
11 **information, and generated your expert report, based**
12 **on a 500 mile radius?**
13    A.   That's a compound question there.
14 Which part do you want me to answer?
15    **Q.   Well, would you have accepted his**
16 **report as accurate?**
17    A.   I have -- you know, I have -- that's
18 not my area of professional expertise so I don't have
19 any reason to judge it.
20    **Q.   So you would?**
21    A.   Yeah.
22    **Q.   You would accept that and would have**
23 **generated a report similar to the one you've done**
24 **here for a 2.25 mile radius or a 500 mile radius,**

1  because you're buying into --
2     A.   No, I don't think I would have gone
3  500 miles, because 500 miles goes beyond the data
4  that the Simons and Saginor model is based on.
5     **Q.   Where's the outer boundary of the**
6  **data that they have generated?**
7     A.   I'd have to go back and look at that
8  report, and I don't have that right here in front of
9  me right now.
10    **Q.   If I handed it to you, could you tell**
11 **me?**
12    A.   See what they say, yeah.
13    **Q.   I'm handing you, and I'm not going to**
14 **mark it as an exhibit, a paper which is titled A**
15 **Mega-Analysis of the Effect of Environmental**
16 **Contamination and Positive Amenities on Residential**
17 **Real Estate Values, Robert Simons and Jesse D.**
18 **Saginor.**
19    A.   Just to be factual, it's a
20 meta-analysis, not a mega-analysis.
21    **Q.   I misspoke.**
22    A.   So this is not going to be an
23 exhibit, I'm looking at.
24    **Q.   No, sir.  But you recognize that to**

1  be an article you're relying on?
2     A.   Yes, sir.
3     **Q.   One of the important ones?**
4     A.   Yes. I don't have a calculator here
5  to take the analog of it, but for the distance, the
6  maximum is 3.22.  That's the log of distance.  I'd
7  have to take the analog of it to get the...
8     **Q.   What would be some of the minimum**
9  **distance that the authors determined to be in play at**
10 **other sites?**
11    A.   So that's a log variable, and I'd
12 also have to take the analog but I can tell you that
13 it's less than a mile.
14    **Q.   So it would be less than a mile on**
15 **the inside to -- what did you say?  3...**
16    A.   3.22, but that's the log of miles.
17 Let's see if they say anything here.  Okay, so the
18 natural log.  It went from 25 miles to zero.
19    **Q.   So there's some that are 25 miles?**
20    A.   Yes.
21    **Q.   So if -- would you have been**
22 **comfortable, had Horsak found detections of these**
23 **components 25 miles away from the site, to have**
24 **utilized that distance factor in connection with your**

1  preparation of your report?
2     A.   I think I've answered that question
3  multiple times now.  I'm not an expert in
4  Mr. Horsak's field, so I take the information that he
5  has and used it. That's the standard practice, to
6  rely on other experts' information.  We do that in
7  our published research in peer review journals as
8  well.  Would I have gone out that far?  The answer is
9  no because this is a case for Hattiesburg, and I
10 would have stopped at Hattiesburg city limits.
11    **Q.   Okay. I understand that.  Now, you**
12 **mentioned the Herrin report, so someone who is**
13 **reading this, maybe doesn't know what that is.  That**
14 **is yet another expert retained by the city, I believe**
15 **with an accounting background, and she generated a**
16 **report that you relied upon, and you told me that it**
17 **was the number of residences or parcels of property;**
18 **is that correct?**
19    A.   That's correct.
20    **Q.   And I believe -- I'll either ask you**
21 **to tell me or I'll try to move through this.  It was**
22 **2000 and some single-family residences, and**
23 **approximately 5,000 commercial or vacant properties**
24 **within the 2.25 mile radius, or did I mistake that?**

17 (Pages 65 to 68)

Kevin Boyle, PhD.
December 2, 2015

Page 69

1        A.   Yeah.  So, for the residential it's
2   2,724 within the 2.25 mile radius.
3        Q.   Thank you.  And the remaining
4   properties was what?
5        A.   I don't have that number right here
6   for the commercial.
7        Q.   As I recall -- we can get it but I
8   believe it was approximately 5,000 commercial vacant
9   properties, for a total of almost 8,000 pieces of
10  property.  Does that sound about right?
11       A.   That sounds about right.
12       Q.   Now, do I understand, from your
13  report, that, based upon testing of 105 properties,
14  and you've told me you're not exactly sure how many
15  of them tested positive, but you thought it was more
16  than 50.  So let's say 70, for sake of discussion, 70
17  tested positive.  Based upon those 70 detections that
18  were found, 8,000 properties have been -- will at
19  some point in the future, you predict, will be
20  diminished in value.
21       A.   Is that a question or statement?
22       Q.   I'm asking.  Is that true?
23       A.   The question is?
24       Q.   Your report, you assert that some

Page 70

1   8,000 properties, at some point in the future, you
2   predict, will sustain diminution in value of anywhere
3   from 10 to 15 percent, due solely to the positive
4   detection reports of approximately some 70 properties
5   within this 2.25 mile radius.
6        A.   So there's several parts to that.  So
7   the first part is, is that I have to rely on
8   Mr. Horsak that in his field, that 105 is a
9   sufficient sample to do that.  So I'm going back --
10       Q.   You don't know personally what that
11  is?  You're just buying into his program?
12       A.   I accept his professional expertise
13  in that area.
14            The next part is, is what I predict
15  is the diminution of residential of 15 percent, and
16  what we'll call in a general name, commercial,
17  because it includes a number of different things, and
18  we'll use commercial right now for my work, of
19  10 percent.
20            I am saying that properties within
21  the 2.25 are going to experience that property price
22  diminution to be used for the basis of calculating
23  the losses of tax revenues to Hattiesburg.
24            To go to the next step, though, in

Page 71

1   terms of the number of properties, that's not what I
2   did in my report.  That's what Ms. Herrin did in her
3   report, so you kind of combined all three reports in
4   your question, and it's the sequence of them working
5   together.
6        Q.   You referenced Ms. Herrin as being
7   one of the factual issues for your report and I'm not
8   trying to misstate anything that she put in there.
9        A.   No, but we started with asking about
10  the number but then you changed it to what I did in
11  my report, which carried over into what actually was
12  done in Ms. Herrin's report.
13       Q.   Let's go back through this.  This is
14  important, and I don't mean to confuse you.  I'm not
15  trying to.
16       A.   I'm just trying to be clear on what
17  my report says.
18       Q.   I understand, and I appreciate that.
19  It was probably clear to everybody in this room but
20  me, so let me try to catch up.
21            You will agree with me that the
22  bottom line, when you look at the Herrin report and
23  look at your report and these ad valorem issues, that
24  some 8,000 properties within the 2.25 radius of the

Page 72

1   site, you predict will be adversely affected from a
2   property standpoint, property diminution standpoint?
3        A.   I say that they will be adversely
4   affected.  Let me just clarify that for part of what
5   we've been talking about.  It's not necessary that
6   the contamination is on every property.  When these
7   studies have been done, if you'll look at Simons and
8   Saginor, I believe it might even be in their first
9   paragraph.  They say it's based on proximity.  So
10  it's within the proximity we'll experience it.
11            If they had gone, which I said
12  before, gone the next step and been able to include
13  properties that had actual contamination in them,
14  that would have been another factor, would have
15  increased the percentage diminution.
16            So what I'm saying is that because of
17  proximity, that's the standard approach in my area of
18  expertise, that I predict the property value
19  diminutions.  But these are a lower bound of what
20  will be experienced.  It's a lower bound, ultimately,
21  when you get to Ms. Herrin's debt of what the tax
22  losses are to Hattiesburg.
23       Q.   I appreciate that.  Let me kind of go
24  back to where we need to head.  This 8,000 pieces of

18 (Pages 69 to 72)

Kevin Boyle, PhD.
December 2, 2015

Page 73

1  property are adversely affected, in your view, in
2  your prediction, are based upon, from a contamination
3  standpoint analysis, are based upon detections,
4  positive detections, according to the city's
5  evidence, of roughly 60 or 70 properties?
6      A.  It's based on a sample of the number
7  of detects, so that there is approximate
8  contamination to other property, diminished property
9  values.
10         MR. YARBOROUGH:  Will you please
11     reread my question, and I think it's a yes
12     or no and you can explain.
13         (The record was read by the reporter
14     as requested.)
15         THE WITNESS:  So if you could just
16     help me out, that's kind of a long run-on
17     question.  Could you reask it again, please.
18  BY MR. YARBOROUGH:
19      Q.  Out of the 8,000 properties that are
20  in play -- do we have 8,000 properties in play,
21  roughly?
22      A.  Roughly.
23      Q.  You'll agree to that?
24      A.  Yes.

Page 74

1      Q.  They're in play based upon detections
2  of these two chemicals in roughly 60 or 70 of the
3  properties of the 8,000?
4      A.  They're in play on a percentage, and
5  I don't remember exactly, but 70 percent seems like
6  it's pretty close.  I remember a number of 68
7  percent, but I'm not sure of that.
8      Q.  Let's use 68.  We have 68 detections
9  on properties, and that affects the value of 8,000
10  properties within the 2.25 mile radius?
11      A.  And my answer is yes, and you said I
12  could explain.  My explanation is, is that I'm
13  relying on the science of Mr. Horsak that that is
14  appropriate sampling, and then I'm also relying on
15  the standard practice in our field that proximity to
16  contamination diminishes property values.  It doesn't
17  have to necessarily be on your property to diminish
18  property values.
19         And then the Simons and Saginor
20  looked at 58 studies and found that proximity to
21  contamination is a significant predictor.
22         But then I came back to your point
23  about the ones with the actual contamination.  If
24  that information was able to be factored in then that

Page 75

1  would increase the diminution that I predict beyond
2  the 15 and 10 percent.
3      Q.  I appreciate that speech, Dr. Boyle,
4  but I really want to get an answer to my question,
5  and I'm not arguing with you.
6         In terms of hard, analytical testing
7  data, we'll use your number of 68 properties you
8  testified positive, according to Horsak; is that
9  correct?
10      A.  I'm not saying I remember the number
11  of 68.  68 percent, not 68.  But I don't remember
12  that for sure.
13      Q.  If I represented to you there were
14  105 samples taken -- let's call it 70 -- 75.  Let's
15  say all of them tested positive for purposes of my
16  question.  105.  And based upon 105 in terms of
17  analytical science, the property values have
18  diminished, predicted in the future, these 8,000
19  properties in this 2.25 mile radius?
20      A.  Yes.
21      Q.  Thank you.  The Simons paper that you
22  mentioned just a minute ago, did they -- and that was
23  a meta-analysis?
24      A.  Correct.

Page 76

1      Q.  Not mega, meta-analysis.  Did they
2  determine sites where there had not been any
3  reduction in property values?
4      A.  It's not that they determined.  They
5  did a review of the literature to identify studies
6  that had looked at -- had actual effects on property
7  values, and used them as the data in their analysis.
8  That's what a meta-analysis is.  In that, they
9  included studies that -- it's not that they didn't
10  have any, but they did not have a significant --
11      Q.  Detrimental effect?
12      A.  Significant effect.  Statistically
13  significant effect.
14      Q.  Over and above that paper, you are
15  generally aware that there are any number of
16  contaminated sites around the country that, for
17  whatever reason, had not resulted in detrimental --
18  detriment of nearby property values?
19      A.  What I'm aware of is that there are
20  some that there is not a statistically significant
21  effect.
22      Q.  It varies from site to site?
23      A.  It varies from site to site.  Most of
24  the studies that have been done have found effects

19 (Pages 73 to 76)

Kevin Boyle, PhD.
December 2, 2015

Page 77

1  but you have to be careful in how you interpret
2  statistics.
3          You're basically testing a null
4  hypothesis that there's no effect.  If you find a
5  significant effect, you reject that null hypothesis
6  of no effect.  If you don't, the appropriate way of
7  the statistic is to say that you cannot reject it.
8  It's not that you reject it.  So it could be that
9  there's no effect or it could be that there is just
10  not enough information at the time or something to do
11  it.  So you don't know for sure that there is not
12  effect.  There may be or there may not be.
13          Q.  Thank you.  Now, in many instances,
14  isn't it true that there may be a initial detrimental
15  effect, but with the passage of time, there's a
16  rebound of property values?
17          A.  Yes.
18          Q.  That happens on occasion?
19          A.  Yes.
20          Q.  And there are any number of factors
21  that might result to you, one of which might be
22  publicity about remediation of the site and
23  corrective action and things of that nature?
24          A.  That there has been remediation or

Page 78

1  that the site has been cleaned up, can reduce it or
2  remove it through time.
3          Q.  What about statements from government
4  officials about risk?  And by government, I'm talking
5  about public health service, EPA, DEQ, that the site
6  poses no risk to adjacent residents.  Does that have
7  an impact on property values?  And I know it's a
8  broad question.
9          A.  Yeah, not necessarily, because I
10  think people know that thresholds of risk change
11  through time and new information, so I think people
12  react to whether there is contamination, and the
13  economic literature would suggest that knowledge of
14  contamination can reduce it.  So I think that's
15  information, but I don't think that necessarily
16  removes it.
17          I think the key thing is what you
18  raised before, that I think the literature has shown.
19  When it has been shown that a site has been cleaned
20  up, the effect can go away, but not statements of
21  what the threshold of risk is.
22          Q.  You'll agree with me, won't you, that
23  assuming your predictive analysis is correct, and
24  certainly, representatives of Ashland and Hercules

Page 79

1  don't agree with that, but assuming for the sake of
2  my question that it is correct, you've assigned
3  relatively modest diminution in value to these
4  properties, have you not?
5          A.  I have assigned relatively modest
6  compared to other things that's been in the
7  literature.
8          Q.  And that's based upon the formula in
9  the Saginor paper?
10          A.  I used the best information in the
11  economics literature, tailored it to the Hattiesburg
12  area, so it's my best estimate.  So I believe that
13  those highest numbers were not the best estimate.
14  This was the best estimate.  But I do say that this
15  is still a conservative number.
16          Q.  And that's based largely upon the
17  contamination information that you were provided by
18  Horsak?
19          A.  Yes.
20          Q.  Have you ever reviewed any portion of
21  the file on the Hercules site, maintained by either
22  the EPA or the Mississippi Department of
23  Environmental Quality?
24          A.  I don't know what you mean by the

Page 80

1  file, but when I was doing some of the work and
2  looking around, I found PDFs of state reports that
3  were online, that I scanned down through various
4  information.
5          I remember one that had information
6  on capping of the landfill sites on the site, and
7  where buildings had been taken down, and whether
8  they're vegetated for the inspection.  You know, if
9  you're talking about a complete file, no, but I found
10  information that I looked at.
11          Q.  Do you know whether there are any
12  information, newspaper articles, reports, what have
13  you, going years back regarding potential off-site
14  contamination caused by the Hercules site, emanating
15  from the Hercules site?
16          A.  What do you mean by years back?
17          Q.  Well, prior to this attic dust
18  information you provided, are you aware of any
19  studies, allegations, articles where there were
20  claims or contentions that there was off-site
21  contamination?
22          A.  I'm not absolutely sure, thinking
23  back in terms of -- I mean, you know, I looked at
24  some, but I can't answer that affirmatively or

20  (Pages 77 to 80)

Kevin Boyle, PhD.
December 2, 2015

Page 81

1  negatively right now of the articles I went through.
2  They may have been. I just don't remember.
3      Q.  I want to go back to talking about
4  the 8,000 properties. And you made the statement a
5  couple of times that in your view, the prediction
6  that you're making, properties that are not -- has
7  not been shown to have been contaminated are likewise
8  detrimentally valued?
9      A.  Experience of property value
10  diminutions.
11      Q.  They have. And so we know that not
12  all of the properties were tested for attic dust,
13  these 105 properties. Not all of them were
14  detections, were they?
15      A.  Not all of them were detections, but
16  I also understood from Mr. Horsak's report, that just
17  because he didn't get a detection didn't mean that
18  there was not the two chemicals present that a dust
19  sample some other place in the property might have
20  detected.
21      Q.  That's pure speculation, though,
22  isn't it?
23      A.  Well, that was his professional
24  opinion. I mean, that's common sense, that if you

Page 82

1  did sampling in another place, you might find
2  information.
3      Q.  Am I correct that this diminution in
4  value, be it 10 percent, 15 percent, would be the
5  same for a property that had a detection versus the
6  same that had no detection, was tested and had no
7  detection?
8      A.  No, I've already said that one that
9  had detection, it would be higher, the property value
10  diminution.
11      Q.  That's not in your report, is it, in
12  terms of the percentage of diminution?
13      A.  Right, because I don't have any
14  information with the existing studies to do that.
15  That's my professional opinion.
16      Q.  But you've basically assigned either
17  this 10 or 15 percent regardless of whether there was
18  a detection of property or regardless of whether the
19  property was even tested within the 2.25 miles?
20      A.  I have not applied -- I've given that
21  prediction of that's what the best estimate of what
22  the -- would be, the diminution would be. But there
23  could be some that could be lower. For example, for
24  the 2.25, I divided that by two, so some of the ones

Page 83

1  beyond would have a higher, some of the ones -- I
2  mean a lower. Some of the ones closer would have a
3  higher just on that. This is kind of the best
4  overall estimate to use for predicting what the
5  diminution in taxes would be.
6      Q.  I want to ask --
7      A.  I guess I want to just step back. I
8  didn't do the specific application in terms of
9  applying them to properties. That's in Ms. Herrin's
10  report, not mine, so I just want to keep this clear
11  on where we're talking about this.
12      Q.  I understand. She's talking about
13  from an accounting, a numbers crunching analysis.
14  I'm talking about the science. I'm talking about the
15  contamination here. Let's just move on.
16          I want to turn to the home -- the
17  properties that were either tested and have no
18  detects, and the remaining 7,900 properties that were
19  not tested. Are we tuned in?
20      A.  Continue.
21      Q.  In fact, I'll even make it easier.
22  Let's talk about the 7,900 that were not tested.
23  You'll agree with me, roughly speaking, there were
24  that rough number within the radius?

Page 84

1      A.  With the numbers we're working with,
2  yes.
3      Q.  And you testified earlier that those
4  properties are likewise detrimentally valued as a
5  result of the contamination present in the area; is
6  that right?
7      A.  Yes.
8      Q.  Now, that type of detriment or that
9  devaluation would be a stigma devaluation, would it
10  not?
11      A.  Not in economic terms. To an
12  economist, when you look at our literature, a stigma
13  occurs after the contamination has been removed so
14  that there's no risk left at all, but properties
15  continue to have a diminution because people don't
16  move on immediately from them. And, you know, it
17  could be that they just don't accept it or it could
18  be that during the period of contamination,
19  properties weren't maintained so that there's other
20  things that take a while for it to adjust. That's
21  what stigma is, in the economics literature.
22      Q.  Well --
23      A.  Let me finish. In these properties,
24  the other 5,000, they are responding to a risk that's

21 (Pages 81 to 84)

Kevin Boyle, PhD.
December 2, 2015

1  been established by the science of the contamination
2  there, so that's not stigma.  Stigma is when there's
3  not a risk that they're exposed to.  It's been
4  removed and it's continued to be an effect.  This is
5  a risk to people of properties and where they live
6  and where they work, and that's a risk, that's not a
7  stigma.
8      Q.   And the risk being a possibility that
9  their property is contaminated?
10     A.   The risk is the property is
11 contaminated.
12     Q.   A risk that there is a possibility
13 that their particular property is contaminated?
14     A.   Yes.
15     Q.   Just the mere possibility?
16     A.   Well, it's not -- if you're talking
17 about it in technical terms, the mere
18 possibility is a very vague term.  When you do
19 sampling like Mr. Horsak does, it shows that there's
20 contamination.
21         Also, his report talks about how the
22 contamination is mobile and can be moving around.
23 It's not the mere possibility.  There's science out
24 there that establishes that contamination is there,

1  and that that contamination is mobile and can move.
2  So it's a real risk.  It's just not a mere
3  possibility.
4      Q.   Well, if I bought one of these
5  properties in this 8,000 that hadn't been tested,
6  it's just my opinion, in terms of my feelings about
7  the value of my home and risk, that's just -- I don't
8  know if my -- none of these property owners in that
9  category know that their properties have been
10 contaminated, do they?
11     A.   I can't say whether any do or don't,
12 but it's -- the value of a property is -- the fair
13 market value of a property is the sale price between
14 willing buyers to willing sellers.  And if willing
15 buyers know that there is a chemical contamination
16 that is a health risk in a property, that's going to
17 affect whether they even want to buy it or the price
18 that they would pay.  That's what the property value
19 studies have demonstrated over and over again.  And
20 so -- and that puts the property owner not just
21 sitting there, oh, I suppose, but making that
22 decision, and realizing that they have to make a
23 concession in their fair market value, when they sell
24 the property.

1      Q.   Dr. Boyle, I realize you're not an
2  attorney, and I don't mean this as a legal question
3  but as just a factual one.
4          Are you aware of, in your reading and
5  just interest in this area, of any -- and you've
6  studied litigation in the context of contaminated
7  sites in these studies that you report.  Are you
8  aware of any instances where a property owner, who
9  has not demonstrated actual contamination to his
10 property, is able to recover for property diminution
11 in a court of law?
12         MR. RADNEY:  Object to the form.
13 Object to the extent it calls for a legal
14 conclusion.
15         THE WITNESS:  I can't give you any
16 answer to that as a lawyer.  And I'll also
17 say that, you know, my work as an expert
18 doesn't carry through to know everything
19 that goes on.  For example, in the case that
20 I testified in Vermont, I don't know
21 everything that followed on after the
22 decision was challenged and went to the
23 Supreme Court and everything.  I just don't
24 know.

1  BY MR. YARBOROUGH:
2      Q.   You don't know of one either way, is
3  what you're telling me?
4      A.   That's not an area of my expertise,
5  again, that I know that information.
6      Q.   Okay.
7      A.   I could use a break for a water,
8  please.
9          MR. YARBOROUGH:  Sure.
10         THE VIDEOGRAPHER:  Off the record at
11 10:59 a.m.
12         (A recess ensued.)
13         THE VIDEOGRAPHER:  On the record at
14 11:12 a.m.
15 BY MR. YARBOROUGH:
16     Q.   Okay, Dr. Boyle, you testified
17 earlier by the break, we were talking about stigma
18 versus real risk.
19     A.   Yes.
20     Q.   Is the real risk, as you understand
21 it, from the contamination that information has been
22 provided you that resulted in these predicted
23 property diminution values, stand from the findings
24 in the presence of the attic dust in the homes that

Page 89

1  were tested and had positive detections?
2      MR. RADNEY:  Object to the form.
3  BY MR. YARBOROUGH:
4      Q.  Is that the risk, contamination of
5  risk?
6      A.  Could you clarify the question for
7  me, please.
8      Q.  You talked about risk that someone
9  would have with respect to the sale of their house
10  because of the contamination, and the -- what do you
11  classify as a contamination here?
12      A.  So the contamination is what I'm
13  relying on in Mr. Horsak's report.  And Mr. Horsak
14  talks about the identification of the contamination
15  and the attic dust which is mobile and can move
16  around, and that I believe he says that, you know,
17  that it's evidence that the contamination is coming
18  from the Hercules site.
19          So it's basically -- if you think
20  about a stool, there's three legs to it, the source
21  at the Hercules site, the property-specific, and
22  residences where there's been detect, and the fact
23  that the dust with the contaminants is mobile.
24      Q.  You mentioned an area that I haven't

Page 90

1  gone into.  Let me do it real briefly.  You're
2  following Horsak's view that every detection of
3  either of these two chemicals, the site was the
4  source of that.  That's what you're relying on?
5      A.  I don't want to testify that that is
6  Mr. Horsak's opinion because I don't know.  But what
7  I do believe I understand --
8      Q.  What is your position on it?
9      A.  It's not my position, but what I
10  understand from his report is that the evidence is
11  that the contaminants come from the Hercules site.
12      Q.  And you're accepting that in
13  generating the report that you generated?
14      A.  I'm accepting Mr. Horsak's opinion,
15  yes.
16      Q.  And not accepting the possibility
17  that there are other sources for these contaminants
18  in the environment?
19      A.  I think, in Mr. Horsak's report, I'd
20  have to go back and check again, but as I recall,
21  he -- I think that he allowed that there's potential
22  for other sources but that the evidence is strong
23  here, but I'm not quite as strong on that.
24      Q.  And the risk that you talked about,

Page 91

1  is that a health risk as a result of these
2  contaminants that are present in the attic dust of
3  these properties?
4      A.  It's a risk that there are
5  contaminants in the properties.
6      Q.  Have you ever brought to this
7  retention addressed situation where the contaminant
8  was present, and only in the attic dust of the
9  surrounding properties, as opposed to ground water or
10  soil or anything of that nature?
11      A.  Can I have that just read back to me,
12  please.
13      Q.  That was a clumsy question.  Maybe I
14  can start over.  This is an attic dust case; is that
15  right, in terms of contamination?
16      A.  I don't know if I'd call it that.
17  I'd say attic dust is one of the pieces of impotence.
18      Q.  Well it's the principal, isn't it?
19      A.  I don't know all the dimensions.  I
20  don't know all the experts in this so I can't answer
21  that.
22      Q.  In terms of what you're addressing,
23  it's the principal contaminant.  That's what you talk
24  about in your report, isn't it?

Page 92

1      A.  Well, it's the contaminants in the
2  dust.
3      Q.  That's what I meant by attic dust
4  case for your purposes.  I'm not trying to hold you
5  to what all those experts said.  It's not my
6  intention of doing that.
7          Have you ever addressed, prior to
8  this retention, a situation where the alleged
9  contamination in adjoining properties was present in
10  attic dust?
11      A.  I have not testified in a case where
12  there has been identified contamination to attic
13  dust, that I know of.
14      Q.  Have you ever read any literature,
15  either referenced, for example, in the Saginor report
16  or any other articles, where that was a situation,
17  the constituents in attic dust was a contamination at
18  issue that adversely affected property values?
19      A.  I haven't read but I have had
20  firsthand experience, when we purchased a home, that
21  we had an asbestos test done, and I paid less for
22  that property because of the asbestos present, and
23  had the asbestos removal done.
24      Q.  You're not aware of any studies or

23 (Pages 89 to 92)

Page 93

1  literature that addressed that issue, of all that you
2  produced?
3      A.  I want to be clear what the question
4  is again.
5      Q.  Talking about attic dust
6  contamination, as Horsak found in some of the
7  properties adjacent to the Hattiesburg site, have you
8  had prior experience, any reading, any literature,
9  any retentions in that particular environmental
10  setting?
11      A.  I have not had any that I can recall,
12  but in the types of analysis that economists do,
13  generally the specific type of contamination is not
14  as relevant as the proximity to the contaminant.
15      Q.  Are you familiar with the term
16  pathway, in terms of risk and contamination?
17      A.  I am familiar with pathway.
18      Q.  What is pathway?
19      A.  Let me just take a drink.
20          Pathway is, as I understand it, it's
21  not an area that I'm expert in, but as I understand
22  it, it's the way that exposure to the contaminant
23  occurs.
24      Q.  That's the way it makes its way, if

Page 94

1  we're talking about human exposure, to the human.
2  We've got air, ingestion, injection, dermal.  That
3  would be the four ways.  Would you agree with that?
4      A.  Yes.
5      Q.  Did I get those right?  Right.
6          Have you done any research about
7  pathways which may not be present in contaminants
8  present in attic dust, in residences and commercial
9  property?
10      A.  That's not my area of expertise.
11      Q.  So your answer will be no?
12      A.  No.
13      Q.  Are you familiar with the Agency For
14  Toxic Substances and Disease Registry out of Atlanta,
15  Georgia?
16      A.  I have heard of that before.
17      Q.  They're an arm of the Department of
18  Health and Human Services.  Are you aware of the
19  position that the ATSDR has in, at least some cases,
20  taken with respect to significance of attic dust
21  contamination?
22      A.  I am not.
23      MR. YARBOROUGH:  I want to mark as
24  Exhibit 4, a letter I'll hand you.

Page 95

1          (Exhibit No. 4 was marked for
2  identification.)
3  BY MR. YARBOROUGH:
4      Q.  I realize you've not seen this
5  before.  Take a minute and look at that.  And I'll
6  represent to you that this is a letter I pulled off
7  the internet, doing some research about attic dust
8  contamination, and it's there for anyone to get.  I
9  cant' vouch for it, but I think that's where it came
10  from.
11      A.  Do you want me to read it?
12      Q.  Yes.  I'll tell you what, in order to
13  save time, this has -- this is a report dealing with
14  a different site.  It has nothing to do with
15  Hattiesburg.  Okay?  I was specifically interested in
16  you taking a look at the second paragraph.
17      A.  I'd like to read the whole thing, if
18  I could.
19      Q.  Sure.
20          (Brief pause.)
21          THE WITNESS:  Okay, I've read it.
22  BY MR. YARBOROUGH:
23      Q.  Thank you.  Do you see the
24  position -- the relevance that the ATSDR assigns

Page 96

1  contaminated attic dust in this particular instance?
2      A.  And you're asking me...
3      Q.  Well, it states, does it not, that
4  the ATSDR does not evaluate attic dust for cumulative
5  airborne or incidental ingestion exposures.  And that
6  would be the two pathways, would they not, you would
7  either breathe the dust or eat it; is that correct?
8      A.  Yes.
9      Q.  Since this is not an area where
10  occupants spend significant time unless it is used as
11  a living space.  Did I read that correctly?
12      A.  Yes.
13      Q.  The data cannot be used to establish
14  a completed human exposure pathway or to determine
15  health risk, and cannot help to evaluate cash risk in
16  the household or community.  Did I read that
17  correctly?
18      A.  Right.  I think what they're saying,
19  it's not that there's no risk, it's just not
20  complete.
21          If you go down to the bottom, they
22  almost give contradictory here, because the last
23  paragraph says:  We also notice that levels of lead
24  detected in dust samples in one of the homes is

Page 97

1  26,600 milligrams per kilogram.  This concentration
2  of lead in a dust sample may be an indication of a
3  lead hazard within this home.  The most common source
4  of indoor lead is associated with lead-based paint.
5  This home should be evaluated for lead hazards
6  particularly if young children are present.
7         It seems to me they're saying that
8  the dust samples do give an indication of a
9  contamination, but it's not a complete pathway.
10        Q.   Do you know whether the dust they're
11  talking about was taken inside the home as opposed in
12  the attic?
13        A.   I don't, but they're talking about
14  attic dust samples here.
15        Q.   Does it say attic dust when they're
16  talking about lead samples?
17        A.   No.
18        Q.   That's all I have for you on that
19  particular document.
20        Have you ever conducted any study or
21  done any research with respect to the impact
22  specifically of the presence of toxaphene and/or
23  dioxathion on property values?
24        A.   I have not done studies specific to

Page 98

1  those contaminants.
2        Q.   I want to return to your report and
3  ask you about some of your opinions.  You've got it
4  there in front of you.  And I'll try not to cover
5  anything that I've already asked.  I may be
6  backtracking just a little bit.
7        You told me earlier that it's not
8  your opinion that contamination always causes
9  property value diminution, that you know of instances
10  where that has not occurred?
11        A.   I said that I know of instances where
12  they have not been able to find a statistically
13  significant effect, and I've also said that I know of
14  studies that have shown that after cleanup, that the
15  effect has gone away.
16        Q.   How do you define contamination?
17        A.   The way I define contamination is
18  based on people who are scientific experts in that
19  area, and so, you know, in this case, it's the
20  presence of dioxathion and toxaphene in the dust
21  samples.  All the different ones that I've worked
22  with, we work with some type of natural or biological
23  scientist that provides us with that information.
24        Q.   And you rely on that just as you did

Page 99

1  Horsak here?
2        A.   Yes.  That's standard practice.
3        Q.   You state in your opinions that --
4  you indicate in your opinions that they're given to a
5  reasonable degree of economic certainty.  Can you
6  tell me what that means?
7        A.   So what I'm saying when my opinions
8  are to a reasonable degree of economic certainty,
9  that they're established procedures used in the
10  economics field that have been published in
11  peer-reviewed journals that people have looked at,
12  error rates associated with them.
13        Q.   Are you of the opinion in this
14  case -- I'm going to use the acronym PVD, property
15  value diminution.  Is PVD a certain outcome for every
16  property within the 2.5 mile radius?
17        A.   The property value diminution, a
18  certain outcome.
19        Q.   In your opinion, is property value
20  diminution a certain outcome for every property
21  within the two and a half mile radius that we've been
22  talking about here today?
23        A.   I would say that it's possible that
24  there might be a property that would not have a

Page 100

1  diminution -- I can't think of a reason right now,
2  but the statistical analysis would say that we would
3  expect every property to have one.
4        Q.   Are you aware of any science or
5  situations in which contamination resulted in less
6  than the expected or predicted property value
7  diminution?
8        A.   I'd just like that one read back,
9  please.
10        Q.   Are you aware of any science or
11  situations in which contamination resulted in less
12  than the expected or predicted property value
13  diminution?
14        For example, we wake up five years
15  from now and go out and do a market study around the
16  site, and it does not square with your views.
17  There's no diminution.  Are you aware if that has
18  occurred in any of your reading or studies?
19        A.   I don't know of any studies that
20  have -- I want to think about this one.  Can I have
21  that question read back.
22        Q.   Are you aware.  Well, do you want
23  me -- do you want me to give you my question?
24        A.   I don't care.

25 (Pages 97 to 100)

Kevin Boyle, PhD.
December 2, 2015

Page 101

1      Q.   Are you aware of any science or
2  situation in which contamination resulted in less
3  than the expected or predicted property value
4  diminution?  And then I went on to say, for example,
5  if we would wake up five years from now and went out
6  and did a market study of these properties that we've
7  been talking about, and the market dictated that
8  there had not been this diminution that you had
9  predicted, do you know of any situations like that,
10  that are further down the road, that you've read
11  about?
12      A.   So let me explain to you why I was a
13  little bit challenged by this question, because the
14  Hedonic property studies that are at the basis of it
15  are not predictions.  They are actual studies where
16  they've been able to have properties in the sample
17  that have and have not experienced diminution.  So
18  those are real diminutions that have been
19  experienced.
20          In terms of doing the transfer and
21  prediction to another site, there have been studies
22  that have looked at predicting how well the Hedonic
23  models predict.  But it's been enveloped in all the
24  different methods that have been used in making those

Page 102

1  transfers.  And that -- I'd have to go back and
2  check, but I did the analysis of that with one of my
3  graduate students, and the error is in the range of
4  25 to 30 percent.
5      Q.   So what you're saying, sometimes a
6  quarter to a portion of a third are instances where
7  there have been a prediction of property diminution,
8  and they did not in fact occur in the real world?
9      A.   No, not that did not occur but could
10  be higher or lower.
11      Q.   Okay.  Now, you assigned these
12  percentage, drop, percentage diminution in values to
13  the two classes of property that we talked about
14  earlier.  Do you expect all of these properties to
15  experience say a percentage drop in value
16  simultaneously?
17      A.   If the market has adjusted, then they
18  all should experience it.  Now, whether it's sooner
19  for some than others, that depends on how the
20  information on the contamination is dispersed.
21          If people find out about it earlier,
22  later it affects how sales are going, then that could
23  be.  If you take the case of some of the stuff where
24  a public health official has gone out and made sure

Page 103

1  that every single household in the affected area
2  receives the information at the same time, then you'd
3  be expecting it to basically be happening more
4  instantaneously --
5      Q.   Like flipping a light switch.  It
6  would be worth $100 the day before in the light
7  switch, and it's worth $90?
8      A.   Yeah, I mean, that's basically -- to
9  give you an example --
10      Q.   I'm just trying to get an
11  understanding.
12      A.   What's going on right now is they're
13  talking about putting Mountain Valley Pipeline
14  through this area, and to move natural gas, and as
15  soon as that answered that that affected the sale
16  prices of properties in that corridor.
17      Q.   So what you're telling me is
18  essentially is the dissemination of this information
19  within the -- to the owners of the properties at
20  issue, that determines when this drop occurs?
21      A.   Yeah, when and how that information
22  is disseminated.
23      Q.   Is there any way that, other than the
24  passage of time, that we would know if your property

Page 104

1  value diminution predictions are accurate?
2      A.   So in terms of -- for economics,
3  basically, what you're asking me is are they valid?
4  Validity assessment.  And there are three or more
5  different ways of looking at validity.
6          The one validity you've been talking
7  to me about is criterion validity, passage of time,
8  and then observing whether the average effect is
9  15 percent or 10 percent.  That's rarely ever done,
10  and hardly ever do it.  But other ones that are done
11  are content validity and convergent validity.
12          Content validity is when you're
13  following established practices in your profession
14  for doing it.  And so from that perspective, I think
15  that we would find that the predictions that I made
16  are valid.
17          The other one is when you compare
18  them to other ones, and that's where the prediction
19  error types of studies I've done.  So I think that in
20  terms of my field, there would be two that you could
21  look at for validity, without having to wait for the
22  passage of time.
23      Q.   But you're never for sure until the
24  time passes and there's -- a measured market

26 (Pages 101 to 104)

Kevin Boyle, PhD.
December 2, 2015

Page 105

1 diminution can be obtained? It's all just opinion
2 before then, isn't it?
3     A.   No, it's not opinion. Opinion is not
4 based on any actual evidence, somebody just goes out
5 and says it. This is based on actual information, on
6 actual sales, actual diminution of properties with
7 it, and so it is a scientific prediction of what the
8 effect would be.
9     Q.   So you're sitting here guaranteeing,
10 without knowing what's going to happen in the future,
11 these PVDs are going to come about? Is that what
12 you're telling me?
13     A.   What I'm telling you is that it is my
14 best estimate of what they will be as this
15 information becomes available.
16     Q.   So it's an estimate, not a guarantee.
17 It's your protection?
18     A.   It's my prediction.
19     Q.   We talked about predictions earlier.
20         Are you of the opinion that every
21 property -- maybe I asked you this earlier -- within
22 the two and a half mile radius will experience
23 property value diminution? I think you mentioned
24 maybe one that wouldn't.

Page 106

1     A.   I said there's a possibility there
2 might be one. I can't think of reasons why it would
3 be.
4     Q.   Could it be two?
5     A.   You know, I mean, you could find an
6 odd example. I can't think of a reason right now why
7 there would be. Basically, the research indicates
8 that you would expect all properties to have
9 diminished property values.
10     Q.   How can you be certain of that?
11     A.   Because what has been done is looking
12 at studies that have been done, that have found
13 significant property value effects. And one of the
14 things is if you look at the distribution of errors,
15 the distribution is not including zero as a likely
16 outcome.
17     Q.   So what you're telling me, with the
18 exception of maybe one odd man out, odd property out,
19 you're of the opinion that every property within this
20 two and a half mile radius is going to experience a
21 property value diminution?
22     A.   I am.
23     Q.   Now, is that permanent?
24     A.   If and when they're able to clean up

Page 107

1 the contamination, I would expect that that
2 diminution would go away in the future, but I don't
3 have any information at this point in time, to know
4 whether it's possible or when the complete cleanup
5 might occur.
6     Q.   Are you aware of any sites, any
7 studies that you've read about, where the property
8 diminution reversed itself or bounced back to a
9 healthy state, even in the absence of a remediation
10 or cleanup?
11     A.   Not right now. The ones I'm aware of
12 are ones where there has been cleanup.
13     Q.   You're just not aware of any?
14     A.   Just not aware of any.
15     Q.   Okay. You touched on something we
16 hadn't really gone into much, and I want to go into
17 it now, and that deals with the anticipated property
18 tax loss revenue to the City of Hattiesburg.
19         And you stated in your report, and
20 I'm going to quote from page 2: These predictions,
21 ellipses, are appropriate to compute the anticipated
22 loss in property tax revenue to the City of
23 Hattiesburg.
24         Did I read that correctly?

Page 108

1     A.   Where is that on page 2 -- I found it
2 in the middle of the page. Yes.
3     Q.   What's the historical relationship
4 between assessed values and market values, as
5 reflected by our sale prices for residential and
6 commercial property in Hattiesburg?
7     A.   I cannot comment on that. That's
8 within Ms. Herrin's report. My experience,
9 generally, with assessed values is that they are
10 updated periodically, using actual sale prices to
11 update them. But how different municipalities slice
12 and dice them, that varies from community to
13 community, and that's in Ms. Herrin's report.
14     Q.   Let's talk about the assessed values.
15 I assume this is an area that you're somewhat
16 familiar with. There are situations where a property
17 owner receives a tax bill, and for whatever reasons
18 feel like his property has been overvalued for
19 purposes of ad valorem taxation. That happens
20 community to community, does it not?
21     A.   Yes.
22     Q.   And the appropriate remedy to do that
23 would be for the property owner to approach the
24 taxing authority, the tax assessor, collector,

27 (Pages 105 to 108)

Kevin Boyle, PhD.
December 2, 2015

Page 109

1   whoever it might be, and state his case, so to speak;
2   correct?
3       A.   Yes.
4       Q.   And in most instances, will you agree
5   with me that the taxing authorities are reticent to
6   just accept the word of the property owner that they
7   are overtaxed or their properties are overvalued for
8   taxation purposes?  There has to be some proof?
9       A.   Some evidence.
10      Q.   And one element of proof would be
11  comparable sales that could be shown, like on a
12  square foot price in adjoining areas of the property?
13  Would that be one?
14      A.   I don't know what different tax
15  assessors -- how they operate.  I know from personal
16  experience, and I've challenged them, and that they
17  never accepted comparable sales, that they would only
18  do it if you could show that there was something
19  technically incorrect, you know, you have the square
20  footage wrong, or something like that.
21      Q.   What about an appraisal?  What if
22  someone had a formal appraisal and presented it to
23  the tax assessor?  Do you think that would be
24  something that would be considered by the taxing

Page 110

1   authority?
2       A.   Once again, I can't say.  I know when
3   I've challenged, they have not accepted an appraisal
4   because the appraisal was done -- when they do the
5   reassessment it's a mass appraisal across the whole
6   community.  But different ones could have different
7   rules and I can't comment on what individual ones,
8   but that's not my experience.
9       Q.   I believe you stated in your report,
10  I think maybe I'm still on page 2, that you assume a
11  direct correlation between a predicted change in
12  market values, which would be sale price, and a
13  predicted change in assessed values.  Am I correct
14  about that?
15      A.   Where are you reading from?
16      Q.   Do you assume that?  Is there a
17  direct correlation between a predicted change in
18  market values and a predicted change in assessed
19  values?
20      A.   I assume that assessed values change
21  when they're reassessed, and they reflect any changes
22  in market conditions.  So I do assume that there is a
23  correlation between the two.
24      Q.   A direct correlation?

Page 111

1       A.   A direct correlation doesn't have any
2   meaning to me from a professional perspective.
3   Correlation is a statistical term and that there is a
4   correlation.
5       Q.   Why do you recommend applying the PVD
6   percentage you estimated at 15.4, the 10 percent, to
7   Class I and Class II property, respectively, rather
8   than using partial level data to determine land use,
9   and applying the percentages to residential and
10  commercial property, respectively, regardless of
11  class status?
12      A.   I don't know how to answer that
13  question with all the parts to it.  I'm sorry.
14      Q.   You can't answer that?
15      A.   I don't quite understand what you're
16  asking.
17      Q.   Would it help you if I reread it
18  again?
19      A.   Let's try.
20      Q.   Do you recommend applying the PVD
21  percentage you estimated to Class I and Class II --
22  why do you recommend applying the PVD percentages you
23  estimated to Class I and Class II property,
24  respectively, rather than using partial level data to

Page 112

1   determine land use, and applying the percentages to
2   residential and commercial property, respectively,
3   regardless of class status?
4       A.   So, when you --
5       Q.   Does that question mean anything to
6   you?
7       A.   Well, I mean, you talk about applying
8   the 15 percent and then 10 percent but then you say
9   regardless of class status, so that implies just one
10  percentage for all properties?  Is that what you're
11  saying?
12      Q.   I'm just asking my question, if you
13  can answer it.  If you don't understand just tell me.
14      A.   I don't understand it.
15      Q.   We've -- correct me if I'm wrong.  I
16  want to ask another question.  We've earlier
17  discussed the geographic limit on how far your
18  predictions would emanate, and I think you said 3.2
19  will be about the furthest you've seen any studies
20  out there, 3.2 miles?
21      A.   That was the log of it.  I think,
22  what was it, 25?
23      Q.   25 miles, that's correct.
24      A.   That was the extent of the -- what

28 (Pages 109 to 112)

Kevin Boyle, PhD.
December 2, 2015

Page 113

1  Simons and Saginor, so there may be some other ones
2  out there but I would be surprised anything much
3  beyond that.
4       Q.   You stated, on page 16 of your
5  report:  The predictions could be used for properties
6  beyond 2.5 miles from the Hercules Manufacturing site
7  if the contamination were detected in more distant
8  properties.
9            Have we discussed that earlier?
10      A.   Yes.
11      Q.   And did I ask you if there was a
12 geographic limit on how far these predictions are
13 accurate?
14      A.   You didn't ask me on how far they
15 were accurate.  I told you that I wouldn't -- but to
16 answer that, they'd be accurate up and to what Simons
17 and Saginor had observed for other studies.  Given
18 it's a Hattiesburg case, I would not go beyond
19 Hattiesburg with any limit.  I mean, they're not
20 losing the tax base of another community, so I would
21 stop --
22      Q.   So that wouldn't be relevant to your
23 work here today?
24      A.   Right.

Page 114

1       Q.   I want to turn to market data and
2  market knowledge.  We touched on some of that.  How
3  do you define market data?  Do you have a definition
4  for market data?
5       A.   So, I don't know -- market data is
6  pretty broad term, you know.  I mean, basically what
7  we would say --
8       Q.   In the context of property valuation.
9       A.   -- for a model like where an
10 economist would estimate, it would be sale prices
11 between willing buyers and willing sellers, and the
12 characteristics of those properties that you would
13 use in the model to explain variation in sale prices.
14      Q.   What are some examples of
15 property-specific factors that affect values of
16 property?
17      A.   They're generally thought of in
18 groups or categories in them.  So there's lot
19 characteristics, there are house characteristics.  So
20 a lot example is acreage of the property.  House
21 characteristic is square footage.
22           There are community characteristics.
23 An example would be quality of schools.  And then
24 there are environmental characteristics, and one of

Page 115

1  them we're talking about here is the attic dust
2  contamination, would be one example.
3       Q.   On page 6 of your report, we touched
4  on this a little bit, talking about the market
5  adjusting to contamination information.  Buyers and
6  sellers would not be agreeing the transactions would
7  pull information on the extent of current
8  contamination and potential for future contamination.
9       A.   I see where you're reading.
10      Q.   You do?
11      A.   Yes.
12      Q.   And maybe you mentioned this earlier.
13 What exactly has to occur for the market to adjust to
14 contamination information?
15      A.   That the information is out there, so
16 that buyers and sellers have information on the
17 presence of contamination, and what they would need
18 to do to understand if it was in a property that they
19 were buying or selling.
20      Q.   And that would indicate to you that
21 the market has knowledge, and the prices reflect
22 contamination information at that juncture?
23      A.   Yes.
24      Q.   In the Simons paper, and maybe we

Page 116

1  won't need to look at it.  I'm going to read
2  something from page 72.
3       A.   I'd like to see the paper to get an
4  answer.
5       Q.   Let me just read this and see if you
6  agree with it.  Contamination affects property values
7  through impact on the real estate bundle of rights.
8  Do you want to --
9       A.   If I could see it.
10      Q.   I'm just going to ask you about that
11 question.  Are you familiar with the term real estate
12 bundle of rights?
13      A.   Yes, and I remember that sentence in
14 the paper.  I'd still like to see it in context.
15      Q.   What is the real estate bundle of
16 rights?
17      A.   It's a bundle --
18      Q.   As you understand it.
19      A.   -- of rights that an individual can
20 enjoy and transact when they purchase a property.
21      Q.   Would you read -- I'll turn it to you
22 and read it out loud.
23      A.   Contamination affects property values
24 through impact on the real estate bundle of rights.

29 (Pages 113 to 116)

Kevin Boyle, PhD.
December 2, 2015

Page 117

1    These rights include the right to possess, enjoy,
2    control and dispose of real estate property.
3        Q.   That is what you refer to as a bundle
4    of rights?
5        A.   That's how they have, and I would not
6    disagree with that.
7        Q.   As of the present time, and that's --
8    you mentioned that was a right to use and enjoy and
9    not be interfered with the full utilization of your
10   property; is that correct?
11       A.   Yeah.
12       Q.   As of the present time, court rights
13   have been adversely affected for these properties
14   within the two and a half mile radius.
15           MR. RADNEY:  Object to the form.
16       Calls for a legal conclusion.
17   BY MR. YARBOROUGH:
18       Q.   Are you aware of any loss of bundle
19   of rights, loss of use, loss of enjoyment,
20   interference?
21       A.   You're asking me to testify outside
22   of what my expertise as an economist is.
23       Q.   I'm just asking you if you're aware.
24   It's not an opinion.

Page 118

1        A.   My area of expertise is to predicting
2    the diminution.  When you look at economics -- let me
3    give you an example --
4        Q.   I'd rather you answer my question.
5    If you can't, you can't.  Are you aware of any loss
6    of these bundle of rights in any of these properties
7    we've been talking about, at the present time?
8            MR. RADNEY:  Object to the form.
9        Calls for a legal conclusion.
10           THE WITNESS:  I just want to explain
11       that to --
12   BY MR. YARBOROUGH:
13       Q.   I'd rather you answer my question and
14   then you can explain it.  Yes or no?
15       A.   Ask the question again.
16       Q.   Are you aware of any interference in
17   these bundle of rights, the right to use, enjoy, free
18   from interference of any kind, at the present time,
19   of any of these 8,000 properties we've been talking
20   about?
21       A.   What I'm aware of is that there is
22   contamination.  As an economist, we don't go to that
23   level.  For example --
24       Q.   That's fine, but will you give me a

Page 119

1    yes or no?  You say that doesn't mean anything to
2    you, but are you aware of any?
3        A.   I can say that I do not know that's
4    not the area that I would be specifically offering a
5    professional opinion on.
6        Q.   So you're not aware of any?
7        A.   I can't say that I'm aware right now.
8        Q.   Okay.  Is the -- is the impact on
9    these properties the same for rental property versus
10   owned property, the PVD?
11       A.   So, the diminution that I gave is for
12   owned property.  But it differentiates whether it's
13   owner-occupied or rented.  So the 15 percent is for
14   owner-occupied, whereas the 10 percent is for owner,
15   not occupied, where they rent it.
16       Q.   Okay.  What about vacant versus
17   occupied?
18       A.   So -- what do you mean by vacant?
19       Q.   Empty house, nobody lives there.
20       A.   So whether it's owner-occupied or not
21   owner-occupied, the diminution is the same.
22       Q.   Do you know whether any of the 8,000
23   plus properties within a two and a half mile radius,
24   have leaking underground storage tanks?

Page 120

1        A.   I do not.
2        Q.   What about septic tank problems?
3        A.   I do not.
4        Q.   Are they near high voltage power
5    lines?
6        A.   I do not.
7        Q.   Are they near railroad tracks or
8    major thoroughfares?
9        A.   It depends on whether you say close.
10   I mean, I know that those elements are in the area,
11   but close is a relative term.
12       Q.   Are there any landfills within the
13   two and a half mile area?
14       A.   I understand that there's some
15   landfills on the Hercules site.
16       Q.   Other than that.  Off-site.
17       A.   I don't remember any when I was
18   looking around, but there may be.
19       Q.   Are there any feeding operations?
20       A.   Not that I know of.
21       Q.   Do you know if any of these
22   properties have hazardous waste of any kind?
23       A.   They may or may not.
24       Q.   What about issues with groundwater?

30 (Pages 117 to 120)

Kevin Boyle, PhD.
December 2, 2015

Page 121

1    A.   There may be groundwater.
2    Q.   **Are there properties with**
3  **construction defects, foundation issues or soil**
4  **stability issues?**
5    A.   I don't know.  None of these would
6  affect my prediction, but we could go through them
7  all.
8    Q.   **Whether it was a floodplain or prone**
9  **to flooding wouldn't matter to you?  You're not**
10 **interested in how many of the properties might be in**
11 **a floodplain, or prone to flooding?**
12   A.   I'm not predicting the full value of
13 the property.  If you're predicting the full value,
14 you would bring these into considerations.  I'm only
15 looking at the diminution.
16       If you look at the Simons and Saginor
17 equation, I understand from reading that there had
18 been some possible groundwater contamination but I
19 didn't turn that on, because I couldn't find -- there
20 wasn't any evidence.  They've gone beyond the site
21 that I know of at this time.  I didn't turn on the
22 case to find animal feedings.  Some of these things,
23 if they were present, are ways that they could be
24 included, but I did not add them into the property

Page 122

1  value diminution.
2    Q.   **Because you're just not familiar with**
3  **the area down there, are you?  And you've not been**
4  **down there, you don't know what's present and not**
5  **present?**
6    A.   These issues are purely irrelevant
7  for my analysis.
8    Q.   **This will lead to mine final question**
9  **on this topic.  So what you're saying is that**
10 **property-specific conditions don't affect the PVD**
11 **diminution that you've assigned?**
12   A.   Right, because I am not looking at
13 the specific property.  I'm just looking at the
14 overall effect that would happen on the market to be
15 used for the aggregate loss and tax revenue.
16       Just to step back to where we were
17 talking earlier, in the Halliburton case we were
18 making predictions for individual properties, so we
19 needed a value for those properties that took in
20 local conditions.  And there, we worked with a local
21 appraiser who went in and took those considerations
22 into effect, and did the analysis.  And you, know, if
23 we were doing for individual properties, I would have
24 worked with somebody locally.  I'm sure that I that is

Page 123

1  not what we were trying to do.  We're trying to get
2  the best estimate of the overall loss and tax
3  revenues, not making individual predictions for each
4  one.
5        The claim, as I understand it, is not
6  for the homeowners, but for the community of
7  Hattiesburg, and that's the type of prediction I'm
8  trying to make here.
9    Q.   **I guess, since you've told me that**
10 **property-specific conditions don't affect your PVD**
11 **assessment, I take it, then, you're not aware of**
12 **whether a property owner has been limited at the**
13 **current or in the future time, of potential use of**
14 **their property?**
15   A.   Is there more to that?
16   Q.   **No, that's it.  You're not aware of**
17 **any impact, any property owner being limited to the**
18 **present or future use of their property, are you?**
19   A.   I don't have any specific, any
20 individual specific --
21   Q.   **You're not property-specific**
22 **interested?**
23   A.   Right.  I'm looking at the aggregate
24 effect.

Page 124

1    Q.   **Is your PVD theory based on distance**
2  **from the source site, being the Hercules site, as**
3  **maintained by the city, or on actual contamination?**
4        MR. RADNEY:  Object to the form.
5        THE WITNESS:  Can I have that again?
6  BY MR. YARBOROUGH:
7    Q.   **Is your PVD theory based on distance**
8  **from the source site or on actual contamination?**
9    A.   What do you mean by actual
10 contamination?
11   Q.   **Verified by analytical testing.**
12   A.   So I just want -- I'm just trying to
13 think through -- I'd like it read back again or can
14 you read it to me.
15   Q.   **Let me give you an example.  The**
16 **farthest -- correct me if I'm wrong.  The detection**
17 **farthest removed from the site, what was it?**
18 **2.5 miles?**
19   A.   Yes.
20   Q.   **That was one the farthest out.  Does**
21 **the property diminution that you assign the house**
22 **right next door to it result from it being present,**
23 **next door to the house where the detection was found**
24 **or is it measured due to the geographical source,**

31 (Pages 121 to 124)

Kevin Boyle, PhD.
December 2, 2015

1  back to the site?
2      A.  So I'm more comfortable with talking
3  about the formula than the theory.
4      Q.  Does the formula take into account --
5      A.  The formula is the distance from the
6  contamination site.  It does not have an additional
7  variable about whether contamination was detected on
8  individual properties.
9      Q.  That's fine.  You answered my
10  question.
11      A.  I'd just like a bathroom break.
12      MR. YARBOROUGH:  Sure.
13      THE VIDEOGRAPHER:  Off the record at
14  12:03 p.m.
15      (A recess ensued.)
16      THE VIDEOGRAPHER:  On the record at
17  12:09 p.m.
18  BY MR. YARBOROUGH:
19      Q.  Dr. Boyle, you testified, made
20  several comments recently about your role was not to
21  really address the site-specific diminution for an
22  individual property owner, but rather your concern
23  with the loss and tax revenue to the city; is that
24  correct?

1      A.  Of what the diminution would be
2  overall on property values for that calculation.
3      Q.  And they would have a loss or damage
4  based upon those calculations?
5      A.  Of my calculations and Ms. Herrin's
6  calculations.
7      Q.  Now, as of the present time the city
8  has not incurred any damages like that, have they?
9      A.  You know, I don't know whether there
10  have been some damages that have been occurring from
11  the presence of contaminants on the site.
12      Q.  You're not aware of any?
13      A.  I'm not aware of any, but they could
14  possibly be there.
15      Q.  But certainly, this massive
16  reassessment that you predict may result in the
17  future has not occurred; is that correct?  You'd know
18  if that happened, wouldn't you?
19      A.  This change has not occurred at this
20  time, as far as I know, with the information just
21  becoming available, yes.
22      Q.  So these opinions that you've
23  rendered, as we stated earlier, are predictions of
24  what you believe will occur at some point in the

1  future?
2      A.  They're predictions based on actual
3  sales and established scientific procedures, not just
4  my opinion.
5      MR. YARBOROUGH:  Can we go off the
6  record for a second, please.
7      THE VIDEOGRAPHER:  Off the record at
8  12:11 p.m.
9      (Brief pause.)
10      THE VIDEOGRAPHER:  On the record at
11  12:12 p.m.
12  BY MR. YARBOROUGH:
13      Q.  I want to turn to the Simons and
14  Saginor meta-analysis and ask you a few questions
15  about this report.  Are you familiar with -- being a
16  professor with a Ph.D., you're familiar -- and
17  author, are you familiar with the definition of peer
18  review?
19      A.  I am.
20      Q.  Why is that important?
21      A.  Peer review is a way of making sure
22  that the study has followed scientifically
23  established procedures.
24      Q.  And had been passed on by others in

1  the field?
2      A.  Yes.
3      Q.  Passing muster, so to speak?
4      A.  Yes.
5      Q.  How many of the -- I believe it was
6  58 studies in the Simons model, did you review
7  personally?
8      A.  I have reviewed some, but not --
9  well, let's be specific.  I do not believe I was a
10  peer reviewer in the publication of any of those
11  studies.
12      Q.  Do you know what decisions were made
13  by the authors regarding standardizing, including,
14  excluding or otherwise manipulating the data?  Just
15  off the top of your head, do you know?
16      A.  Well, I'd have to go through.  They
17  were very careful in their documentation, everything
18  that they did in the process here, and it has the
19  standard procedures for reporting.  But, I mean,
20  there are many things that they did, from going at
21  the beginning, where they -- you know, they looked
22  broadly, ended up with 230 studies, came down to some
23  of the checks that they did statistically, so there's
24  a lot of different things they did and reported, and

32 (Pages 125 to 128)

Kevin Boyle, PhD.
December 2, 2015

1    that's in the article.
2        **Q.   And a lot of different decision parts**
3    **such as time, geography, property type that effect**
4    **the outcome of the studies?**
5        A.   I'm not sure exactly what you're
6    asking me there.
7        **Q.   Do you know what selection process**
8    **Simons utilized to select the 58 studies from the**
9    **over 100 articles considered?**
10        A.   What I understand is that they looked
11    at studies that talked about contamination of
12    property values, and took the ones that actually
13    provided measures of property value diminutions.
14    There might be ones in the literature that talk about
15    whether you could get lending or other types of
16    things when you do an initial search, might come up,
17    but would not be appropriate for inclusion here.
18        **Q.   Were any of the studies that were**
19    **excluded, did they affect the ultimate meta-analysis**
20    **equation?**
21        A.   The studies that were excluded,
22    there's nothing in here that says whether they did or
23    did not.  My understanding was, is that the ones that
24    were excluded would not have been the same type of

1    studies here, so there wouldn't have been a way to
2    include them.  But they did do extensive analysis of
3    the studies within here, of whether they would have
4    an effect through the outlier analysis.  But they
5    also looked at how many studies would have to be
6    done -- how many additional studies would have to
7    come in to change the result.  I can't remember
8    exactly where that is in here, but I believe it was
9    in the order of about 30.  So they did do what would
10    be established robustness checks on the influence of
11    studies.
12        **Q.   Can you tell me how they selected the**
13    **specific variables to use in the meta-analysis**
14    **equation, such as location, distance, contamination**
15    **time, litigation?**
16        A.   I cannot tell you how they selected
17    specific variables, but they are variables that make
18    sense, from looking at the studies in the field.
19        **Q.   Do you know what process they used to**
20    **code each of the variables for each of the**
21    **observations?**
22        A.   I can't remember what they talked
23    about with that on coding.  I'd have to go back and
24    read the paper through carefully in order to give you

1    an answer on that.
2        **Q.   Do you know how many observations**
3    **they selected from each study?**
4        A.   They don't give a table with the
5    number for each study, but they do do analyses of
6    looking at whether the effect that different numbers
7    of observations from a study would affect the
8    results.
9        **Q.   If they remove outliers and they**
10    **affect the reliability of the model, don't they?**
11        A.   I don't think there's any evidence
12    that they affect the reliability of the model.
13    Actually, removing outliers is one of the procedures
14    for having what you might consider a more reliable
15    model.
16        **Q.   So you -- that's why you selected**
17    **this outlier 3 model as one of your papers you rely**
18    **upon?**
19        A.   Yes.
20        **Q.   On page 79 of their report , I'll ask**
21    **you about it.  There's a quote.  Of the 228**
22    **observations --**
23        A.   I'm not with you yet.
24        **Q.   I'm sorry.**

1        A.   Okay, I see it.
2        **Q.   Of the 228 observations, 34 were**
3    **associated with zero property value loss.**
4            **What does that mean?**
5        A.   That would mean that studies were not
6    able to detect a statistically significant effect.
7        **Q.   How does it affect the models'**
8    **estimate of PVD?**
9        A.   Those studies are included in the
10    analysis.  So those studies are considered when they
11    estimate the model.
12        **Q.   Are all 34 of those observations**
13    **included in the outlier 3 model?**
14        A.   I believe they are.  Let me just go
15    to that and read what they say.
16            (Brief pause.)
17            THE WITNESS:  They say that the
18    obviously unimpaired property values in
19    excess of 500,000, where removed.  That
20    would not be for any of the studies that I
21    used in there, because I'm focusing on the
22    Hedonics.  But that would be the case study
23    ones.  So there were some that were removed
24    from the equation, not all of them.  But I'm

33 (Pages 129 to 132)

Kevin Boyle, PhD.
December 2, 2015

Page 133

1    not relying on the case study or survey or
2    other ones. I'm only relying on their
3    results for the Hedonic property value
4    model.
5    BY MR. YARBOROUGH:
6        Q.   So the 34 observations that were
7    associated with zero property value loss, they don't
8    indicate to you that diminution cannot be assumed?
9    They're meaningless to you in terms of your opinion;
10   is that correct?
11       A.   No, they're not meaningless. They're
12   included in the equation as they should have been,
13   and being considered in the analysis.
14       Q.   Does their meta-analysis produce
15   different results? By different results I mean
16   estimates of PVD for properties that are actually
17   contaminated versus those that are not.
18       A.   They do not have a variable that
19   distinguishes that in their equation. Their study --
20   this is the first sentence in their study. It says:
21   This research addresses how proximity to source
22   influences environmental contamination effects on
23   residential property values.
24            The reason that they do that is

Page 134

1    that's the standard way that these are looked at in
2    the economics and the real estate literature, is
3    proximity.
4        Q.   So I assume, then, their results
5    don't vary by degree of contamination?
6        A.   They do not. But then again,
7    basically, I think what the economics literature has
8    found is that people do not want to see
9    contamination.
10       Q.   Answer me this. Are the presence
11   and/or the degree of contamination factors that are
12   relevant to property value?
13       A.   So the presence is, and I have said
14   more than once today that I would expect, if they did
15   have it in their equation, that it would have been an
16   additional factor that would have increased the price
17   diminution.
18            One of the reasons that is not in is,
19   when you're estimating these models, in order to
20   include a variable like that, you need to have a
21   measure of the contamination for each property to
22   include it in the underlying Hedonic model. That
23   information is generally not available. But if it
24   was, I think we would be seeing a larger property

Page 135

1    diminution. So that's another factor that makes the
2    15 and 10 percent conservative.
3        Q.   Is the degree of contamination a
4    factor that's relative to property value?
5        A.   It may or may not be a factor, but
6    again, that would be another variable that would be
7    in the equation. And if it did for each increment,
8    it would increase it. It would not be a decrease in
9    the percentage diminution.
10       Q.   Is there a model, Saginor model,
11   capable of producing a specific instance of PVD, or
12   is it, by design, formulated to produce equal or
13   equivalent diminutions for all properties?
14       A.   Well, it produces values that can
15   be -- it's a formulaic process that can give values,
16   depending on what the conditions are. So, you know,
17   given the variables in the equation, there are
18   different things that changed. You could get
19   different ones for different properties.
20            But it's really the same procedure,
21   the kind of formulaic procedure that an appraiser
22   uses in terms of when they do their appraisal and
23   they have three common ones, you make adjustments for
24   the square footage or the acreage of a property.

Page 136

1    This would be one that doesn't necessarily the
2    percentage doesn't vary from property to property but
3    it would be a formulaic one for a community with this
4    type of contamination would be. The magnitude of the
5    effect changes by the value of the house.
6        Q.   What is the model you use to produce
7    the same PVD value for every property, two classes of
8    property?
9        A.   Because they're all in the -- for
10   each of the classes, because they are in the same
11   community, with the same community characteristics.
12       Q.   Since you mentioned community, is
13   that estimate unique to the Hercules site? Is it
14   unique to Hattiesburg?
15       A.   It's unique to those characteristics
16   that we put into it. So would it change with another
17   community? Yes. I mean, it changed with what I did
18   in Duncan, Oklahoma. It was a much larger property
19   value diminution predicted there.
20       Q.   So it's unique to this particular
21   site, this particular situation?
22       A.   Yes, in Hattiesburg.
23       Q.   Would the model produce the same
24   outcome for every other site in the south for which

34 (Pages 133 to 136)

Kevin Boyle, PhD.
December 2, 2015

Page 137

1  you coded the variables in the same way?
2       A.   Yes, it would.
3       Q.   You'd have no variables which would
4  differ, I take it is what you're telling me?
5            MR. RADNEY:  Object to the form.
6            THE WITNESS:  I think I misspoke on
7       that one because unemployment would change,
8       interest rates would change, and so the sell
9       variable would be the same.  I just reacted
10      to the sell variable, but the prediction
11      would change.
12  BY MR. YARBOROUGH:
13      Q.   Does your model have an error rate?
14      A.   There is --
15      Q.   Or a margin of error?
16      A.   The margin of error that I would put
17  on it is based on what -- kind of a convergent
18  validity type of test that I told you about before,
19  and that would be in the range of 25 to 30 percent.
20      Q.   Are you aware of specific site or
21  situation in which the Simon and Saginor
22  meta-analysis accurately predicted PVD?
23      A.   I don't know of any cases.  We've
24  been through that.  In the cases, I don't know what

Page 138

1  the outcome is afterwards.
2       Q.   What's the date of their article?
3       A.   2006.
4       Q.   So in the nine years since the
5  publication of that article, we just -- at least
6  you're not aware of whether the model has been proven
7  accurate in a given situation?  You can't quote me to
8  a particular site or area?
9       A.   And I've answered this before.
10  You're asking for the criteria and validity, and I
11  told you I just don't know where the cases go
12  afterwards, and what happens.  But this would stand
13  up to the other two types of validity that I
14  discussed earlier.
15      Q.   Fair enough.  Do you know what the
16  most recent sales data analyzed in one of the 58
17  studies that underlie their model?
18      A.   I don't have that information in
19  front of me, but it would be pre 2006, because those
20  all had to be in place for them to do their study.
21      Q.   Has the real estate market changed
22  since then?
23      A.   There have been changes in real
24  estate markets.

Page 139

1       Q.   And the economy as well?
2       A.   And the economy.
3       Q.   Has mortgage rates changed?
4       A.   Mortgage rates have changed and we've
5  taken account of that in the model.
6       Q.   Has unemployment changed?
7       A.   Yes, and we've taken account of that
8  in the model.
9       Q.   Are you aware of any relevant studies
10  that have been published since they completed their
11  research in the early 2000s, any studies which
12  addressed their paper?
13      A.   I don't know of any studies that have
14  commented on their paper.
15      Q.   Would you agree that at some point in
16  time their model may become dated and no longer
17  relevant for predicting PVD?
18      A.   That's possible.  That addresses a
19  different issue.  You know, in economics we refer to
20  that as reliability.  If you do something at one
21  point in time can you replicate it in a second -- at
22  a later point in time, and they have been -- these
23  types of things have been very robust and so I would
24  think that within the time frame that we're talking

Page 140

1  about, that these percentage diminutions should be
2  quite stable.
3       Q.   Let me turn to, if I could, ask you
4  about -- maybe it will be the last paper.  Yes, it
5  is.
6       A.   Are we done with this one?
7       Q.   Yes, sir, we are.  I'm not sure I
8  even have a copy of this with me.
9       A.   This is not an exhibit.
10      Q.   I'll keep this with me, but you're
11  familiar with the Ihlanfeldt and Taylor study?
12      A.   Ihlanfeldt.
13      Q.   This addressed -- what was that
14  study?
15      A.   That was a study -- can I have the
16  study to look at?
17      Q.   I don't have it in front of me.  Do
18  you know what geography was studied?
19      A.   It was --
20      Q.   Was it Atlanta?
21      A.   Atlanta area, Fulton County area.
22      Q.   What basically did they study?
23      A.   They looked at property value effects
24  from proximity to contaminated properties, and I

35 (Pages 137 to 140)

Kevin Boyle, PhD.
December 2, 2015

Page 141

1  believe that they had apartments, retail, commercial,
2  industrial, vacant lands that they looked at.
3       Q.   And I think that study was back in
4  the 1990s; is that right?  We can maybe look.
5       A.   We can look at that to confirm.
6  2004.
7       Q.   I'm sorry, I misspoke.  And this is a
8  study that you relied upon, at least partially?
9       A.   Yes.
10      Q.   Do you consider the Hattiesburg,
11 Mississippi, and the Atlanta, Georgia, to be
12 comparable cities and comparable real estate markets?
13      A.   I believe that there are differences
14 between the markets.  When I looked at these studies
15 out there that had looked at -- let's just use
16 commercial for this whole group just to make it
17 easier in conversation, that it was the one that was
18 the best match because it talked about the types of
19 properties that would be in there.
20          The effects, in my opinion,
21 professional opinion, would be less in the Ihlanfeldt
22 and Taylor study than in the Hattiesburg area,
23 because there's more substitutes, and economic
24 substitutes is a fundamental concept.  If you have

Page 142

1  more different opportunities you can shift away and
2  it would reduce the effect.  And so, my opinion would
3  be that there are differences but the differences
4  most likely would mean that Ihlanfeldt and Taylor
5  would underestimate the effects in Hattiesburg.
6       Q.   Would you agree Atlanta is probably
7  not an appropriate comparison to Hattiesburg?
8       A.   No, I would not agree, or I would not
9  have done it.
10      Q.   Ms. Herrin, in her report, indicated
11 that there were 5,532 Class II properties within the
12 two and a half mile radius of the Hercules site.  Do
13 you know what property types exist among these
14 nonresidential properties?
15      A.   My understanding is that there are
16 apartments, there's retail, there's industrial.
17 There's a variety of different types of, you know,
18 what I'm calling in that commercial category.
19      Q.   There's a wide variety of properties,
20 commercials?
21      A.   I'm giving you the examples of what
22 the categories would be.
23      Q.   I want to make sure I understand that
24 you've told me earlier your basis, and if you have

Page 143

1  it, please elaborate, that each of these 5,532
2  nonresidential properties would experience the same
3  percentage property value diminution?
4       A.   That's what I have, is the average
5  for them.  If we were going out -- this would be the
6  same thing we were just talking about with the
7  residential.  If we were going out and we were
8  looking at individual ones, the Ihlanfeldt and Taylor
9  one would allow us to do individual ones that would
10 vary from apartments, to retail, to commercial.  But
11 my understanding also is that the Hattiesburg records
12 don't allow that type of distinguishing.  I thought
13 the average across all them was the 10 percent was
14 appropriate because we're looking at the factor again
15 what the property loss might be, not going in for
16 individual properties.  If we were, we could do more
17 customizing, if we were looking at individual
18 properties.
19      Q.   Dr. Boyle, are you familiar and if so
20 can you describe any other site or situation where
21 5,000 plus properties experienced the same property
22 value diminution percentage simultaneously due to a
23 single cause or factor?
24      A.   Well, I don't know where this 5,000,

Page 144

1  but --
2       Q.   I'm talking about the 5532 Ms. Herrin
3  indicated in her report.
4       A.   You're asking about a specific
5  number.  What I'm going to tell you is that if you
6  look at Ihlanfeldt and Taylor and what they found --
7  they had large sample sizes.  What they show is that
8  there are, across broad classes of properties,
9  property value diminution experienced.
10          Once again, we're not going down and
11 we're not predicting for individual properties.
12 We're predicting what the aggregate effect is on the
13 value of properties in terms of what the City of
14 Hattiesburg would lose in terms of property tax
15 revenue.
16      Q.   But I want to talk about property
17 diminution evidenced by market value.  And that's
18 what the taxing authorities use, isn't it?  A cents
19 value, market value?
20      A.   And the Ihlanfeldt and Taylor study
21 studied actual market values to come up with that.
22      Q.   Do you know of any site situation
23 where these over 5,000 properties experienced the
24 same property value diminution percentage

36 (Pages 141 to 144)

Kevin Boyle, PhD.
December 2, 2015

Page 145

1  simultaneously as you said it would occur, due to a
2  single cause or factor anywhere in the United States?
3       A.   I can't give you a specific one but
4  you're making it so specific it's impossible to give
5  you an example.
6       Q.   Just in general.  One that's just
7  comparable.
8            MR. RADNEY:  That specifically has
9       5,000 properties?  I think that's where he
10      got hung up.
11  BY MR. YARBOROUGH:
12      Q.   Yes, all at once.  You're not aware
13  of one?
14      A.   No.
15      Q.   Fair enough.  Did I ask you earlier
16  if you had done any reading on the two products that
17  are involved here, the two contaminants?
18      A.   You did not.
19      Q.   Have you?
20      A.   I did a little at the beginning but
21  that was not really my area of expertise, so I didn't
22  do anything since.
23      Q.   Have you done any risk -- what you
24  did look at, was it research that addressed the

Page 146

1  impact that these two particular products might have
2  on property values, the presence of these products?
3       A.   No, it was not the presence of these
4  products on property values.
5       Q.   Have you ever spoken to the
6  Hattiesburg or Forrest County tax assessor or
7  collector --
8       A.   No.
9       Q.   -- in connection with your work on
10  this case?  You made no inquiry as to whether or not
11  there's been any reduction in the ad valorem tax
12  basis for any of the properties at issue in this
13  case?
14      A.   No.
15      Q.   That was not of interest to you?
16      A.   I was not doing individual
17  properties.  I was looking at the aggregate of --
18  potential aggregate effect, and then the specific
19  calculations of conditions in Hattiesburg is what
20  Ms. Herrin did.
21      Q.   Are you familiar with any commercial
22  business development within the two and a half mile
23  area that has taken place in the past two years?
24      A.   I am not.

Page 147

1       Q.   What about construction of personal
2  residences within that area in the past two years?
3       A.   I have not.
4       Q.   What about construction of apartment
5  complexes within the past two years?
6       A.   I have not.
7       Q.   That type of market activity is not
8  germane to you in giving the opinions that you're
9  giving in this case?
10      A.   No, it is not.
11           MR. YARBOROUGH: Okay.  Let's go off
12      the record, if we could, as I wind down?
13           THE VIDEOGRAPHER:  Off the record at
14      12:41 p.m.
15           (A recess ensued.)
16           (Exhibit No. 5 was marked for
17      identification.)
18           THE VIDEOGRAPHER:  On the record at
19      12:47 p.m.
20  BY MR. YARBOROUGH:
21      Q.   Dr. Boyle, during a break, I handed
22  you what I marked as Exhibit 5, which is an order
23  that was entered in the Duncan, Oklahoma, litigation
24  that you were involved.  One of the named plaintiffs

Page 148

1  was Amanda Alexander versus Halliburton Energy.  The
2  case is United States District Court for the Western
3  District of Oklahoma, and the order signed by Chief
4  United States District Judge Vickie Miles-LaGrange on
5  July 22, 2015.  Have I described that document?
6       A.   Yes.
7       Q.   Now, this is an order on a motion
8  that was filed by Halliburton, to exclude plaintiff's
9  expert Kevin J. Boyle, and you are the one, in fact,
10  Kevin J. Boyle that's referred to in this order?
11      A.   Yes.
12      Q.   And the court did in fact exclude the
13  opinions that you offered up in that litigation in
14  Oklahoma, did she not?
15      A.   I'm not an attorney but my
16  understanding is that they found that what I was
17  asked to testify to was not admissible under Oklahoma
18  law, that it wasn't a question in terms of the
19  admissibility of the information and myself as expert
20  information.
21      Q.   It wasn't necessarily an attack on
22  your credentials, it was just a legal issue, is what
23  you're saying?
24      A.   That's my understanding.

37 (Pages 145 to 148)

Kevin Boyle, PhD.
December 2, 2015

Page 149

1      Q.   And specifically, I'm reading here:
2   Having carefully reviewed the parties' submissions
3   and in particular Dr. Boyle's expert report and
4   deposition testimony, the court finds that the report
5   and opinions of Dr. Boyle should be excluded.
6   Specifically, the court finds that Dr. Boyle's
7   testimony will not help the trier of fact understand
8   the evidence or determine a fact in issue as required
9   by Rule 702(a).
10          Under Oklahoma law, quote, the
11  measure of damages for permanent injury to land is
12  the difference between the reasonable market value of
13  the land immediately before the injuries, and the
14  reasonable market value of the land immediately after
15  the injuries.  Further, the Oklahoma Supreme Court
16  has found that evidence of the value of the land at
17  the time of trial, two years after the alleged
18  pollution of a stream, was insufficient to establish
19  damages.
20          In his report, Dr. Boyle states that
21  his report addresses, quote, addresses long-term
22  property value diminutions, not losses immediately
23  after the contamination became public knowledge, that
24  occurred after the residential real estate market has

Page 150

1   adjusted to the presence of perchlorate contamination
2   and other losses incurred by property owners.
3          Have I read that correctly?
4      A.   I'm assuming you've read that.
5      Q.   What I wanted to know was, has there
6   been any other activity in this case since that order
7   was entered, in which you were involved?  I mean, did
8   this end your involvement in this particular case.
9   Has there been an appeal, to your knowledge?
10     A.   I do not know what the current status
11  of the case is.
12     Q.   And the type of work that you were an
13  expert, that you prepared in this Halliburton,
14  Duncan, Oklahoma, litigation is you're addressing the
15  same type issues that you did in the expert report
16  you rendered in the Hattiesburg case?
17          MR. RADNEY:  Object to the form.
18          THE WITNESS:  I'm using similar
19  procedures in the two cases.
20  BY MR. YARBOROUGH:
21     Q.   And you told us on multiple occasions
22  that you are not relying on present market conditions
23  to render -- and data to render the opinions that you
24  rendered in this case on diminution?

Page 151

1      A.   From an economic perspective, things
2   just don't happen instantaneously, like the Oklahoma
3   one.  It takes time for them to evolve, and what I'm
4   giving is the one where there's the full information
5   available, for people to make those decisions.
6      Q.   Not based on present market data and
7   transactions?
8      A.   That's right.
9          MR. YARBOROUGH:  I believe that's all
10  the questions I have for you, Dr. Boyle.  I
11  appreciate you coming in today.
12          MR. RADNEY:  Let me just take one
13  second, see if there's anything.
14          THE VIDEOGRAPHER:  Off record at
15  12:52 p.m.
16          (A recess ensued, after which, the
17  deposition concluded at 12:52 p.m.)
18
19
20
21
22
23
24

Page 152

1          WITNESS SIGNATURE PAGE
2      I hereby certify that I have read my
3   deposition, and made those changes and/or corrections
4   I deem necessary, and approve the same as now
5   written.
6
7   Executed this      day of        , 2015.
8
9
10
11
            KEVIN BOYLE, Ph.D.
12
13
14
15
16
17
18
19
20
21
22
23
24

38 (Pages 149 to 152)

Kevin Boyle, PhD.
December 2, 2015

Page 153

```
 1        C E R T I F I C A T E
 2   COMMONWEALTH OF VIRGINIA
 3   COUNTY OF ROANOKE
 4        I, CECELIA BROOKMAN, Notary Public in
 5   and for the Commonwealth of Virginia, at Large, do
 6   hereby certify that the foregoing deposition of KEVIN
 7   BOYLE, Ph.D., was by me reduced to machine shorthand
 8   in the presence of the witness, afterwards
 9   transcribed by me by means of computer, and that to
10   the best of my ability the foregoing is a true and
11   correct transcript of the deposition.
12        I FURTHER CERTIFY that this
13   deposition was taken at the time and place specified
14   in the foregoing caption.
15        I FURTHER CERTIFY that I am not
16   related to nor employed by any of the parties hereto,
17   and have no interest in the outcome.
18        DATED at Roanoke, Virginia, this 7th
19   day of December, 2015.
20
21
        _____
22        CECELIA BROOKMAN, RPR
23
     My Commission expires August 31, 2019
24   Notary Registration Number:  7502161
```

Page 154

```
 1        ERRATA SHEET
     DEPOSITION OF:  KEVIN BOYLE, Ph.D.
 2   IN THE MATTER OF:  City of Hattiesburg v. Hercules,
              Inc., et al.
 3        DATE:  December 2, 2015
     I have read the foregoing deposition and I wish to
 4   make the following changes:
        (IF THERE ARE NO CHANGES, WRITE "NONE")
 5   Page Line    Change              Reason
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23
24        _____
```

39 (Pages 153 to 154)

Kevin Boyle, PhD.
December 2, 2015

Page 155

---

**A**

**ability** 23:11
153:10
**able** 24:4 60:11
72:12 74:24 87:10
98:12 101:16
106:24 132:6
**absence** 107:9
**absolutely** 80:22
**accept** 65:22 70:12
84:17 109:6
**acceptable** 14:14
**accepted** 13:20
14:1,11 65:10,15
109:17 110:3
**accepting** 61:2,8
90:12,14,16
**access** 11:16
**account** 125:4
139:5,7
**accounting** 68:15
83:13
**accurate** 65:16
104:1 113:13,15
113:16 138:7
**accurately** 137:22
**acreage** 114:20
135:24
**acronym** 39:9,11
39:14,17 99:14
**action** 31:13 77:23
**activity** 53:18
147:7 150:6
**actual** 21:6,14 22:5
25:14 32:12 57:17
59:18 72:13 74:23
76:6 87:9 101:15
105:4,5,6,6
108:10 124:3,8,9
127:2 144:21
**ad** 71:23 108:19
146:11
**add** 121:24
**addition** 8:10 14:8

**additional** 125:6
130:6 134:16
**additionally** 61:1
**address** 5:17 33:15
33:15 55:17
125:21
**addressed** 11:1
12:21,23 41:7
91:7 92:7 93:1
139:12 140:13
145:24
**addresses** 35:23
133:21 139:18
149:21,21
**addressing** 13:6,22
33:2,9 55:16
91:22 150:14
**adjacent** 78:6 93:7
**adjoining** 92:9
109:12
**adjust** 84:20
115:13
**adjusted** 102:17
150:1
**adjusting** 115:5
**adjustment** 61:23
61:24 62:1,11
**adjustments**
135:23
**administration**
12:5
**admissibility**
148:19
**admissible** 148:17
**admitting** 59:17
**advance** 8:8
**adversely** 72:1,3
73:1 92:18 117:13
**advisory** 43:5,7
**affect** 20:17 86:17
114:15 121:6
122:10 123:10
129:19 131:7,10
131:12 132:7
**affirmatively** 80:24

**agencies** 44:15
**agency** 44:14 94:13
**agent** 20:16 37:14
**aggregate** 122:15
123:23 144:12
146:17,18
**ago** 10:10,12 11:21
28:3 75:22
**agree** 23:23 25:6
61:17 62:14 71:21
73:23 78:22 79:1
83:23 94:3 109:4
116:6 139:15
142:6,8
**agreeing** 115:6
**agreement** 41:6
**agricultural** 5:22
5:23 18:16
**air** 63:4 94:2
**airborne** 96:5
**al** 1:6 3:5 4:13
154:2
**alexander** 148:1
**allegations** 80:19
**alleged** 11:1 92:8
149:17
**allow** 143:9,12
**allowed** 90:21
**altered** 61:18
**amanda** 148:1
**amenities** 66:16
**analog** 67:5,7,12
**analogous** 13:7
**analyses** 131:5
**analysis** 10:19
21:19 22:1,16
35:5 36:14,17
42:10 56:19 57:10
73:3 76:7 78:23
83:13 93:12 100:2
102:2 122:7,22
130:2,4 132:10
133:13
**analyst** 17:2
**analytical** 61:3

75:6,17 124:11
**analyzed** 62:5
138:16
**animal** 121:22
**answer** 20:19 22:2
27:19 65:14 68:8
74:11 75:4 80:24
87:16 91:20 94:11
111:12,14 112:13
113:16 116:4
118:4,13 131:1
134:10
**answered** 39:7 40:2
40:17 41:4 68:2
103:15 125:9
138:9
**answering** 44:11
**anticipated** 107:17
107:21
**anybody** 7:15
**apartment** 147:4
**apartments** 43:14
141:1 142:16
143:10
**apologize** 52:20
**appeal** 150:9
**appearances** 3:1
**appears** 50:7,10
**apples** 22:14
**application** 83:8
**applied** 31:17 45:6
48:16 82:20
**applying** 83:9
111:5,9,20,22
112:1,7
**appointment** 43:8
43:10
**appraisal** 23:8,10
23:11 26:1,4
38:13,16,19 39:4
39:19 40:23 41:9
109:21,22 110:3,4
110:5 135:22
**appraisals** 22:17
22:18 23:5 26:16

**appraised** 32:11
**appraiser** 22:17,23
23:4,5,19,20
25:18,20,22 26:24
31:15 35:21 37:13
38:6 39:1,6,6,7,8
41:16,23 122:21
135:21
**appraisers** 23:17
23:20 26:7,10,16
26:18,20 27:3
31:24 32:1,12
38:8,10 39:10
**appraising** 26:18
32:13
**appreciate** 71:18
72:23 75:3 151:11
**approach** 22:24
36:18 57:11 72:17
108:23
**approaches** 22:22
**appropriate** 36:13
74:14 77:6 107:21
108:22 129:17
142:7 143:14
**approve** 152:4
**approximate** 73:7
**approximately**
11:21 17:10 50:11
56:9 68:23 69:8
70:4
**aquatic** 52:11
**area** 11:15 12:7
13:14 27:17 28:8
30:18,21 31:4
35:20 36:1 47:14
47:22 55:21 60:23
65:18 70:13 72:17
79:12 84:5 87:5
88:4 89:24 93:21
94:10 96:9 98:19
103:1,14 108:15
118:1 119:4
120:10,13 122:3
138:8 140:21,21

---

Kevin Boyle, PhD.
December 2, 2015

141:22 145:21
146:23 147:2
**areas** 109:12
**arguing** 20:18 75:5
**arm** 94:17
**arose** 19:18
**article** 67:1 129:1
138:2,5
**articles** 46:11 50:5
50:11,12,23 51:2
51:8 80:12,19
81:1 92:16 129:9
**asb** 39:10
**asbestos** 92:21,22
92:23
**ashland** 4:21 78:24
**aside** 48:2
**asked** 14:11 22:21
24:19 33:12,15
34:2 37:11 39:23
40:2 41:8 44:12
55:17 62:14 63:2
98:5 105:21
148:17
**asking** 9:8 20:8,9
42:1 54:19 69:22
71:9 96:2 104:3
111:16 112:12
117:21,23 129:6
138:10 144:4
**assert** 69:24
**assessed** 108:4,9,14
110:13,18,20
**assessment** 27:7
41:2 104:4 123:11
**assessments** 27:5
**assessor** 108:24
109:23 146:6
**assessors** 109:15
**assign** 124:21
**assigned** 8:16 9:14
60:14 79:2,5
82:16 102:11
122:11
**assignment** 10:24

33:2
**assigns** 95:24
**assimilated** 37:5,7
37:10
**assisted** 31:4,7
**associated** 97:4
99:12 132:3 133:7
**assume** 56:15
108:15 110:10,16
110:20,22 134:4
**assumed** 133:8
**assuming** 78:23
79:1 150:4
**assumption** 56:16
**atlanta** 94:14
140:20,21 141:11
142:6
**atsdr** 94:19 95:24
96:4
**attack** 148:21
**attic** 56:2 59:21
80:17 81:12 88:24
89:15 91:2,8,14
91:17 92:3,10,12
92:17 93:5 94:8
94:20 95:7 96:1,4
97:12,14,15 115:1
**attics** 37:2
**attorney** 15:5,8
42:19 45:20 87:2
148:15
**attorneys** 3:4,10
4:15 32:2,19 46:5
49:6
**attributes** 36:20
**august** 6:11 7:1
45:15 153:23
**author** 50:11,19,20
50:24 51:2 60:4
127:17
**authored** 51:8
**authorities** 109:5
144:18
**authority** 108:24
110:1

**authors** 67:9
128:13
**authorship** 51:7
**available** 21:20
24:24 105:15
126:21 134:23
151:5
**average** 104:8
143:4,13
**aware** 24:15 26:6
26:13,14 54:3
57:21 76:15,19
80:18 87:4,8
92:24 94:18 100:4
100:10,17,22
101:1 107:6,11,13
107:14 117:18,23
118:5,16,21 119:2
119:6,7 123:11,16
126:12,13 137:20
138:6 139:9
145:12

---

**B**

**back** 9:1 16:2,6
36:8 45:17 47:2
53:2 56:5,11
59:22 66:7 70:9
71:13 72:24 74:22
80:13,16,23 81:3
83:7 90:20 91:11
100:8,21 102:1
107:8 122:16
124:13 125:1
130:23 141:3
**backfilling** 54:14
**background** 51:3
53:23 54:21,22
68:15
**backtracking** 98:6
**bad** 59:5
**baker** 3:9
**bakerdonelson**
3:12
**bank** 41:17,20

**banks** 12:9
**base** 20:11 113:20
**based** 22:7 54:11
61:12 65:11 66:4
69:13,17 72:9
73:2,3,6 74:1
75:16 79:8,16
98:18 105:4,5
124:1,7 126:4
127:2 137:17
151:6
**basic** 7:16 13:1
64:10
**basically** 13:3
18:23 20:16 28:13
54:11 55:22 77:3
82:16 89:19 103:3
103:8 104:3 106:7
114:6 134:7
140:22
**basis** 70:22 101:14
142:24 146:12
**bathroom** 49:10
125:11
**bearman** 3:9
**becoming** 126:21
**beginning** 6:11
128:21 145:20
**believe** 6:21 15:1
16:5 24:21 27:11
28:16 38:5,7
41:17 43:18 45:15
68:14,20 69:8
72:8 79:12 89:16
90:7 110:9 126:24
128:5,9 130:8
132:14 141:1,13
151:9
**bell** 39:1
**benefits** 19:2
**berkowitz** 3:9
**best** 45:16 79:10,12
79:13,14 82:21
83:3 105:14 123:2
141:18 153:10

**beyond** 66:3 75:1
83:1 113:3,6,18
121:20
**big** 61:23
**bill** 108:17
**biological** 98:22
**birmingham** 3:5
**bit** 52:17 56:1
62:16 98:6 101:13
115:4
**blacksburg** 8:2
**board** 43:6
**body** 18:4
**bottom** 71:22 96:21
**bought** 86:4
**bounced** 107:8
**bound** 72:19,20
**boundaries** 29:6
**boundary** 66:5
**boyle** 1:12 2:13 4:9
5:1,16,24 6:4
45:14 49:21 50:12
50:13,15,16,21,21
75:3 87:1 88:16
125:19 143:19
147:21 148:9,10
149:5,20 151:10
152:11 153:7
154:1
**boyles** 149:3,6
**breach** 12:10
**break** 49:10,22
55:24 88:7,17
125:11 147:21
**breathe** 96:7
**bridge** 64:17
**brief** 95:20 127:9
132:16
**briefly** 90:1
**bring** 121:14
**bringing** 15:3
**broad** 55:21 78:8
114:6 144:8
**broadly** 128:22
**broker** 37:14

Kevin Boyle, PhD.
December 2, 2015

**brokers** 32:20,20 32:21
**brookman** 1:18 5:3 153:4,22
**brought** 91:6
**buildings** 80:7
**bulldozed** 11:15
**bulldozing** 11:18
**bundle** 116:7,12,15 116:17,24 117:3 117:18 118:6,17
**bureau** 47:20
**business** 146:22
**buy** 86:17
**buyer** 41:21
**buyers** 36:21 86:14 86:15 114:11 115:5,16
**buying** 32:9,9 66:1 70:11 115:19

**C**
**calculate** 9:6
**calculating** 70:22
**calculation** 64:14 126:2
**calculations** 126:4 126:5,6 146:19
**calculator** 67:4
**caldwell** 3:9
**call** 70:16 75:14 91:16
**called** 38:2 39:10
**calling** 142:18
**calls** 87:13 117:16 118:9
**cant** 10:6 80:24 86:11 87:15 91:20 95:9 100:1 106:2 106:6 110:2,7 111:14 118:5,5 119:7 130:7,22 138:7 145:3
**capable** 135:11
**capping** 80:6

**caption** 153:14
**care** 100:24
**career** 51:7,8
**careful** 77:1 128:17
**carefully** 130:24 149:2
**carried** 71:11
**carries** 64:9
**carry** 87:18
**case** 1:4 4:12 7:7 8:16 9:5,23,24 10:9,24 14:16,18 14:21 16:3,4,5,7 16:15,17,19 29:20 29:21 30:2,8,11 31:5,8,12,12,18 32:8 33:14 35:17 36:6 45:19 49:7,7 49:9 54:17 56:13 68:9 87:19 91:14 92:4,11 98:19 99:14 102:23 109:1 113:18 121:22 122:17 132:22 133:1 146:10,13 147:9 148:2 150:6,8,11 150:16,24
**cases** 14:4,12,12 15:11,16 29:20 94:19 137:23,24 138:11 150:19
**cash** 96:15
**catch** 71:20
**categories** 114:18 142:22
**category** 86:9 142:18
**cause** 143:23 145:2
**caused** 80:14
**causes** 98:8
**cece** 4:14
**cecelia** 1:18 5:3 153:4,22
**cents** 144:18

**certain** 8:15,17 33:10 99:15,18,20 106:10
**certainly** 18:3 78:24 126:15
**certainty** 99:5,8
**certification** 44:24 45:2
**certify** 152:2 153:6 153:12,15
**challenged** 87:22 101:13 109:16 110:3
**challenges** 14:13
**chance** 21:16
**change** 61:20 78:10 110:11,13,17,18 110:20 126:19 130:7 136:16 137:7,8,11 154:5
**changed** 34:8,14 71:10 135:18 136:17 138:21 139:3,4,6
**changes** 21:6 110:21 136:5 138:23 152:3 154:4,4
**changing** 22:20
**characteristic** 114:21
**characteristics** 114:12,19,19,22 114:24 136:11,15
**check** 17:11 19:8 45:17 56:11 90:20 102:2
**checks** 128:23 130:10
**chemical** 12:18,19 13:15 14:3,4 54:22 86:15
**chemicals** 74:2 81:18 90:3
**chief** 148:3

**children** 97:6
**christiansburg** 1:17 4:11
**circumstances** 9:10
**cited** 51:3
**cities** 141:12
**city** 1:3 4:12,19 6:5 29:6,13 34:4 47:8 54:17 68:10,14 107:18,22 124:3 125:23 126:7 144:13 154:2
**citys** 73:4
**civil** 5:11 14:24 15:1
**claim** 15:4 29:22 42:3,16 44:6 123:5
**claims** 80:20
**clarify** 72:4 89:6
**class** 31:13 111:7,7 111:11,21,21,23 111:23 112:3,9 142:11
**classes** 45:2 102:13 136:7,10 144:8
**classify** 89:11
**clean** 43:6 106:24
**cleaned** 78:1,19
**cleanup** 98:14 107:4,10,12
**clear** 54:13 71:16 71:19 83:10 93:3
**clearly** 44:18
**clinton** 12:4
**close** 74:6 120:9,11
**closed** 12:5
**closer** 83:2
**clumsy** 13:19 91:13
**coauthor** 51:1,3 52:13
**code** 130:20
**coded** 137:1
**coding** 130:23
**collect** 52:22 53:5

53:13,15
**collecting** 33:17
**collector** 108:24 146:7
**colorado** 16:4
**com** 3:6,12
**combined** 31:15 71:3
**come** 26:16 90:11 105:11 129:16 130:7 144:21
**comfortable** 67:22 125:2
**coming** 89:17 151:11
**comment** 108:7 110:7
**commented** 139:14
**comments** 125:20
**commercial** 37:17 68:23 69:6,8 70:16,18 94:8 108:6 111:10 112:2 141:1,16 142:18 143:10 146:21
**commercials** 142:20
**commission** 153:23
**committee** 43:6,7
**common** 3:4 81:24 97:3 135:23
**commonalities** 51:19
**commonwealth** 153:2,5
**community** 21:11 21:19 31:20 33:19 96:16 108:12,13 108:20,20 110:6 113:20 114:22 123:6 136:3,11,11 136:12,17
**companies** 12:7 14:20

Kevin Boyle, PhD.
December 2, 2015

**comparable** 23:6
109:11,17 141:12
141:12 145:7
**compare** 51:18
104:17
**compared** 79:6
**comparison** 142:7
**compensated** 43:9
43:11
**competent** 55:9
**complementary**
23:21
**complete** 80:9
96:20 97:9 107:4
**completed** 10:5
96:14 139:10
**complexes** 147:5
**component** 18:3
**components** 67:23
**compound** 63:11
65:13
**compute** 107:21
**computer** 153:9
**concentration** 97:1
**concept** 141:24
**conceptual** 13:1
**concern** 64:10
125:22
**concerning** 9:20
59:23
**concession** 86:23
**concluded** 151:17
**conclusion** 60:17
64:6 87:14 117:16
118:9
**condition** 22:11
59:12
**conditions** 40:10
40:16 110:22
122:10,20 123:10
135:16 146:19
150:22
**conducted** 97:20
**conferred** 38:19
**confidentiality**

10:5
**confirm** 6:18 141:5
**confuse** 33:7 71:14
**confused** 50:17
**conglomerate** 12:8
**conjunction** 27:17
35:16
**connection** 6:18
11:9 16:23 17:18
28:8 36:5 39:10
41:10 43:13 46:13
49:23 51:14 52:23
67:24 146:9
**conservative** 79:15
135:2
**consider** 53:6,8
64:14 131:14
141:10
**considerations**
121:14 122:21
**considered** 64:7
109:24 129:9
132:10 133:13
**constituents** 92:17
**construction** 121:3
147:1,4
**consultant** 43:23
44:1
**contact** 45:23
**contaminant** 91:7
91:23 93:14,22
**contaminants**
54:11 55:20 56:2
56:24 58:7 89:23
90:11,17 91:2,5
92:1 94:7 98:1
126:11 145:17
**contaminated** 9:15
76:16 81:7 85:9
85:11,13 86:10
87:6 96:1 133:17
140:24
**contamination**
11:3,3 12:16,18
12:20 13:8,10,15

13:23 14:2,3,4
19:17,17 20:3,3,5
20:9,15,16 21:7,9
21:18 22:8,10,11
24:15,24 32:14
34:1 36:15 37:1
46:15 48:4 57:12
57:16 59:15,18
60:9,18,20 64:11
66:16 72:6,13
73:2,8 74:16,21
74:23 78:12,14
79:17 80:14,21
83:15 84:5,13,18
85:1,20,22,24
86:1,15 87:9
88:21 89:4,10,11
89:12,14,17 91:15
92:9,12,17 93:6
93:13,16 94:21
95:8 97:9 98:8,16
98:17 100:5,11
101:2 102:20
107:1 113:7 115:2
115:5,8,8,14,17
115:22 116:6,23
118:22 121:18
124:3,8,10 125:6
125:7 129:11
130:14 133:22
134:5,9,11,21
135:3 136:4
149:23 150:1
**content** 104:11,12
**contentions** 80:20
**context** 10:21
15:21 31:21 40:24
87:6 114:8 116:14
**continue** 83:20
84:15
**continued** 85:4
**contract** 12:10
**contradictory**
96:22
**control** 117:2

**convenient** 49:11
**convergent** 104:11
137:17
**conversation**
141:17
**conversations** 7:11
**copy** 50:9 140:8
**core** 45:6
**correct** 6:22,23 7:4
7:22 10:2 11:4
18:20 19:12,20
26:24 28:6 29:23
48:19 54:23 60:22
62:16 63:17 64:1
68:18,19 75:9,24
78:23 79:2 82:3
96:7 109:2 110:13
112:15,23 117:10
124:16 125:24
126:17 133:10
153:11
**corrections** 152:3
**corrective** 77:23
**correctly** 96:11,17
107:24 150:3
**correlation** 110:11
110:17,23,24
111:1,3,4
**corridor** 103:16
**costs** 19:2
**couldnt** 22:16
41:21 55:8 121:19
**counsel** 6:5 7:9,11
7:16,23
**counterpart** 44:14
**counterparts** 44:17
**counties** 29:5,12,16
29:18
**country** 76:16
**county** 4:10 29:8,9
29:11 140:21
146:6 153:3
**couple** 25:16,20
50:13 81:5
**court** 1:1 2:16 4:11

4:14 11:6,12,13
12:3,13,24 13:14
13:20 14:9 17:3
18:10 45:8 55:14
87:11,23 117:12
148:2,12 149:4,6
149:15
**courts** 14:1
**cover** 48:10 98:4
**covered** 17:5
**covers** 48:12
**credentials** 55:12
148:22
**credible** 35:5 36:13
**criteria** 138:10
**criterion** 104:7
**criticizing** 23:11
**crumble** 61:17
**crunching** 83:13
**cumulative** 96:4
**curious** 60:12
**current** 63:4 115:7
123:13 150:10
**currently** 42:23
**curve** 64:23
**customary** 26:19
**customized** 27:14
27:22
**customizing** 143:17
**cut** 11:14
**cutoff** 60:10
**cuts** 29:10
**cv** 6:20

**D**

**damage** 16:5 64:14
126:3
**damages** 11:16
126:8,10 149:11
149:19
**data** 27:15 32:4,7
33:18 34:21 35:1
47:21 52:23 53:9
53:16 58:15 60:21
61:13 62:4 66:3,6

Kevin Boyle, PhD.
December 2, 2015

75:7 76:7 96:13 111:8,24 114:1,3 114:4,5 128:14 138:16 150:23 151:6
**date** 1:15 4:7 6:10 7:2,3 15:20 138:2 154:3
**dated** 6:22 139:16 153:18
**daubert** 14:13
**day** 8:4 35:12 103:6 152:7 153:19
**days** 35:11 43:15
**dealing** 95:13
**deals** 107:17
**debt** 72:21
**decades** 40:11
**december** 1:15 4:7 153:19 154:3
**decision** 40:13 86:22 87:22 129:2
**decisions** 18:24 19:3 20:17 128:12 151:5
**decrease** 135:8
**deem** 152:4
**defects** 62:6 121:3
**defendant** 1:7 16:4
**defendants** 3:8 4:21
**define** 25:9 98:16 98:17 114:3
**definition** 25:6 114:3 127:17
**definitions** 25:4
**degree** 8:16 18:15 19:5 20:21 44:23 45:1 99:5,8 134:5 134:11 135:3
**dema** 15:13
**demonstrated** 86:19 87:9
**department** 15:8 44:14,21 79:22

94:17
**depended** 60:17
**depending** 135:16
**depends** 59:6 102:19 120:9
**deposition** 1:12 2:12 4:8 5:10,13 6:16 7:9,13 14:20 14:22 16:8,9 17:7 45:14 52:18 149:4 151:17 152:3 153:6,11,13 154:1 154:3
**depositions** 17:5,9 17:14
**deq** 15:6 78:5
**dermal** 94:2
**describe** 28:12 46:8 62:19 143:20
**described** 62:1 148:5
**design** 135:12
**designation** 38:1,6 38:18 39:5
**designations** 32:22 39:4
**detail** 59:22
**detect** 58:3,5,17,24 60:2 89:22 132:6
**detected** 54:10 58:6 81:20 96:24 113:7 125:7
**detection** 58:9 63:9 63:11,18 64:3 70:4 81:17 82:5,6 82:7,9,18 90:2 124:16,23
**detections** 65:8 67:22 69:17 73:3 73:4 74:1,8 81:14 81:15 89:1
**detects** 55:19,22,23 56:23 58:18 59:4 59:6,24 60:13 61:21 65:6 73:7

83:18
**determine** 76:2 96:14 111:8 112:1 149:8
**determined** 67:9 76:4
**determines** 103:20
**detriment** 76:18 84:8
**detrimental** 40:15 76:11,17 77:14
**detrimentally** 81:8 84:4
**devaluation** 84:9,9
**developed** 20:7
**developer** 11:14
**developing** 51:5
**development** 146:22
**dice** 108:12
**dictated** 101:7
**didnt** 14:6 16:11,22 17:3 32:21 33:1,3 33:14 45:17 50:17 52:14,22 53:13 54:1,2 58:12 76:9 81:17,17 83:8 113:14 121:19,21 145:21
**differ** 137:4
**differed** 33:3
**difference** 33:23 34:1 149:12
**differences** 51:20 141:13 142:3,3
**different** 12:23 16:1 23:18 26:23 27:2 31:11,21 32:8 33:1,6 34:2 39:4 50:21 63:1 70:17 95:14 98:21 101:24 104:5 108:11 109:14 110:6,6 128:24 129:2 131:6

133:15,15 135:18 135:19,19 139:19 142:1,17
**differentiates** 119:12
**dimensions** 91:19
**diminish** 74:17
**diminished** 69:20 73:8 75:18 106:9
**diminishes** 74:16
**diminution** 8:17 9:6 11:2 19:13,16 19:20 20:10,11,20 21:9 23:24 24:9 24:11,22 31:17 34:24 60:14 70:2 70:15,22 72:2,15 75:1 79:3 82:3,10 82:12,22 83:5 84:15 87:10 88:23 98:9 99:15,17,20 100:1,7,13,17 101:4,8,17 102:7 102:12 104:1 105:1,6,23 106:21 107:2,8 118:2 119:11,21 121:15 122:1,11 124:21 125:21 126:1 133:8 134:17 135:1,9 136:19 143:3,22 144:9,17 144:24 150:24
**diminutions** 9:14 59:19 72:19 81:10 101:18 129:13 135:13 140:1 149:22
**dioxathion** 37:2 55:20 58:24 63:16 97:23 98:20
**direct** 110:11,17,24 111:1
**disagree** 117:6
**disbursed** 36:16

**discussed** 112:17 113:9 138:14
**discussion** 69:16
**disease** 94:14
**dispersed** 102:20
**dispose** 117:2
**disseminated** 103:22
**dissemination** 103:18
**distance** 47:4 48:6 48:7 54:4,4,7,8 62:9,15,18,18,19 62:23,24 63:8 64:4,7,9,16,19 67:5,6,9,24 124:1 124:7 125:5 130:14
**distant** 54:10 63:9 63:11 113:7
**distinguishes** 133:19
**distinguishing** 143:12
**distribution** 60:10 106:14,15
**district** 1:1,1 4:11 148:2,3,4
**divided** 82:24
**division** 1:2
**doctor** 22:13
**doctorate** 5:20,22
**document** 97:19 148:5
**documentation** 128:17
**documented** 63:5
**documents** 16:18
**doddfrank** 26:21 41:17
**doesnt** 64:23 68:13 74:16 87:18 111:1 119:1 136:1,2
**doing** 21:4 33:12 34:7 59:16 80:1

92:6 95:7 101:20
104:14 122:23
146:16
**donelson** 3:9
**dont** 5:9 6:10 10:8
14:19 16:2 18:1
18:13,21 19:22
25:19 29:8,10,14
29:15,17 34:8,13
34:17,18,22 38:22
39:2,3,5,15,24
40:17 41:14,24
42:13 43:19 44:6
44:6,8 45:1 48:6
48:24 49:1 53:20
54:5 55:5,9 57:6
57:24 64:7,20
65:18 66:2,8 67:4
69:5 70:10 71:14
74:5 75:11 77:6
77:11 78:15 79:1
79:24 81:2 82:13
84:15,17 86:7,11
87:2,20,23 88:2
90:5,6 91:16,19
91:20 97:13
100:19,24 107:2
109:14 111:12,15
112:13,14 114:5
118:22 120:17
121:5 122:4,10
123:10,19 126:9
131:4,10,11 133:7
134:5 137:23,24
138:11,18 139:13
140:17 143:12,24
151:2
**door** 124:22,23
**dr** 2:13 4:9 5:24 6:4
45:14 49:21 75:3
87:1 88:16 125:19
143:19 147:21
149:3,5,6,20
151:10
**drink** 93:19

**drop** 102:12,15
103:20
**due** 19:3,16 70:3
124:24 143:22
145:1
**duly** 4:17
**duncan** 9:23 11:9,9
29:20 30:11,18
31:4,7,23 32:5,16
33:9,13,24 35:7
51:15,18 136:18
147:23 150:14
**dust** 37:1 54:10
55:19 56:3 58:7
59:21 80:17 81:12
81:18 88:24 89:15
89:23 91:2,8,14
91:17 92:2,3,10
92:13,17 93:5
94:8,20 95:7 96:1
96:4,7,24 97:2,8
97:10,14,15 98:20
115:1

—————————
**E**
**eagle** 16:4
**earlier** 6:15 16:21
24:17 29:19,22
35:17 60:1 84:3
88:17 98:7 102:14
102:21 105:19,21
112:16 113:9
115:12 122:17
126:23 138:14
142:24 145:15
**early** 7:1 45:15
139:11
**earn** 18:10,13
**earth** 28:14
**easier** 83:21 141:17
**east** 1:17
**eastern** 1:2
**eat** 96:7
**econometrics** 45:3
**economic** 21:24

22:23 35:5 36:14
36:18 40:9 45:3
50:1 57:10 78:13
84:11 99:5,8
141:23 151:1
**economics** 5:21,22
5:23 18:4,17,18
43:6 45:6 79:11
84:21 99:10 104:2
118:2 134:2,7
139:19
**economist** 13:2
18:19,22,23 22:21
26:22 27:4 40:12
40:18 41:3 45:12
84:12 114:10
117:22 118:22
**economists** 23:17
42:11 46:6 93:12
**economy** 139:1,2
**educated** 25:5,10
**effect** 24:13,14
52:10 57:16 64:13
64:18,22 66:15
76:11,12,13,21
77:4,5,6,9,12,15
78:20 85:4 98:13
98:15 104:8 105:8
122:14,22 123:24
129:3 130:4 131:6
132:6 136:5 142:2
144:12 146:18
**effects** 21:7,16 23:1
23:1,16 40:10,15
76:6,24 106:13
133:22 140:23
141:20 142:5
**either** 39:6 41:10
50:24 63:16 68:20
79:21 82:16 83:17
88:2 90:3 92:15
96:7
**elaborate** 143:1
**element** 109:10
**elements** 120:10

**eligible** 40:19
**ellipses** 107:21
**emanate** 112:18
**emanating** 80:14
**employed** 42:21,23
43:1,2 44:20
153:16
**employee** 43:1,2,23
44:1,9,16
**employment** 47:18
**empty** 119:19
**encompassed** 29:13
**ended** 128:22
**energy** 148:1
**engineering** 42:4
**enjoy** 116:20 117:1
117:8 118:17
**enjoyment** 117:19
**ensued** 49:15 88:12
125:15 147:15
151:16
**entered** 147:23
150:7
**entirety** 48:1
**entities** 19:1
**entity** 15:11
**enveloped** 101:23
**environment** 90:18
**environmental**
9:15 11:3 12:16
13:8,23 14:2 15:8
40:10 42:4,17
44:14,15,15,21
54:22 66:15 79:23
93:9 114:24
133:22
**epa** 42:22,24 43:3,4
43:5,7,17 44:10
78:5 79:22
**equal** 135:12
**equation** 27:13
62:11 121:17
129:20 130:14
132:24 133:12,19
134:15 135:7,17

**equivalent** 135:13
**errata** 154:1
**error** 99:12 102:3
104:19 137:13,15
137:16
**errors** 106:14
**esq** 3:7,13
**essentially** 103:18
**establish** 57:15
96:13 149:18
**established** 22:23
85:1 99:9 104:13
127:3,23 130:10
**establishes** 85:24
**estate** 25:17,22
26:1,4,7,9,15,23
30:21 31:24 32:19
32:20 35:20,22,23
37:13,14,14 38:1
39:24 40:5 51:22
53:11 66:17 116:7
116:11,15,24
117:2 134:2
138:21,24 141:12
149:24
**estimate** 22:1,4,6
22:12,24 79:12,13
79:14 82:21 83:4
105:14,16 114:10
123:2 132:8,11
136:13
**estimated** 111:6,21
111:23
**estimates** 133:16
**estimating** 134:19
**et** 1:6 4:13 154:2
**evaluate** 40:15 96:4
96:15
**evaluated** 97:5
**everybody** 71:19
**evidence** 73:5
89:17 90:10,22
105:4 109:9
121:20 131:11
149:8,16

Kevin Boyle, PhD.
December 2, 2015

**evidenced** 144:17
**evolve** 151:3
**exact** 6:10 7:11
**exactly** 15:7 45:18
  55:15 56:1 59:10
  69:14 74:5 115:13
  129:5 130:8
**examination** 2:2
  5:7 26:12
**examine** 40:22
**example** 24:7 61:20
  82:23 87:19 92:15
  100:14 101:4
  103:9 106:6
  114:20,23 115:2
  118:3,23 124:15
  145:5
**examples** 114:14
  142:21
**exception** 106:18
**excerpts** 46:15 48:4
**excess** 132:19
**exclude** 148:8,12
**excluded** 129:19,21
  129:24 149:5
**excluding** 128:14
**excuse** 37:1
**executed** 152:7
**exhibit** 2:10,12,13
  2:14,15,16 5:12
  6:17 46:8 49:16
  50:3 66:14,23
  94:24 95:1 140:9
  147:16,22
**exhibits** 2:9 4:3
**exist** 19:21 24:1,12
  142:13
**existing** 82:14
**expect** 100:3
  102:14 106:8
  107:1 134:14
**expected** 100:6,12
  101:3
**expecting** 103:3
**experience** 40:9,11

49:4 51:4 52:15
  70:21 72:10 81:9
  92:20 93:8 102:15
  102:18 105:22
  106:20 108:8
  109:16 110:8
  143:2
**experienced** 21:7
  72:20 101:17,19
  143:21 144:9,23
**expert** 6:6,19,20
  9:10,16,19 10:14
  13:13,22 16:23
  17:18 18:10,13
  19:11 23:22 42:13
  45:7,9 48:18,23
  52:24 54:16 55:18
  60:7 65:11 68:3
  68:14 87:17 93:21
  148:9,19 149:3
  150:13,15
**expertise** 11:6 23:9
  38:12 42:3,16
  48:16 55:1 60:23
  61:6 65:18 70:12
  72:18 88:4 94:10
  117:22 118:1
  145:21
**experts** 49:2 60:24
  68:6 91:20 92:5
  98:18
**expires** 153:23
**explain** 73:12
  74:12 101:12
  114:13 118:10,14
**explanation** 74:12
**exposed** 85:3
**exposure** 93:22
  94:1 96:14
**exposures** 96:5
**extensive** 40:8
  130:2
**extent** 60:8 61:12
  87:13 112:24
  115:7

**exxon** 16:14,14

**F**
**face** 61:2
**facilities** 19:18
**facility** 54:9
**fact** 25:3 83:21
  89:22 102:8 148:9
  148:12 149:7,8
**factor** 48:6,7 62:23
  64:10 67:24 72:14
  134:16 135:1,4,5
  143:14,23 145:2
**factored** 74:24
**factors** 77:20
  114:15 134:11
**facts** 8:14,15 46:12
  61:13
**factual** 47:24 48:3
  48:13 49:22 60:20
  66:19 71:7 87:3
**factually** 13:7
**faculty** 18:6
**fair** 40:23 61:11
  62:7 86:12,23
  138:15 145:15
**familiar** 37:24
  38:18 39:18,22
  93:15,17 94:13
  108:16 116:11
  122:2 127:15,16
  127:17 140:11
  143:19 146:21
**family** 24:8
**far** 62:9 64:7,17
  68:8 112:17
  113:12,14 126:20
**farther** 61:21
**farthest** 124:16,17
  124:20
**federal** 5:11
**feeding** 120:19
**feedings** 121:22
**feel** 56:3 108:18
**feelings** 86:6

**fees** 26:19,20
**felt** 30:15 32:17
**fence** 54:9 63:8
**field** 11:6 13:22
  18:4 35:22 38:13
  40:13 42:4,6,14
  42:17 44:24 45:9
  55:9 68:4 70:8
  74:15 99:10
  104:20 128:1
  130:18
**fields** 42:9
**fifth** 25:3
**file** 79:21 80:1,9
**filed** 148:8
**final** 16:19 122:8
**find** 77:4 82:1
  98:12 102:21
  104:15 106:5
  121:19,22
**findings** 88:23
**finds** 149:4,6
**fine** 55:5 118:24
  125:9
**finish** 22:2,2 84:23
**firm** 15:12
**firms** 19:1
**first** 11:13 13:24
  16:3,5 17:1 70:7
  72:8 133:20
**firsthand** 92:20
**five** 17:13,15,17,19
  17:20,24 59:4
  100:14 101:5
**flat** 64:24
**flattens** 64:23
**flipping** 103:5
**flooding** 121:9,11
**floodplain** 121:8,11
**focusing** 132:21
**follow** 41:19
**followed** 87:21
  127:22
**following** 90:2
  104:13 154:4

**follows** 5:5
**foot** 109:12
**footage** 109:20
  114:21 135:24
**foregoing** 153:6,10
  153:14 154:3
**forest** 12:6
**forget** 28:21
**form** 8:20 33:16
  43:16 87:12 89:2
  117:15 118:8
  124:4 137:5
  150:17
**formal** 26:11 41:9
  109:22
**formula** 79:8 125:3
  125:4,5
**formulaic** 135:15
  135:21 136:3
**formulated** 135:12
**forrest** 146:6
**found** 25:5 47:15
  67:22 69:18 74:20
  76:24 80:2,9 93:6
  106:12 108:1
  124:23 134:8
  144:6 148:16
  149:16
**foundation** 61:13
  61:15,16 121:3
**four** 94:3
**frame** 139:24
**framework** 13:1,4
**franklin** 3:3
**free** 56:3 118:17
**front** 52:11 66:8
  98:4 138:19
  140:17
**full** 5:14 22:7 24:14
  24:23 117:9
  121:12,13 151:4
**fully** 19:23 24:15
  35:3 36:16 37:4
**fulton** 140:21
**fundamental** 52:7

141:24
**further** 101:10
149:15 153:12,15
**furthest** 112:19
**future** 19:13 23:23
24:21 69:19 70:1
75:18 105:10
107:2 115:8
123:13,18 126:17
127:1

**G**

**gas** 103:14
**gears** 37:12
**general** 4:10 7:12
9:9 15:6,8 51:10
52:14 70:16 145:6
**generally** 8:14,22
48:22 49:4 51:14
76:15 93:13 108:9
114:17 134:23
**generate** 60:4
**generated** 6:19
32:4 48:9,17
51:15 60:14 61:14
65:11,23 66:6
68:15 90:13
**generating** 7:5,20
34:23 55:17 90:13
**generation** 7:3
**geographic** 112:17
113:12
**geographical** 62:19
124:24
**geography** 129:3
140:18
**georgia** 94:15
141:11
**germane** 34:21
35:2 147:8
**give** 5:17 87:15
96:22 97:8 100:23
103:9 118:3,24
124:15 130:24
131:4 135:15

145:3,4
**given** 17:5,6,8,14
40:22 62:11 82:20
99:4 113:17
135:17 138:7
**giving** 31:16 36:6
142:21 147:8,9
151:4
**go** 16:2 17:3 20:12
20:24 21:2,3
22:15,17 23:4
24:6 30:16,24
32:18 34:16 39:12
41:8 44:8 45:8,17
47:2 56:5,11,14
57:18 59:21 64:12
64:22 66:7 70:24
71:13 72:23 78:20
81:3 90:20 96:21
100:15 102:1
107:2,16 113:18
118:22 121:6
127:5 128:16
130:23 132:14
138:11 147:11
**goes** 33:4 64:13
66:3 87:19 105:4
**going** 6:15 31:14
32:12 33:20 34:13
52:16,19 53:24
59:22 64:12 66:13
66:22 70:9,21
80:13 86:16 99:14
102:22 103:12
105:10,11 106:20
107:20 116:1,10
128:20 143:5,7,15
144:5,10
**google** 28:13
**googled** 25:4
**government** 12:10
12:11 43:24 44:9
78:3,4
**governments** 19:1
**graduate** 17:2 45:5

102:3
**greater** 59:20
**ground** 91:9
**groundwater**
120:24 121:1,18
**group** 141:16
**groups** 114:18
**guarantee** 105:16
**guaranteeing** 105:9
**guess** 10:13 25:5,11
25:14 40:20 62:6
83:7 123:9

**H**

**hadnt** 86:5 107:16
**half** 65:2,3 99:21
105:22 106:20
117:14 119:23
120:13 142:12
146:22
**halliburton** 10:1
29:22 30:5 32:8
122:17 148:1,8
150:13
**hand** 6:15 94:24
**handed** 50:2 66:10
147:21
**handing** 66:13
**hands** 36:23
**happen** 105:10
122:14 151:2
**happened** 34:23
126:18
**happening** 103:3
**happens** 77:18
108:19 138:12
**hard** 75:6
**harvesting** 11:17
12:5
**hattiesburg** 1:3
4:12,19 6:5 8:19
9:5 19:14 21:11
21:14 27:7,14,17
27:20,24 28:5
29:7,13 31:21

32:24 33:3,4,14
33:24 34:4,6,13
35:17,18,20 36:1
36:12 40:22 41:9
47:9,12,14,19,21
52:23 53:12,19
54:17 64:1 68:9
68:10 70:23 72:22
79:11 93:7 95:15
107:18,23 108:6
113:18,19 123:7
136:14,22 141:10
141:22 142:5,7
143:11 144:14
146:6,19 150:16
154:2
**hattiesburglaurel**
47:23
**havent** 54:6 61:7
89:24 92:19
**hazard** 97:3
**hazardous** 120:22
**hazards** 97:5
**head** 26:14 72:24
128:15
**health** 42:8,14 78:5
86:16 91:1 94:18
96:15 102:24
**healthy** 107:9
**heard** 38:20 39:9
39:11,18 94:16
**hearing** 39:15
**hedonic** 22:1,4,5
36:17 57:18
101:14,22 133:3
134:22
**hedonics** 132:22
**held** 8:1
**help** 26:20 39:21
73:16 96:15
111:17 149:7
**helped** 33:11
**hercules** 1:6 4:13
4:21 8:18 19:14
19:18 28:5 54:9

78:24 79:21 80:14
80:15 89:18,21
90:11 113:6
120:15 124:2
136:13 142:12
154:2
**hereto** 153:16
**herrin** 48:6 68:12
71:2,6,22 142:10
144:2 146:20
**herrins** 46:20
71:12 72:21 83:9
108:8,13 126:5
**hes** 55:8
**high** 120:4
**higher** 82:9 83:1,3
102:10
**highest** 38:5 79:13
**highlighted** 50:4,16
**hill** 5:18
**historical** 108:3
**history** 14:20
**hit** 21:10
**hold** 5:20 19:4,5
39:5,24 40:5
42:13 44:23 45:1
45:7 92:4
**holding** 44:8
**home** 83:16 86:7
92:20 97:3,5,11
**homeowners** 123:6
**homes** 41:7 59:15
88:24 96:24
**honestly** 44:12
**horsak** 47:4 48:4,8
54:4,8,12,16
56:20 60:7,20
61:14 62:6,15,20
67:22 70:8 74:13
75:8 79:18 85:19
89:13 93:6 99:1
**horsaks** 46:15 64:6
65:7 68:4 81:16
89:13 90:2,6,14
90:19

**hotel** 8:2
**house** 41:11,11
  89:9 114:19,20
  119:19 124:21,23
  136:5
**household** 96:16
  103:1
**houses** 20:6 37:16
**human** 94:1,1,18
  96:14
**hung** 145:10
**hypothesis** 77:4,5

**I**

**i55** 3:10
**id** 13:18 46:10
  49:24 51:18 53:6
  56:11 66:7 67:6
  67:11 90:19 91:16
  91:17 95:17 100:8
  102:1 116:3,14
  118:4,13 124:13
  125:11 128:16
  130:23
**idea** 19:24
**identification** 4:4
  49:17 89:14 95:2
  147:17
**identified** 9:19
  92:12
**identify** 4:16 14:16
  50:23 76:5
**ihlanfeldt** 140:11
  140:12 141:21
  142:4 143:8 144:6
  144:20
**ii** 111:7,21,23
  142:11
**ill** 16:2 39:23 68:20
  68:21 83:21 87:16
  94:24 95:5,12
  98:4 116:21
  131:20 140:10
**illegal** 11:17 41:11
  41:15

**im** 6:15 7:10 10:4,8
  19:20 20:8,9,14
  20:18 22:22 23:15
  23:18 25:12,20
  26:14,14 31:8
  33:7 35:1,2 36:11
  37:11 39:7,8,11
  39:16,22 43:2,6
  43:10,24 44:1
  47:13 48:1 50:17
  51:2 52:13,19
  54:19,24 55:3
  56:4,5 57:24
  59:22 60:11 61:10
  63:21 66:13,13,23
  68:3 69:22 70:9
  71:7,14,16 72:16
  74:7,12,14 75:5
  75:10 76:19 78:4
  80:22 83:14,14
  89:12 90:14,23
  92:4 93:21 99:7
  99:14 103:10
  105:13 107:11,20
  110:10 111:13
  112:12,15 116:1
  116:10 117:23
  118:21 119:7
  121:12,14 122:13
  122:24 123:7,23
  124:12,16 125:2
  126:13 129:5
  131:23,24 132:21
  132:24 133:2
  140:7 141:7
  142:18,21 144:2,5
  148:15 149:1
  150:4,18 151:3
**immediate** 27:16
  63:24
**immediately** 84:16
  149:13,14,22
**impact** 13:8,15
  27:14 78:7 97:21
  116:7,24 119:8

  123:17 146:1
**implied** 19:2
**implies** 112:9
**important** 30:16
  34:22 36:4 52:5,7
  52:8,21 55:16
  57:8 62:23 67:3
  71:14 127:20
**impossible** 21:22
  22:15 145:4
**impotence** 91:17
**improper** 40:24
**incidental** 96:5
**include** 72:12
  117:1 130:2
  134:20,22
**included** 76:9
  121:24 132:9,13
  133:12
**includes** 70:17
**including** 106:15
  128:13
**inclusion** 129:17
**incorrect** 109:19
**increase** 75:1 135:8
**increased** 72:15
  134:16
**increment** 135:7
**incurred** 126:8
  150:2
**index** 2:1
**indicate** 99:4
  115:20 133:8
**indicated** 60:13
  142:10 144:3
**indicates** 106:7
**indication** 48:5
  97:2,8
**individual** 31:14,16
  31:19 33:21 58:13
  110:7 116:19
  122:18,23 123:3
  123:20 125:8,22
  143:8,9,16,17
  144:11 146:16

**individuals** 18:9,11
  18:24 46:4 49:5
  60:8
**indoor** 97:4
**industrial** 28:17
  141:2 142:16
**industry** 12:9
**influence** 130:10
**influenced** 24:3
  34:19
**influences** 133:22
**information** 9:4,20
  20:2,6 21:18,20
  22:7 23:2,6,7,16
  23:21 24:24 25:14
  31:3,6 33:11
  34:11,20 35:3,4
  36:3,4,12,14,22
  36:24 37:4 41:18
  42:10,13 46:9,10
  46:14,16,21 47:6
  47:11,17,24 48:3
  48:8,12,14,15,20
  48:21 51:11 53:7
  53:14,18,20,22
  56:18 59:7,18
  60:24 65:11 68:4
  68:6 74:24 77:10
  78:11,15 79:10,17
  80:4,5,10,12,18
  82:2,14 88:5,21
  98:23 102:20
  103:2,18,21 105:5
  105:15 107:3
  115:5,7,14,15,16
  115:22 126:20
  134:23 138:18
  148:19,20 151:4
**informed** 25:5,10
  25:14
**ingestion** 94:2 96:5
**initial** 77:14 129:16
**initiated** 30:17
**initiating** 15:18
**injection** 94:2

**injuries** 149:13,15
**injury** 149:11
**inquiry** 146:10
**inside** 67:15 97:11
**insolvent** 12:8
**inspection** 80:8
**instance** 96:1
  135:11
**instances** 77:13
  87:8 98:9,11
  102:6 109:4
**instantaneously**
  103:4 151:2
**institute** 38:16,19
**insufficient** 149:18
**intention** 92:6
**interest** 46:22 47:3
  47:5,7,22 48:9
  53:7 87:5 137:8
  146:15 153:17
**interested** 7:11
  41:21 95:15
  121:10 123:22
**interfered** 117:9
**interference**
  117:20 118:16,18
**internet** 53:24 95:7
**interpret** 13:18
  14:10 77:1
**interpreted** 14:15
**interviewed** 35:19
  36:2
**invasive** 52:11
**involved** 12:15,19
  17:17 28:4 30:22
  31:1 48:5 145:17
  147:24 150:7
**involvement** 11:12
  150:8
**involving** 9:24
**irrelevant** 122:6
**isnt** 26:6 35:1 59:10
  77:14 81:22 91:18
  91:24 105:2
  144:18

issuance 27:18
issue 12:16,21
  22:18 30:8 33:2
  40:22 41:9 92:18
  93:1 103:20
  139:19 146:12
  148:22 149:8
issued 9:16 30:7,10
issues 12:23 33:8
  33:15 42:8 55:17
  71:7,23 120:24
  121:3,4 122:6
  150:15
issuing 51:9
iv 3:7
ive 7:8 9:4 16:1,3
  17:8 23:20 25:19
  26:17 37:19,20
  40:2,17 45:2 50:2
  55:7 56:22 68:2
  82:8,20 95:21
  98:5,13,21 104:19
  109:16 110:3
  138:9

_____

**J**

jack 15:12
jackson 3:11
japanese 12:9
jersey 14:5,18 15:5
  15:6,16
jesse 66:17
john 5:16
journal 51:22
journals 40:12 68:7
  99:11
jr 3:13
judge 11:23 12:1
  14:13 65:19 148:4
july 148:5
juncture 115:22
jury 11:24 12:1
  55:15

_____

**K**

keep 83:10 140:10
kevin 1:12 4:9 5:1
  5:16 148:9,10
  152:11 153:6
  154:1
key 47:5 78:17
kilogram 97:1
kind 52:5 71:3
  72:23 73:16 83:3
  118:18 120:22
  135:21 137:17
know 18:1,8 22:10
  25:19 28:15,15,20
  29:5,12,14,15
  32:21 34:17 38:21
  39:2 41:14 43:19
  45:23 46:1,4 48:7
  53:23 54:15,23
  55:2,5,10,11 56:1
  56:6,17,22 58:2,4
  61:22 62:12 63:10
  63:12 64:20,20,22
  65:17 68:13 70:10
  77:11 78:7,10
  79:24 80:8,11,23
  81:11 84:16 86:8
  86:9,15 87:17,18
  87:20,24 88:2,5
  89:16 90:6 91:16
  91:19,20 92:13
  97:10 98:9,11,13
  98:19 100:19
  101:9 103:24
  106:5 107:3
  109:14,15,19
  110:2 111:12
  114:5,6 119:3,22
  120:10,20,21
  121:5,21 122:4,22
  126:9,9,17,20
  128:12,15,21
  129:7 130:19
  131:2 135:16
  137:23,24 138:11
  138:15 139:13,19

140:18 142:13,17
  143:24 144:22
  150:5,10
knowing 105:10
knowledge 20:4
  24:4 36:21 39:17
  48:16,20 51:10
  78:13 114:2
  115:21 149:23
  150:9
known 38:19 59:14
knows 20:4
kyle 50:21

_____

**L**

labor 47:20
lake 11:15 52:11
land 111:8 112:1
  149:11,13,14,16
landfill 80:6
landfills 120:12,15
lands 141:2
lane 5:18
large 18:3 61:12
  144:7 153:5
largely 79:16
larger 62:2 134:24
  136:18
larkin 3:7 4:18
  45:21
late 6:11,24
law 3:4,10 15:12
  40:21 87:11
  148:18 149:10
laws 42:17
lawyer 87:16
layout 33:19
lead 96:23 97:2,3,4
  97:5,16 122:8
leadbased 97:4
leaking 119:24
learned 46:3
learning 48:16
leave 30:17
left 84:14

legal 15:21 87:2,13
  117:16 118:9
  148:22
legs 89:20
lender 35:21 40:23
  41:2
lending 53:12
  129:15
letter 2:15 94:24
  95:6
level 111:8,24
  118:23
levels 96:23
liability 41:22
license 19:4 26:3
  39:24 40:5,18
  44:23
licensed 22:17
  23:10 26:8,10,23
  37:18 40:14 41:13
  41:22
licensure 26:13
licensures 40:19
lie 29:7
light 103:5,6
lightfoot 3:3
lightfootlaw 3:6
likewise 81:7 84:4
limit 112:17 113:12
  113:19
limited 123:12,17
limits 29:13 68:10
line 29:9 54:9 59:23
  62:13 63:8 71:22
  154:5
lines 29:11 120:5
listed 37:16,19
listen 22:22
listing 50:4,5,7
listings 53:12
literature 7:20 35:6
  48:2,17 50:1,1
  60:3,12 76:5
  78:13,18 79:7,11
  84:12,21 92:14

93:1,8 129:14
  134:2,7
litigation 6:6,19
  9:16 10:20 11:1
  13:21 15:18 16:24
  17:18 28:5 29:22
  30:22 32:17 33:9
  33:13 51:16 87:6
  130:15 147:23
  148:13 150:14
little 41:5 43:17
  52:17 54:14 56:1
  59:22 62:16 98:6
  101:13 115:4
  145:20
live 85:5
lives 119:19
living 18:11,13
  96:11
llc 3:3
loan 41:11 53:18
local 31:4,24 33:11
  34:20 47:11,14
  122:20,20
locally 122:24
location 1:17
  130:14
log 64:11 67:6,11
  67:16,18 112:21
logarithm 64:16
long 8:3 10:10
  11:21 35:7,10
  64:9 73:16
longer 139:16
longterm 149:21
look 21:5 22:5
  23:17,17,18 27:2
  27:3,4,6 30:24
  36:18 50:10,14
  56:5 57:11 58:15
  59:8 66:7 71:22
  71:23 72:7 84:12
  95:5,16 104:21
  106:14 116:1
  118:2 121:16

Kevin Boyle, PhD.
December 2, 2015

140:16 141:4,5
144:6 145:24
**looked** 9:14 28:13
28:14 31:11 59:11
74:20 76:6 80:10
80:23 99:11
101:22 128:21
129:10 130:5
134:1 140:23
141:2,14,15
**looking** 31:13,22
34:3,22 52:15
53:23 59:16 63:19
63:21 66:23 80:2
104:5 106:11
120:18 121:15
122:12,13 123:23
130:18 131:6
143:8,14,17
146:17
**looks** 28:15
**lose** 144:14
**loses** 64:18,22
**losing** 113:20
**loss** 31:20 107:18
107:22 117:18,19
117:19 118:5
122:15 123:2
125:23 126:3
132:3 133:7
143:15
**losses** 34:4 70:23
72:22 149:22
150:2
**lot** 33:6 114:18,20
128:24 129:2
**loud** 116:22
**lower** 72:19,20
82:23 83:2 102:10
**lradney** 3:6

_____

**M**
**machine** 153:7
**magic** 60:10
**magnitude** 136:4

**mai** 38:2,4,5,10,15
39:6
**main** 1:17
**maintained** 79:21
84:19 124:3
**major** 120:8
**majority** 18:9
**making** 33:21
36:23 40:13 81:6
86:21 101:24
122:18 123:3
127:21 145:4
**man** 106:18
**manifested** 19:23
23:7 24:23
**manipulating**
128:14
**manufacturing**
113:6
**map** 63:18,24
**margin** 137:15,16
**mark** 66:14 94:23
**marked** 4:3 5:12
6:17 46:8 49:16
50:3 95:1 147:16
147:22
**markedly** 26:23
27:1
**market** 21:8,14,15
21:19,22 22:1,15
23:3,7,16 24:12
26:20 27:4,7,15
32:4,7,12 34:21
35:1,3,4 36:12,16
37:5 40:15,23
52:23 53:9,18
86:13,23 100:15
101:6,7 102:17
104:24 108:4
110:12,18,22
114:1,2,3,4,5
115:4,13,21
122:14 138:21
144:17,19,21
147:7 149:12,14

149:24 150:22
151:6
**markets** 27:10
138:24 141:12,14
**mass** 110:5
**massive** 126:15
**match** 141:18
**material** 7:16
**materials** 8:6,7,10
8:11
**matter** 121:9 154:2
**matters** 17:6 49:22
**maximum** 67:6
**mean** 9:12,13 13:17
18:1,8 43:1 44:4
64:12 71:14 79:24
80:16,23 81:17,24
83:2 87:2 103:8
106:5 112:5,7
113:19 114:6
119:1,18 120:10
124:9 128:19
132:4,5 133:15
136:17 142:4
150:7
**meaning** 111:2
**meaningful** 58:19
**meaningless** 34:7
133:9,11
**means** 99:6 153:9
**meant** 92:3
**measure** 24:5
134:21 149:11
**measured** 20:9
104:24 124:24
**measures** 129:13
**measuring** 20:12
20:24 21:2
**meet** 26:21 32:18
35:14
**meeting** 7:23 8:3,8
**meetings** 32:3,6
**mega** 76:1
**megaanalysis**
66:15,20

**member** 18:7
**membership** 38:1
**memory** 7:18 39:4
45:16
**mentioned** 25:16
25:19 32:20 54:4
62:22 68:12 75:22
89:24 105:23
115:12 117:8
136:12
**mere** 85:15,17,23
86:2
**met** 31:23 32:1
35:18
**metaanalysis** 27:12
27:21 66:20 75:23
76:1,8 127:14
129:19 130:13
133:14 137:22
**methods** 101:24
**metropolitan** 47:21
**microeconomics**
13:4
**mid** 16:6
**middle** 108:2
**midstream** 53:20
**mile** 65:2,3,5,12,24
65:24 67:13,14
68:24 69:2 70:5
74:10 75:19 99:16
99:21 105:22
106:20 117:14
119:23 120:13
142:12 146:22
**miles** 61:22 63:5
64:3 65:6,9 66:3,3
67:16,18,19,23
82:19 112:20,23
113:6 124:18
**mileslagrange**
148:4
**milligrams** 97:1
**mine** 16:4 55:1
83:10 122:8
**minimized** 62:7

**minimum** 67:8
**miniscule** 17:23
18:2
**minute** 50:14 75:22
95:5
**mississippi** 1:1 6:5
28:23,24 29:3,4,6
47:9,19,23 53:19
79:22 141:11
**misspoke** 66:21
137:6 141:7
**misstate** 71:8
**mistake** 68:24
**mobile** 85:22 86:1
89:15,23
**model** 22:2,4,5,6,9
22:12,24 25:13
57:19 66:4 114:9
114:13 128:6
131:10,12,15,17
132:11,13 133:4
134:22 135:10,10
136:6,23 137:13
138:6,17 139:5,8
139:16
**models** 101:23
132:7 134:19
**modest** 79:3,5
**moment** 46:11
**montgomery** 4:10
**month** 7:2
**mortgage** 35:21
139:3,4
**motion** 148:7
**mountain** 103:13
**move** 39:23 42:2
52:18 68:21 83:15
84:16 86:1 89:15
103:14
**moving** 85:22
**multiple** 68:3
150:21
**municipal** 29:6
**municipalities**
108:11

muster 128:3

**N**

name 4:6 5:14
14:19 28:19,21
29:10 51:1 70:16
named 147:24
names 29:8,15,17
national 12:6
nationally 47:10
natural 16:5 67:18
98:22 103:14
nature 37:17 53:13
77:23 91:10
near 120:4,7
nearby 28:16 29:10
76:18
necessarily 39:17
74:17 78:6 67:18
136:1 148:21
necessary 72:5
152:4
need 20:19 21:17
22:6,9,10 23:2,15
24:3 33:1,3,14
72:24 115:17
116:1 134:20
needed 32:10,18
33:10 122:19
needs 23:5,6
negative 57:23
negatively 81:1
neighborhood
28:12
neither 12:15,19
never 10:5 13:13
13:20 16:8,9
25:17 28:11 37:12
37:16,18 39:24
40:7,8 55:6,7
104:23 109:17
new 14:5,18 15:5,6
15:16 20:6 35:2
36:24 78:11
newport 5:18

newspaper 80:12
nine 35:15 138:4
nonresidential
142:14 143:2
north 3:4,10 28:18
nos 4:3
notary 153:4,24
note 12:8
notice 2:12 5:12
96:23
noticed 25:1
ntbe 14:4,12,18
null 77:3,5
number 16:1 46:16
46:18,19 48:5
58:19,20 60:3,6
60:10 62:2,5 63:6
68:17 69:5 70:17
71:1,10 73:6 74:6
75:7,10 76:15
77:20 79:15 83:24
131:5 144:5
153:24
numbers 79:13
83:13 84:1 131:6

**O**

oakes 3:15 4:6
object 8:20 33:16
87:12,13 89:2
117:15 118:8
124:4 137:5
150:17
observation 58:14
observations
130:21 131:2,7,22
132:2,12 133:6
observed 113:17
observing 104:8
obtain 32:4 53:13
obtained 105:1
obviously 132:18
occasion 8:5 12:2
77:18
occasions 9:9 10:23

12:12,24 150:21
occupants 96:10
occupied 119:15,17
occur 19:3 24:4
102:8,9 107:5
115:13 126:24
145:1
occurred 37:3
98:10 100:18
126:17,19 149:24
occurring 126:10
occurs 84:13 93:23
103:20
odd 106:6,18,18
offer 41:15 45:11
offered 148:13
offering 119:4
offhand 14:19
official 102:24
officials 78:4
offsite 80:13,20
120:16
oh 43:21 86:21
oil 14:20
okay 43:21 49:21
63:3 67:17 68:11
88:6,16 95:15,21
102:11 107:15
119:8,16 132:1
147:11
oklahoma 9:23
11:9,10 30:18
32:5,17 33:9,13
51:16 136:18
147:23 148:3,14
148:17 149:10,15
150:14 151:2
ole 29:1,2
once 28:1 110:2
134:14 144:10
145:12
ones 9:17,18 15:24
16:2 51:3,4,17
52:5 62:9 67:3
74:23 82:24 83:1

83:2 98:21 104:10
104:18 107:11,12
110:6,7 113:1
129:12,14,23
132:23 133:2
135:19,23 143:8,9
online 47:15,17
80:3
operate 109:15
operating 12:7
13:3
operations 120:19
opinion 41:15 60:8
81:24 82:15 86:6
90:6,14 98:8
99:13,19 105:1,3
105:3,20 106:19
117:24 119:5
127:4 133:9
141:20,21 142:2
opinions 27:18
36:6 60:5 61:14
98:3 99:3,4,7
126:22 147:8
148:13 149:5
150:23
opportunities
142:1
opposed 43:23 91:9
97:11
oranges 22:14
orchard 5:18
order 2:16 10:5
23:8,16 95:12
130:9,24 134:19
147:22 148:3,7,10
150:6
originator 35:21
outcome 99:15,18
99:20 106:16
129:4 136:24
138:1 153:17
outer 66:5
outlier 130:4
131:17 132:13

outliers 131:9,13
outset 5:9 45:13
outside 43:22 61:5
117:21
overall 31:20 83:4
122:14 123:2
126:2
overlay 23:10
oversight 26:12
overtaxed 109:7
overvalued 108:18
109:7
owned 12:8 119:10
119:12
owner 86:20 87:8
108:17,23 109:6
119:14 123:12,17
125:22
owneroccupied
119:13,14,20,21
owners 30:4 86:8
103:19 150:2

**P**

page 2:2,10 63:19
63:22,23 107:20
108:1,2 110:10
113:4 115:3 116:2
131:20 152:1
154:5
paid 92:21
paint 97:4
paper 12:7 51:21
66:14 75:21 76:14
79:9 115:24 116:3
116:14 130:24
139:12,14 140:4
papers 131:17
paragraph 72:9
95:16 96:23
parcels 68:17
part 17:19,21,23
52:14 53:8,9
61:15 65:14 70:7
70:14 72:4

**partial** 111:8,24
**partially** 141:8
**particular** 13:14,23
14:16 28:8 50:4
85:13 93:9 96:1
97:19 136:20,21
138:8 146:1 149:3
150:8
**particularly** 97:6
**parties** 149:2
153:16
**parts** 33:6 70:6
111:13 129:2
**party** 15:14 37:21
41:20
**passage** 77:15
103:24 104:7,22
**passed** 127:24
**passes** 104:24
**passing** 128:3
**pathway** 93:16,17
93:18,20 96:14
97:9
**pathways** 94:7 96:6
**pause** 95:20 127:9
132:16
**pay** 86:18
**paycheck** 44:3
**pc** 3:9
**pdfs** 80:2
**peer** 68:7 127:17
127:21 128:10
**peerreviewed**
99:11
**people** 22:7 24:4,14
32:19 35:3,13
36:16 78:10,11
84:15 85:5 98:18
99:11 102:21
134:8 151:5
**peoples** 20:17
59:15
**percent** 24:9 58:17
58:20,21 70:3,15
70:19 74:5,7 75:2

75:11 82:4,4,17
102:4 104:9,9
111:6 112:8,8
119:13,14 135:2
137:19 143:13
**percentage** 9:6
17:16 31:17 56:23
56:24 57:9,21,22
59:19,23 72:15
74:4 82:12 102:12
102:12,15 111:6
111:21 112:10
135:9 136:2 140:1
143:3,22 144:24
**percentages** 8:17
57:2,4,6,17 58:1
111:9,22 112:1
**perchlorate** 150:1
**period** 84:18
**periodically** 108:10
**permanent** 106:23
149:11
**personal** 109:15
147:1
**personally** 70:10
128:7
**perspective** 40:9
104:14 111:2
151:1
**pertinent** 32:5
62:19
**ph** 1:12 5:1 6:2
19:6 127:16
152:11 153:7
154:1
**pictures** 54:11
**pieces** 47:6 69:9
72:24 91:17
**pipeline** 103:13
**place** 24:21 81:19
82:1 138:20
146:23 153:13
**places** 21:6
**plaintiff** 1:4 3:2
4:19 15:22

**plaintiffs** 15:3,17
30:2 32:10 147:24
148:8
**play** 67:9 73:20,20
74:1,4
**please** 4:16 5:15
9:1 44:19 53:2
73:10,17 88:8
89:7 91:12 100:9
127:6 143:1
**plus** 119:23 143:21
**point** 24:15 63:8
69:19 70:1 74:22
107:3 126:24
139:15,21,22
**pollution** 149:18
**poor** 53:20
**portion** 43:12
79:20 102:6
**poses** 78:6
**position** 55:3 90:8
90:9 94:19 95:24
**positive** 57:22
66:16 69:15,17
70:3 73:4 75:8,15
89:1
**possess** 117:1
**possibility** 85:8,12
85:15,18,23 86:3
90:16 106:1
**possible** 21:15 39:3
99:23 107:4
121:18 139:18
**possibly** 62:8
126:14
**potential** 20:5
80:13 90:21 115:8
123:13 146:18
**power** 120:4
**practice** 39:19 68:5
74:15 99:2
**practices** 104:13
**pre** 138:19
**precise** 14:7
**predict** 19:12,15

21:8 25:2,10 37:8
37:9 69:19 70:2
70:14 72:1,18
75:1 101:23
126:16
**predicted** 24:7 25:2
75:18 88:22 100:6
100:12 101:3,9
110:11,13,17,18
136:19 137:22
**predicting** 23:23
83:4 101:22 118:1
121:12,13 139:17
144:11,12
**prediction** 24:10
24:20 25:2,6,7,8
25:10,13,15 27:14
27:22 73:2 81:5
82:21 101:21
102:7 104:18
105:7,18 121:6
123:7 137:10
**predictions** 33:21
101:15 104:1,15
105:19 107:20
112:18 113:5,12
122:18 123:3
126:23 127:2
**predictive** 78:23
**predictor** 74:21
**preparation** 27:17
28:9 31:5 49:24
52:24 68:1
**prepare** 10:14,15
16:16
**prepared** 8:13 9:9
16:7,18,19 48:23
51:22 54:24
150:13
**preparing** 7:8,17
36:5 46:13 50:2,6
51:24
**presence** 88:24
97:22 98:20
115:17 126:11

134:10,13 146:2,3
150:1 153:8
**present** 3:14 20:5
20:17 22:8 81:18
84:5 91:2,8 92:9
92:22 94:7,8 97:6
117:7,12 118:7,18
121:23 122:4,5
123:18 124:22
126:7 150:22
151:6
**presented** 109:22
**presenting** 41:16
**presently** 19:21
24:1,11
**pretty** 74:6 114:6
**previous** 9:17,18
**price** 41:6 70:21
86:13,17 109:12
110:12 134:16
**prices** 22:5 32:10
36:19 103:16
108:5,10 114:10
114:13 115:21
**principal** 51:23
91:18,23
**prior** 9:11 10:24
12:24 26:12 80:17
92:7 93:8
**probably** 17:11
28:18 59:3 71:19
142:6
**problems** 120:2
**procedure** 5:12
135:20,21
**procedures** 35:6
99:9 127:3,23
128:19 131:13
150:19
**proceeding** 13:14
14:23,24
**process** 32:9
128:18 129:7
130:19 135:15
**produce** 133:14

135:12 136:6,23
**produced** 93:2
**produces** 135:14
**producing** 135:11
**products** 145:16
146:1,2,4
**profession** 35:24
104:13
**professional** 1:19
5:2 37:22 39:19
48:20 65:18 70:12
81:23 82:15 111:2
119:5 141:21
**professor** 127:16
**proffer** 45:10
**proffering** 45:8
**program** 26:15
70:11
**promise** 52:21
**prone** 121:8,11
**proof** 109:8,10
**properties** 8:18
13:9,11,16 19:13
19:17 22:6 23:24
28:11,17 31:1,11
31:14,16,19 32:5
32:9,11,13 33:20
33:22 37:17,19
46:17,19 48:5
56:1,9,17,19
57:22 59:1 62:2
68:23 69:4,9,13
69:18 70:1,4,20
71:1,24 72:13
73:5,19,20 74:3,9
74:10 75:7,19
79:4 81:4,6,12,13
83:9,17,18 84:4
84:14,19,23 85:5
86:5,9 91:3,5,9
92:9 93:7 101:6
101:16 102:14
103:16,19 105:6
106:8 109:7
112:10 113:5,8

114:12 117:13
118:6,19 119:9,23
120:22 121:2,10
122:18,19,23
125:8 133:16
135:13,19 140:24
141:19 142:11,14
142:19 143:2,16
143:18,21 144:8
144:11,13,23
145:9 146:12,17
**property** 8:17 9:14
10:19 11:1 19:16
21:6,19 22:11,18
24:22 30:4 35:24
36:19,20 40:10,16
40:22 52:11,15
53:14,15 68:17
69:10 70:21 72:2
72:2,6,18 73:1,8,8
74:16,17,18 75:17
76:3,6,18 77:16
78:7 81:9,19 82:5
82:9,18,19 85:9
85:10,13 86:8,12
86:13,16,18,20,24
87:8,10,18 88:23
92:18,22 94:9
97:23 98:9 99:14
99:16,17,19,20,24
100:3,6,12 101:3
101:14 102:7,13
103:24 105:21,23
106:9,13,18,19,21
107:7,17,22 108:6
108:16,18,23
109:6,12 111:7,10
111:23 112:2
114:8,16,20
115:18 116:6,20
116:23 117:2,10
119:9,10,12
121:13,24 122:13
123:12,14,17,18
124:21 125:22

126:2 129:3,12,13
132:3,18 133:3,7
133:23 134:12,21
134:24 135:4,24
136:2,2,7,8,18
140:23 142:13
143:3,15,21 144:9
144:14,16,24
146:2,4 149:22
150:2
**propertyspecific**
89:21 114:15
122:10 123:10,21
**protection** 105:17
**proven** 138:6
**provide** 23:20
**provided** 6:16 8:15
9:19 16:10 32:7
34:10 40:19 46:10
46:12,14,16 48:3
48:7 49:23 54:8
55:11,12 56:18
58:16 60:5 79:17
80:18 88:22
129:13
**provides** 98:23
**proximity** 57:11,16
59:17 72:9,10,17
74:15,20 93:14
133:21 134:3
140:24
**public** 20:4 42:8,14
46:21,24 48:9
78:5 102:24
149:23 153:4
**publication** 47:16
128:10 138:5
**publications** 48:13
48:14
**publicity** 77:22
**published** 68:7
99:10 139:10
**publishing** 40:12
**puerto** 14:22 15:7
15:16

**pull** 115:7
**pulled** 95:6
**pulp** 12:6
**purchase** 116:20
**purchased** 92:20
**pure** 81:21
**purely** 122:6
**purpose** 30:20
**purposes** 30:21
56:14 75:15 92:4
108:19 109:8
**pursuant** 5:11
**put** 22:9 57:6 71:8
136:16 137:16
**puts** 86:20
**putting** 48:1
103:13
**pvd** 99:14,15 111:5
111:20,22 119:10
122:10 123:10
124:1,7 132:8
133:16 135:11
136:7 137:22
139:17
**pvds** 105:11

**Q**
**qualifications** 55:2
55:4
**qualified** 41:1
**quality** 15:9 44:15
44:21 79:23
114:23
**quarter** 102:6
**question** 13:19
14:7,11,15 20:19
24:19 33:5 34:3
38:1 41:5 44:12
44:13,18 50:18
54:18 59:5,23
61:3,9 62:14,17
63:1,4 65:13 68:2
69:21,23 71:4
73:11,17 75:4,16
78:8 79:2 87:2

89:6 91:13 93:3
100:21,23 101:13
111:13 112:5,12
112:16 116:11
118:4,13,15 122:8
125:10 148:18
**questions** 52:19
127:14 151:10
**quite** 90:23 111:15
140:2
**quote** 107:20
131:21 138:7
149:10,21

**R**
**radius** 65:2,3,5,12
65:24,24 68:24
69:2 70:5 71:24
74:10 75:19 83:24
99:16,21 105:22
106:20 117:14
119:23 142:12
**radney** 3:7 4:18,18
8:20 33:16 87:12
89:2 117:15 118:8
124:4 137:5 145:8
150:17 151:12
**railroad** 120:7
**raised** 78:18
**range** 17:12,15
55:23 61:21 102:3
137:19
**rarely** 104:9
**rate** 47:3,3,5,7,9
47:11,13,18,22
48:10,10 53:7
137:13
**rates** 46:22,22
47:14 53:8 99:12
137:8 139:3,4
**reach** 41:6
**reached** 27:18
**react** 78:12
**reacted** 137:9
**read** 9:1,2 36:7,9

42:12 51:1 53:1,3
56:22 60:11 73:13
91:11 92:14,19
95:11,17,21 96:11
96:16 100:8,21
101:10 107:7,24
116:1,5,21,22
124:13,14 130:24
132:15 150:3,4
152:2 154:3
**reading** 54:14
68:13 87:4 93:8
100:18 110:15
115:9 121:17
145:16 149:1
**ready** 7:12
**real** 25:17,22 26:1
26:3,7,9,15,23
30:21 31:24 32:19
32:20 35:20,21,22
37:13,14,14 38:1
39:24 40:5,16
51:22 52:22 53:11
53:14 66:17 86:2
88:18,20 90:1
101:18 102:8
116:7,11,15,24
117:2 134:2
138:21,23 141:12
149:24
**realize** 52:3 87:1
95:4
**realizing** 86:22
**really** 20:8 55:5
75:4 107:16
125:21 135:20
145:21
**realtors** 32:2
**reask** 73:17
**reason** 61:5,19
65:19 76:17 100:1
106:6 133:24
154:5
**reasonable** 26:19
36:21 99:5,8

149:12,14
**reasons** 106:2
108:17 134:18
**reassessed** 110:21
**reassessment** 110:5
126:16
**rebound** 77:16
**recall** 57:2,4 58:1
69:7 90:20 93:11
**receive** 19:9 43:16
**receives** 103:2
108:17
**recess** 49:15 88:12
125:15 147:15
151:16
**recognize** 38:12
50:12 66:24
**recognized** 13:21
**recommend** 111:5
111:20,22
**record** 4:5 9:2 36:9
49:13,18 53:3
54:13 73:13 88:10
88:13 125:13,16
127:6,7,10 147:12
147:13,18 151:14
**records** 50:7
143:11
**recover** 87:10
**reduce** 78:1,14
142:2
**reduced** 153:7
**reduction** 76:3
146:11
**refer** 5:24 117:3
139:19
**referenced** 64:17
71:6 92:15
**references** 2:14
51:13
**referred** 148:10
**reflect** 110:21
115:21
**reflected** 108:5
**refresh** 7:17

**regarding** 16:22
80:13 128:13
**regardless** 82:17
82:18 111:10
112:3,9
**registered** 1:19 5:2
**registration** 153:24
**registry** 94:14
**regulations** 42:17
**regulatory** 14:23
15:2
**reject** 77:5,7,8
**related** 9:5 47:8
50:22 153:16
**relationship** 64:11
108:3
**relative** 120:11
135:4
**relatively** 79:3,5
**relevance** 95:24
**relevant** 93:14
113:22 134:12
139:9,17
**reliability** 131:10
131:12 139:20
**reliable** 55:9
131:14
**relied** 7:20 27:9
35:4 48:2,17 50:2
50:5,19,24 51:4,9
51:10,24 57:13
68:16 141:8
**rely** 31:15 52:14
54:1,2 60:7,12,24
68:6 70:7 98:24
131:17
**relying** 60:19 61:2
67:1 74:13,14
89:13 90:4 133:1
133:2 150:22
**remaining** 69:3
83:18
**remediation** 77:22
77:24 107:9
**remedy** 108:22

**remember** 6:10
14:19 16:2 29:8,9
29:10,17 38:22
39:15 74:5,6
75:10,11 80:5
81:2 116:13
120:17 130:7,22
**remembering**
39:12
**removal** 92:23
**remove** 78:2 131:9
**removed** 84:13
85:4 124:17
132:19,23
**removes** 78:16
**removing** 131:13
**render** 150:23,23
**rendered** 126:23
150:16,24
**rent** 119:15
**rental** 119:9
**rented** 119:13
**replicate** 139:21
**report** 2:13 6:19,20
6:21 7:3,5,17,19
7:21 8:13,22 9:10
9:16,19 10:14,15
12:22 13:14,23
16:8,10,16,19
19:11,19 23:22
24:7,10,18 25:1,3
27:8,18,21 28:9
30:8,8,10 31:5
34:9,14,19 36:5
41:8 46:7,13,15
46:20 47:2 48:4,6
48:8,18,23 49:24
50:2,6,8 51:5,9,9
51:12,15,21,24
52:17,24 54:1,12
55:1,3,12,13,15
55:18 56:3,5,12
56:20,22 57:5,7
59:1,9,10,20 60:1
60:4,11 61:12,17

62:22 63:20,23
65:7,10,11,16,23
66:8 68:1,12,16
69:13,24 71:2,3,7
71:11,12,17,22,23
81:16 82:11 83:10
85:21 87:7 89:13
90:10,13,19 91:24
92:15 95:13 98:2
107:19 108:8,13
110:9 113:5 115:3
127:15 131:20
142:10 144:3
149:3,4,20,21
150:15
**reported** 56:23
59:20 61:4 62:6
128:24
**reporter** 1:18,19
4:14 5:3 9:2 36:9
53:3 73:13
**reporting** 128:19
**reports** 50:19
51:23 70:4 71:3
80:2,12
**reprediction** 62:12
**represent** 95:6
**representatives**
78:24
**represented** 56:13
75:13
**representing** 15:14
15:15
**requested** 9:3
36:10 53:4 73:14
**require** 26:7
**required** 149:8
**requirements**
26:21
**requires** 26:11
**reread** 73:11
111:17
**research** 17:1
51:22 68:7 94:6
95:7 97:21 106:7

133:21 139:11
145:24
**residences** 68:17
68:22 89:22 94:8
147:2
**residential** 28:18
39:1 66:16 69:1
70:15 108:5 111:9
112:2 133:23
143:7 149:24
**residents** 24:8 78:6
**resource** 16:5
**respect** 89:9 94:20
97:21
**respectively** 111:7
111:10,24 112:2
**responding** 84:24
**restrictions** 44:7
**result** 11:2 24:22
35:23 77:21 84:5
91:1 124:22
126:16 130:7
**resulted** 11:2 76:17
88:22 100:5,11
101:2
**results** 31:14 61:4
131:8 133:3,15,15
134:4
**retail** 141:1 142:16
143:10
**retain** 46:2
**retained** 6:4,9,24
13:18 15:10,11
16:14 17:18 29:21
45:14,18 49:6
54:17 68:14
**retention** 6:18 7:2
11:10 28:8 32:16
49:23 91:7 92:8
**retentions** 15:20
16:13 93:9
**reticent** 109:5
**return** 46:7 98:2
**revenue** 107:18,22
122:15 125:23

144:15
**revenues** 70:23
123:3
**reversed** 107:8
**review** 8:10 52:4
56:3,19,20 62:20
62:21 68:7 76:5
127:18,21 128:6
**reviewed** 7:16 8:6,7
46:12 50:5 55:1
79:20 128:8 149:2
**reviewer** 128:10
**richard** 3:13
**rick** 4:20
**rico** 14:22 15:7,16
**right** 21:24 28:21
28:23 29:9,14
32:22 38:22 39:13
47:1 56:10 66:8,9
69:5,10,11 70:18
81:1 82:13 84:6
91:15 94:5,5
96:18 100:1
103:12 106:6
107:11 113:24
117:1,8 118:17
119:7 122:12
123:23 124:22
141:4 151:8
**rights** 116:7,12,16
116:19,24 117:1,4
117:12,19 118:6
118:17
**ring** 39:1
**risk** 78:4,6,10,21
84:14,24 85:3,5,6
85:8,10,12 86:2,7
86:16 88:18,20
89:4,5,8 90:24
91:1,4 93:16
96:15,15,19
145:23
**road** 11:15,18
101:10
**roanoke** 153:3,18

**robert** 66:17
**robust** 139:23
**robustness** 130:10
**role** 52:4 125:20
**room** 71:19
**rough** 10:13 83:24
**roughly** 24:9 56:8
73:5,21,22 74:2
83:23
**rounds** 56:6
**rowing** 11:16
**rpr** 1:18 153:22
**rule** 149:9
**ruled** 14:13
**rules** 5:11 41:18
110:7
**run** 46:23 60:5
**runon** 73:16
**ryarborough** 3:12

**S**

**saginor** 51:23 52:1
52:17 57:13 59:9
59:10,13,16 64:8
66:4,18 72:8
74:19 79:9 92:15
113:1,17 121:16
127:14 135:10
137:21
**sake** 69:16 79:1
**sale** 32:10 37:16,19
41:10 86:13 89:9
103:15 108:5,10
110:12 114:10,13
**sales** 22:5 27:3,4,6
27:10,15,20 32:12
52:22 53:6,12,15
53:18 102:22
105:6 109:11,17
127:3 138:16
**salesperson** 35:22
**sample** 70:9 73:6
81:19 97:2 101:16
144:7
**sampled** 56:2,2

**samples** 58:7,8,17
58:18,23 75:14
96:24 97:8,14,16
98:21
**sampling** 56:7
57:15 74:14 82:1
85:19
**save** 95:13
**saw** 53:22
**saying** 20:14 25:12
33:23 34:24 35:1
35:2 36:11 70:20
72:16 75:10 96:18
97:7 99:7 102:5
112:11 122:9
148:23
**says** 71:17 89:16
96:23 105:5
129:22 133:20
**scanned** 80:3
**school** 17:2
**schools** 114:23
**science** 43:5 54:21
74:13 75:17 83:14
85:1,23 100:4,10
101:1
**scientific** 43:7
98:18 105:7 127:3
**scientifically**
127:22
**scientist** 98:23
**search** 129:16
**second** 10:3,4 12:2
12:4 17:2 21:12
21:13 95:16 127:6
139:21 151:13
**see** 52:10 55:24
61:8 66:12 67:17
95:23 115:9 116:3
116:5,9,14 132:1
134:8 151:13
**seeing** 134:24
**seen** 58:1 95:4
112:19
**segregate** 46:11

**select** 47:10 129:8
**selected** 130:12,16
131:3,16
**selection** 129:7
**sell** 86:23 137:8,10
**sellers** 36:22 86:14
114:11 115:6,16
**selling** 115:19
**senior** 39:1
**sense** 9:9 37:22
81:24 130:18
**sentence** 116:13
133:20
**september** 6:11,22
7:1,6 45:15
**septic** 120:2
**sequence** 71:4
**serve** 6:6
**service** 78:5
**services** 94:18
**set** 26:20
**setting** 9:11,15 11:1
93:10
**settled** 16:20 17:3
**sheet** 154:1
**shes** 83:12
**shift** 142:1
**shifting** 37:12
**shorthand** 153:7
**show** 21:16 64:8
109:18 144:7
**showed** 23:1 61:21
65:8
**shown** 21:8 78:18
78:19 81:7 98:14
109:11
**shows** 85:19
**side** 15:21
**signature** 152:1
**signed** 148:3
**significance** 94:20
**significant** 74:21
76:10,12,13,20
77:5 96:10 98:13
106:13 132:6

**similar** 9:10,11,12
10:17 13:3 27:3
31:6,7 65:23
150:18
**simon** 137:21
**simons** 51:22,24
52:16 57:13 59:9
59:13,15 64:8
66:4,17 72:7
74:19 75:21 113:1
113:16 115:24
121:16 127:13
128:6 129:8
**simpler** 41:5
**simply** 22:16
**simultaneously**
102:16 143:22
145:1
**single** 21:18 24:8
103:1 143:23
145:2
**singlefamily** 68:22
**sir** 20:9 66:24 67:2
140:7
**sit** 20:13 46:9
**site** 8:18 9:15 10:7
19:14 21:10 22:18
28:12 30:5,13
32:18,24 54:10
60:22 63:24 65:9
67:23 72:1 76:22
76:22,23,23 77:22
78:1,5,19 79:21
80:6,14,15 89:18
89:21 90:3,11
93:7 95:14 100:16
101:21 113:6
120:15 121:20
124:2,2,8,17
125:1,6 126:11
136:13,21,24
137:20 138:8
142:12 143:20
144:22
**sites** 34:1,23 67:10

76:2,16 80:6 87:7
107:6
**sitespecific** 125:21
**sitting** 86:21 105:9
**situation** 13:7
30:15 91:7 92:8
92:16 101:2
136:21 137:21
138:7 143:20
144:22
**situations** 100:5,11
101:9 108:16
**sizes** 144:7
**slice** 108:11
**small** 17:19,21
20:20 43:15 62:10
62:10
**smaller** 62:8
**soil** 91:10 121:3
**sold** 37:20
**solely** 70:3
**somebody** 54:14
105:4 122:24
**somewhat** 108:15
**soon** 103:15
**sooner** 102:18
**sorry** 43:21 47:13
111:13 131:24
141:7
**sort** 54:22
**sought** 13:21
**sound** 28:23 56:10
69:10
**sounds** 69:11
**source** 59:17 89:20
90:4 97:3 124:2,8
124:24 133:21
**sources** 46:21,24
48:9 90:17,22
**south** 28:18 136:24
**southern** 1:1 28:22
28:24
**space** 96:11
**spatial** 60:9
**speak** 7:14,15

18:12 109:1 128:3
**speaking** 51:14
83:23
**special** 43:24
**species** 52:11
**specific** 32:22
51:11 60:6 83:8
93:13 97:24
122:13 123:19,20
128:9 130:13,17
135:11 137:20
144:4 145:3,4
146:18
**specifically** 31:22
64:21 95:15 97:22
119:4 145:8 149:1
149:6
**specified** 153:13
**speculation** 81:21
**speech** 75:3
**spend** 18:9 43:13
96:10
**spoken** 49:5,8
146:5
**spread** 55:21
**square** 100:16
109:12,19 114:21
135:24
**sra** 38:19,20,21
39:6
**stability** 121:4
**stable** 140:2
**stand** 38:4,15 88:23
138:12
**standard** 35:6
42:11 49:1,4
57:11,18 60:23
68:5 72:17 74:15
99:2 128:19 134:1
**standardizing**
128:13
**standards** 39:19
**standpoint** 72:2,2
73:3
**stands** 38:21 52:5

**start** 91:14
**started** 6:16 19:22
20:1,10,11,20,22
71:9
**state** 5:14 11:17,19
15:15 29:3,4 40:4
40:6,14 44:13,15
44:21 47:19 80:2
99:3 107:9 109:1
**stated** 55:2 107:19
110:9 113:4
126:23
**statement** 69:21
81:4
**statements** 78:3,20
**states** 1:1 11:14
26:7 42:22 96:3
145:2 148:2,4
149:20
**statistic** 77:7
**statistical** 25:13
47:22 100:2 111:3
**statistically** 76:12
76:20 98:12
128:23 132:6
**statistician** 45:8,11
**statistics** 44:24
45:3,4,5,12 47:21
77:2
**status** 111:11 112:3
112:9 150:10
**step** 70:24 72:12
83:7 122:16
**steve** 3:15 4:6
**stigma** 84:9,12,21
85:2,2,7 88:17
**stipulate** 49:3
**stipulation** 5:10
**stood** 38:24
**stool** 89:20
**stop** 113:21
**stopped** 68:10
**storage** 119:24
**stream** 149:18
**street** 1:17 3:4

**streets** 28:14
**stringent** 41:18
**strong** 90:22,23
**student** 45:5
**students** 26:16
102:3
**studied** 87:6
140:18 144:21
**studies** 18:24 21:5
27:11 57:13,14
59:19 72:7 74:20
76:5,9,24 80:19
82:14 86:19 87:7
92:24 97:24 98:14
100:18,19 101:14
101:15,21 104:19
106:12 107:7
112:19 113:17
128:6,11,22 129:4
129:8,11,18,21
130:1,3,5,6,11,18
132:5,9,10,20
138:17 139:9,11
139:13 141:14
**study** 10:17 21:14
21:22 24:12 26:19
97:20 100:15
101:6 127:22
131:3,5,7 132:22
133:1,19,20
138:20 140:11,14
140:15,16,22
141:3,8,22 144:20
**studying** 40:9
**stuff** 102:23
**style** 4:12
**subject** 46:23
**submissions** 149:2
**submitted** 10:16
**subsequently** 32:7
**substances** 94:14
**substitutes** 141:23
141:24
**sued** 12:9
**sufficient** 70:9

Kevin Boyle, PhD.
December 2, 2015

**suggest** 78:13
**suggested** 56:8
**summarize** 27:12
**supervisor** 26:12
**supplant** 23:9
**supplanting** 23:19
**support** 40:13
**suppose** 86:21
**supposed** 10:8
**supreme** 87:23
  149:15
**sure** 15:7 17:4 22:3
  31:8 56:4,6,12
  69:14 74:7 75:12
  77:11 80:22 88:9
  95:19 102:24
  104:23 122:24
  125:12 127:21
  129:5 140:7
  142:23
**surprised** 113:2
**surrounding** 8:18
  13:9,11,15 91:9
**survey** 133:1
**sustain** 24:9 70:2
**sustained** 24:8
**swear** 4:15
**switch** 103:5,7
**sworn** 4:17 5:2

—————
**T**
**table** 63:5 131:4
**tailored** 27:22
  79:11
**take** 7:1 13:12
  16:21 17:7 21:5
  24:21 41:22 53:17
  62:9 67:5,7,12
  68:4 84:20 93:19
  95:5 102:23
  123:11 125:4
  137:4 151:12
**taken** 5:11 8:14 9:4
  27:16 45:2 58:23
  75:14 80:7 94:20

97:11 139:5,7
  146:23 153:13
**takes** 151:3
**talk** 7:10 26:17
  52:16 54:3 83:22
  91:23 108:14
  112:7 129:14
  144:16
**talked** 89:8 90:24
  102:13 105:19
  129:11 130:22
  141:18
**talking** 20:15 22:13
  24:20 54:15 62:16
  62:21 63:15 65:2
  72:5 78:4 80:9
  81:3 83:11,12,14
  83:14 85:16 88:17
  93:5 94:1 97:11
  97:13,16 99:22
  101:7 103:13
  104:6 115:1,4
  118:7,19 122:17
  125:2 139:24
  143:6 144:2
**talks** 85:21 89:14
**tank** 120:2
**tanks** 119:24
**tapers** 64:12
**tax** 31:20 34:3
  70:23 72:21
  107:18,22 108:17
  108:24 109:14,23
  113:20 122:15
  123:2 125:23
  144:14 146:6,11
**taxation** 108:19
  109:8
**taxes** 44:4 83:5
**taxing** 108:24
  109:5,24 144:18
**taylor** 140:11
  141:22 142:4
  143:8 144:6,20
**teach** 26:15

**tech** 26:15
**technical** 85:17
**technically** 109:19
**tell** 5:3 9:22 10:6
  10:10 11:12 14:6
  18:21 20:23 33:8
  54:5,23 55:8,14
  66:10 67:12 68:21
  95:12 99:6 112:13
  130:12,16 144:5
**telling** 20:14 23:14
  23:15 32:15 57:20
  57:24 88:3 103:17
  105:12,13 106:17
  137:4
**tendered** 12:22
  13:13,17
**term** 85:18 93:15
  111:3 114:6
  116:11 120:11
**termed** 62:5
**terms** 13:8 14:2
  21:18 23:10 34:3
  40:23 41:6 51:6
  53:11 60:17 71:1
  75:6,16 80:23
  82:12 83:8 84:11
  85:17,17 86:6
  91:15,22 93:16
  101:20 104:2,20
  133:9 135:22
  144:13,14 148:18
**test** 39:17 54:10
  92:21 137:18
**tested** 57:22,23
  69:15,17 75:15
  81:12 82:6,19
  83:17,19,22 86:5
  89:1
**testified** 5:4 11:5
  11:16 12:3,13
  14:9 16:8,9 24:18
  49:21 75:8 84:3
  87:20 88:16 92:11
  125:19

**testify** 16:23 49:1
  54:24 55:3 90:5
  117:21 148:17
**testifying** 23:19
**testimony** 14:14
  16:21 45:11 149:4
  149:7
**testing** 61:3,20
  69:13 75:6 77:3
  124:11
**thank** 13:12 69:3
  75:21 77:13 95:23
**thats** 6:2,13,20
  8:22 9:8,23 10:13
  14:14,22 18:10
  22:16 24:17,18
  25:7,8,12,13,14
  28:20 33:3 36:15
  39:3 41:7 45:16
  46:8 48:12,19,24
  49:3 50:21 52:7
  52:13 54:20 57:12
  57:13 58:10,11,13
  60:23 61:5,15
  62:15 63:1,7,23
  65:13,17 67:6,11
  67:16 68:5,19
  71:1,2 72:17
  73:16 76:8 78:14
  79:6,8,16 81:21
  81:24 82:11,15,21
  83:9 84:20,24
  85:2,6,6 86:7,16
  86:18 88:4 90:4
  91:23 92:3 93:24
  94:10 95:9 97:18
  99:2 103:8 104:9
  104:18 108:7,13
  110:8 112:23
  117:5,7 118:24
  119:3 123:7,16
  125:9 129:1
  131:16 134:1
  135:1,4 139:18
  143:4 144:17

145:6,9 148:10,24
  151:8,9
**theory** 124:1,7
  125:3
**theres** 14:9,18,21
  20:2 21:1 28:17
  33:5 37:3 40:18
  48:13 59:17 60:6
  60:10 64:21 67:19
  70:6 77:4,9,15
  84:14,19 85:2,19
  85:23 89:20,22
  90:21 96:19
  100:17 104:24
  106:1 114:18
  120:14 128:23
  129:22 131:11,21
  141:23 142:16,16
  142:17,19 146:11
  151:4,13
**theyre** 36:23 51:4
  59:16 74:1,4 80:8
  85:3 94:17 96:18
  97:7,10,13,15
  99:4,9 103:12
  106:24 110:21
  113:19 114:17
  127:2 133:9,11,11
  136:9
**theyve** 101:16
  121:20
**thing** 65:9 78:17
  95:17 143:6
**things** 27:2 37:17
  46:11 53:13 70:17
  77:23 79:6 84:20
  106:14 121:22
  128:20,24 129:16
  135:18 139:23
  151:1
**think** 5:9 10:8 13:2
  19:8,23 24:17
  34:8,13,18 41:4
  48:19 57:6 62:14
  66:2 68:2 73:11

78:10,11,14,15,17
78:18 89:19 90:19
90:21 95:9 96:18
100:1,20 104:14
104:19 105:23
106:2,6 109:23
110:10 112:18,21
124:13 131:11
134:7,24 137:6
139:24 141:3
145:9
**thinking** 31:18,19
80:22
**third** 37:21 41:20
102:6
**thoroughfares**
120:8
**thought** 69:15
114:17 143:12
**three** 17:7 27:3
71:3 89:20 104:4
135:23
**threshold** 64:21
78:21
**thresholds** 78:10
**timber** 11:14,17
12:5
**time** 1:16 13:24
17:16,22,24 18:6
18:9 19:23 21:15
22:19 23:12 24:16
32:23 34:16,18
37:5 38:8,8,23
43:12 49:12 56:9
77:10,15 78:2,11
95:13 96:10 103:2
103:24 104:7,22
104:24 107:3
117:7,12 118:7,18
121:21 123:13
126:7,20 129:3
130:15 139:16,21
139:22,24 149:17
151:3 153:13
**times** 11:5 14:9

17:19 25:16,20
27:23 68:3 81:5
**titled** 66:14
**today** 7:13 20:13
20:13,13 22:15
56:14 99:22
113:23 134:14
151:11
**todays** 4:7
**told** 8:6 22:21
35:17 37:12 38:24
45:13 60:1 68:16
69:14 98:7 113:15
123:9 137:18
138:11 142:24
150:21
**tongass** 12:6
**top** 40:12 128:15
**topic** 122:9
**total** 35:13 69:9
**totally** 12:22 60:19
64:24
**touch** 46:1
**touched** 54:6
107:15 114:2
115:3
**toxaphene** 37:2
55:20 58:24 63:16
97:22 98:20
**toxic** 94:14
**toxicology** 42:6
**tracks** 120:7
**tradeoffs** 18:24
**training** 25:24
26:11
**transact** 116:20
**transactions** 24:3
36:23 53:11,12
115:6 151:7
**transcribed** 153:9
**transcript** 153:11
**transfer** 101:20
**transfers** 102:1
**travel** 30:11,18
40:21

**trial** 149:17
**trier** 149:7
**trip** 30:17 31:8,9
31:10,23 33:10
34:6 35:8,9,14
**true** 22:16 26:6
40:20 61:8 69:22
77:14 153:10
**truth** 5:3,4,4 61:10
**try** 52:18 68:21
71:20 98:4 111:19
**trying** 33:7 39:16
71:8,15,16 92:4
103:10 123:1,1,8
124:12
**tuned** 83:19
**turn** 49:24 59:22
83:16 114:1
116:21 121:19,21
127:13 140:3
**turns** 62:4
**twice** 11:7
**two** 9:17,18 10:23
12:6,12,24 14:8
15:10 21:1 22:22
40:11 56:6 58:6
63:13,14,15 65:1
65:3 74:2 81:18
82:24 90:3 96:6
99:21 102:13
104:20 105:22
106:4,20 110:23
117:14 119:23
120:13 136:7
138:13 142:12
145:16,17 146:1
146:22,23 147:2,5
149:17 150:19
**type** 10:17 19:4
25:7,8,12 39:8
84:8 93:13 98:22
123:7 129:3,24
136:4 137:18
143:12 147:7
150:12,15

**types** 19:1 57:14
93:12 104:19
129:15 138:13
139:23 141:18
142:13,17
**typically** 27:3

---

**U**

**ultimate** 129:19
**ultimately** 72:20
**underestimate**
142:5
**undergraduate**
45:4
**underground**
119:24
**underlie** 138:17
**underlying** 13:5
134:22
**understand** 17:4
18:15 19:19 21:21
26:9 32:16 33:18
41:24 42:12 57:21
68:11 69:12 71:18
83:12 88:20 90:7
90:10 93:20,21
111:15 112:13,14
115:18 116:18
120:14 121:17
123:5 129:10
142:23 149:7
**understanding**
54:7,20 63:7
103:11 129:23
142:15 143:11
148:16,24
**understood** 33:8
58:11 81:16
**unemployment**
46:22 47:3,5
48:10 53:8 137:7
139:6
**uniform** 39:18
**unimpaired** 132:18
**unique** 136:13,14

136:15,20
**united** 1:1 42:22
145:2 148:2,4
**university** 19:10
28:16,19,22
**unreliable** 62:5
**update** 108:11
**updated** 108:10
**use** 21:8 23:2 25:1
25:9 27:13,20
41:2,10,18 42:10
42:12 45:4 49:10
70:18 74:8 75:7
83:4 88:7 99:14
111:8 112:1
114:13 117:8,19
118:17 123:13,18
130:13 136:6
141:15 144:18
**uses** 135:22
**uspap** 39:14,21
**utilization** 117:9
**utilize** 27:16 62:24
**utilized** 34:11 47:8
48:1 51:14 55:16
64:5 67:24 129:8

---

**V**

**va** 1:17
**vacant** 68:23 69:8
119:16,18 141:2
**vague** 85:18
**valdez** 16:15
**valid** 22:18 104:3
104:16
**validity** 61:3 104:4
104:5,6,7,11,11
104:12,21 137:18
138:10,13
**valley** 103:13
**valorem** 71:23
108:19 146:11
**valuation** 114:8
**value** 19:13 21:10
23:17,18,24 32:11

Kevin Boyle, PhD.
December 2, 2015

40:23 41:3,15
61:2 69:20 70:2
72:18 74:9 79:3
81:9 82:4,9 86:7
86:12,13,18,23
98:9 99:15,17,19
100:6,12 101:3
102:15 104:1
105:23 106:13,21
121:12,13 122:1
122:19 129:13
132:3 133:3,7
134:12 135:4
136:5,7,19 140:23
143:3,22 144:9,13
144:17,19,19,24
149:12,14,16,22
**valued** 81:8 84:4
**values** 10:19 13:2
19:2,15,16 21:6
24:2,22 27:2
31:16 34:24 35:24
40:11,15 52:12,15
60:14 66:17 73:9
74:16,18 75:17
76:3,7,18 77:16
78:7 88:23 92:18
97:23 102:12
106:9 108:4,4,9
108:14 110:12,13
110:18,19,20
114:15 116:6,23
126:2 129:12
132:18 133:23
135:14,15 144:21
146:2,4
**variable** 22:9 67:11
125:7 133:18
134:20 135:6
137:9,10
**variables** 130:13
130:17,17,20
135:17 137:1,3
**variation** 114:13
**varies** 76:22,23

108:12
**variety** 142:17,19
**various** 8:16 80:3
**vary** 134:5 136:2
143:10
**vegetated** 80:8
**verified** 124:11
**vermont** 11:13,20
87:20
**versus** 4:13 46:12
82:5 88:18 119:9
119:16 133:17
148:1
**vibrant** 53:19
**vicinity** 63:24
**vickie** 148:4
**videographer** 3:15
4:5,7 49:13,18
88:10,13 125:13
125:16 127:7,10
147:13,18 151:14
**videotaped** 1:12
**view** 7:13 34:22
73:1 81:5 90:2
**views** 100:16
**violation** 40:21
**virginia** 4:11 5:19
26:15,19 30:18
153:2,5,18
**visit** 30:13 32:18
**visited** 28:7
**visiting** 30:21
**voltage** 120:4
**vouch** 95:9
**vs** 1:5

**W**

**w2** 43:16,19,23
44:5
**wages** 44:2
**wait** 104:21
**wake** 100:14 101:5
**want** 48:24 49:1
50:9 56:15 65:14
75:4 81:3 83:6,7

83:10,16 86:17
90:5 93:3 94:23
95:11 98:2 100:20
100:22,23 107:16
112:16 114:1
116:8 118:10
124:12 127:13
134:8 142:23
144:16
**wanted** 21:17 52:18
150:5
**wasnt** 33:23 57:8
121:20 148:18,21
**waste** 34:15,18
120:22
**water** 88:7 91:9
**way** 14:14 16:2
20:18 21:4,12
24:6 28:4 37:3
47:8 65:8 77:6
88:2 93:22,24,24
98:17 103:23
127:21 130:1
134:1 137:1
**ways** 21:1 23:18
94:3 104:5 121:23
**went** 8:11 21:4 25:4
31:10 33:18 59:11
67:18 81:1 87:22
101:4,5 122:21
**west** 28:16
**western** 148:2
**weve** 62:15 72:5
94:2 99:21 101:6
112:15,16 118:7
118:19 137:23
139:4,7
**whats** 28:19 34:23
55:11 57:14 59:14
64:18 103:12
105:10 108:3
122:4 138:2
**wheres** 66:5
**white** 3:3
**wide** 142:19

**wilderness** 11:14
**willing** 86:14,14,14
114:11,11
**wind** 147:12
**wisconsin** 19:10
**wish** 154:3
**withhold** 44:2,4
**witness** 4:15,17 6:6
8:24 9:4 12:11
13:13 18:14 33:17
36:7,11 53:1,5
73:15 87:15 95:21
118:10 124:5
132:17 137:6
150:18 152:1
153:8
**witnesses** 18:10
**wont** 52:21 78:22
116:1
**word** 25:2,3,9
109:6
**words** 39:12
**work** 7:6,8 18:4
26:18,22 33:12
34:7 35:16,24
36:5 38:8,8 43:17
45:19 49:7 51:6
56:16 62:23 70:18
80:1 85:6 87:17
98:22 113:23
146:9 150:12
**worked** 16:1,3
23:20 25:17,21
29:19 37:12,13
38:10 55:6,7
98:21 122:20,24
**working** 15:12 30:1
71:4 84:1
**world** 102:8
**worse** 59:13
**worth** 103:6,7
**wouldnt** 25:9 35:18
41:12,16 52:6
61:23 64:13
105:24 113:15,22

121:9 126:18
130:1
**write** 154:4
**written** 152:5
**wrong** 19:20
109:20 112:15
124:16

**X**

**Y**

**yarborough** 2:3
3:13 4:20,20 5:8
8:21 9:7 34:5
37:6 49:12,20
53:10 73:10,18
88:1,9,15 89:3
94:23 95:3,22
117:17 118:12
124:6 125:12,18
127:5,12 133:5
137:12 145:11
147:11,20 150:20
151:9
**yeah** 54:19 65:21
66:12 69:1 78:9
103:8,21 117:11
**year** 6:12,13 20:7
37:3 43:13 45:15
**years** 10:11,12
11:22 17:13,17,20
17:24 28:3 80:13
80:16 100:14
101:5 138:4
146:23 147:2,5
149:17
**yesterday** 7:24 8:9
**youd** 4:15 22:4,10
24:3 29:21 59:7
64:14 103:2
126:17 137:3
**youll** 58:15 62:14
72:7 73:23 78:22
83:23
**young** 97:6

Kevin Boyle, PhD.
December 2, 2015

**youre** 13:22 18:11
  18:18 20:14,15
  22:20 32:15 34:22
  34:24 41:1,12,24
  42:19 57:20,21
  60:11,19 61:2,7
  63:19 66:1 67:1
  69:14 70:11 77:3
  80:9 81:6 85:16
  87:1 88:3 90:1,4
  90:12 91:22 92:24
  96:2 102:5 103:17
  104:3,12,23 105:9
  105:12 106:17,19
  107:13 108:15
  111:15 112:10
  115:9 117:21,23
  119:6 121:9,13
  122:2,9 123:11,16
  123:21 126:12
  127:16 129:5
  134:19 137:4
  138:6,10 140:10
  144:4 145:4,12
  147:8 148:23
  150:14
**youve** 8:14,16
  12:13,21 13:13,20
  14:9 17:5,6 24:17
  28:7 35:17,18
  40:2 41:4 51:7,7
  65:23 69:14 79:2
  82:16 87:5 95:4
  98:3 101:10 104:6
  107:7 112:19
  122:3,11 123:9
  126:22 142:24
  150:4

---
**Z**
---
**zero** 67:18 106:15
  132:3 133:7

---
**0**
---
**00** 1:16

**000** 68:23 69:8,9,18
  70:1 71:24 72:24
  73:19,20 74:3,9
  75:18 81:4 84:24
  86:5 118:19
  119:22 132:19
  143:21,24 144:23
  145:9
**03** 4:1,6 125:14
**05** 49:19
**0786** 3:5
**09** 125:17

---
**1**
---
**1** 2:12 4:3 5:12
**10** 10:11,12 11:22
  14:20 17:12 35:15
  49:19 70:3,19
  75:2 82:4,17
  88:11 104:9 111:6
  112:8 119:14
  135:2 143:13
**100** 103:6 129:9
**105** 56:9,17,19 58:8
  58:23 59:4 60:13
  69:13 70:8 75:14
  75:16,16 81:13
**1099** 43:20,21
**11** 88:14 127:8
**12** 50:11 88:14
  125:14,17 127:8
  127:11,11 147:14
  147:19 151:15,17
**13** 2:15
**13cv208ksmtp** 1:5
**14** 2:15
**147** 2:16
**15** 10:11,12 11:22
  24:9 70:3,15 75:2
  82:4,17 104:9
  111:6 112:8
  119:13 135:2
**16** 113:4
**1980s** 16:6
**1983** 19:7

**1990s** 141:4

---
**2**
---
**2** 1:5,15 2:13 4:3
  6:17 46:8 61:22
  63:5 65:3,4,24
  68:24 69:2,2 70:5
  70:21 71:24 74:10
  75:19 82:19,24
  99:16 107:20
  108:1 110:10
  112:18,20 113:6
  124:18 154:3
**20** 60:13 64:3
**2000** 68:22
**2000s** 139:11
**2004** 141:6
**2006** 138:3,19
**2015** 1:15 4:8 6:22
  148:5 152:7
  153:19 154:3
**2019** 153:23
**205** 3:5
**20th** 3:4
**22** 67:6,16 148:5
**228** 131:21 132:2
**230** 128:22
**24073** 1:17
**2414** 3:11
**25** 61:22 63:5 65:3
  65:4,24 67:18,19
  67:23 68:24 69:2
  70:5,21 71:24
  74:10 75:19 82:19
  82:24 102:4
  112:22,23 137:19
**26** 97:1
**275** 5:18
**28th** 6:22 7:6
**2nd** 4:8

---
**3**
---
**3** 2:14 49:16 50:3
  67:6,15,16 112:18
  112:20 131:17

132:13
**30** 102:4 130:9
  137:19
**31** 153:23
**34** 132:2,12 133:6
**351** 3:11
**35203** 3:5
**39211** 3:11

---
**4**
---
**4** 2:15 94:24 95:1
  111:6
**400** 3:4
**41** 147:14
**4268** 3:10
**47** 147:19
**49** 2:14

---
**5**
---
**5** 2:3,12,16 68:23
  69:8 84:24 99:16
  113:6 124:18
  142:11 143:1,21
  143:24 144:23
  145:9 147:16,22
**50** 56:9 58:17,20,21
  69:16
**500** 65:5,6,8,12,24
  66:3,3 132:19
**52** 151:15,17
**532** 142:11 143:1
**55** 1:17
**5532** 144:2
**57** 49:14
**58** 27:11 57:12
  74:20 128:6 129:8
  138:16
**581** 3:5
**59** 88:11

---
**6**
---
**6** 2:13,15 63:22,23
  115:3
**60** 73:5 74:2
**600** 97:1

**601** 3:11
**68** 74:6,8,8 75:7,11
  75:11,11

---
**7**
---
**7** 83:18,22
**70** 69:16,16,17 70:4
  73:5 74:2,5 75:14
**702** 149:9
**72** 116:2
**724** 69:2
**75** 75:14
**7502161** 153:24
**79** 131:20
**7th** 153:18

---
**8**
---
**8** 69:9,18 70:1
  71:24 72:24 73:19
  73:20 74:3,9
  75:18 81:4 86:5
  118:19 119:22
**80** 59:11
**84** 19:8

---
**9**
---
**9** 1:16 4:1,6 49:14
**90** 103:7
**900** 83:18,22
**95** 2:15

eDeposition Services
(844) 533-DEPO