IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

CITY OF HATTIESBURG                                                          PLAINTIFF

V.                                                                     NO. 2:13-cv-208-KS-MTP

HERCULES, INC., ET AL.                                              DEFENDANTS

**HERCULES INCORPORATED'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO EXCLUDE TESTIMONY OF KEVIN BOYLE**

Although there admittedly is no evidence that property values surrounding the Hercules site have been negatively affected by contamination from the site, the City of Hattiesburg (the "City") is asking the Court to accept Kevin Boyle's "prediction" that every parcel of property within 2.5 miles of the Hercules site—over 8,000—will sustain identical diminutions in property value regardless of whether they are contaminated. The purpose of Boyle's prediction is to support the City's claim that it will lose tax revenue in the future. Boyle is not an appraiser and, therefore, cannot conduct the appraisal necessary for the City to modify its tax base. Moreover, Boyle's opinion that proof of contamination is unnecessary is contrary to Mississippi law, and Boyle relies upon outdated studies from across the country to speculate that property values will decrease at some undefined point in the future. Importantly, Boyle has attempted to offer a similar opinion only once before, and the court correctly excluded his testimony. This Court should do the same.

                                        **I.      FACTUAL BACKGROUND**

Boyle is an economist. He has no expertise in environmental engineering, toxicology, public health issues, or environmental laws and regulations. Ex. "1," Boyle Dep. at 42:3-18. More importantly, Boyle is not an appraiser. *Id.* at 25:20 ("I'm not an appraiser."). Thus, it would be unlawful for Boyle to issue an appraisal in Mississippi. *See* MISS. CODE. ANN. § 73-

34-5; *see also* Ex. "1," Boyle Dep. at 41:2-3 ("A lender could not use an assessment of value that I did as an economist."). Nevertheless, the City designated Boyle to opine about the "predicted diminution in property values due to contamination from the Hercules manufacturing site in Hattiesburg, Mississippi." Ex. "2," Boyle Report at 1. The purpose of Boyle's prediction is "to compute the anticipated loss in property tax revenue to the City of Hattiesburg from diminished sale prices of properties due to contamination from the Hercules manufacturing site." *Id.* at 2.[1]

This is only the second time Boyle has attempted to give expert testimony about property value diminutions in an area surrounding a contaminated site. Ex. "1," Boyle Dep. at 9-10. The first time, Boyle's testimony was excluded. *See Alexander v. Halliburton Energy Servs., Inc.*, 2015 WL 4489185 (W.D. Okla. July 22, 2015). Not learning from his mistakes, Boyle employed "similar procedures" in this case. Ex. "1," Boyle Dep. at 150:18-19.

Boyle predicts that single-family residential properties (also referred to as Class 1 properties) will experience a 15.4% property value diminution, and that commercial properties (also referred to as Class 2 properties) will experience a 10.0% property value diminution. Ex. "2," Boyle Report at 2. According to Boyle, those percentages apply equally to all 2,724 Class 1 properties and all 5,532 Class 2 properties located within 2.25 miles of the Hercules site.[2]

The 15.4% property value diminution for Class 1 properties came from a meta-analysis performed a decade ago by Robert A. Simon and Jesse D. Saginor. *See* Ex. "4," Robert A. Simon and Jesse D. Saginor, *A Meta-Analysis of the Effect of Environmental Contamination and*

---

[1] The City seeks to recover damages based on the alleged contamination of property the City does not own, because the property the City does own has not been damaged. For example, the City tested only seven of the 44 properties it owns. Ex. "3," David Angle Expert Report at Angle 000029, 000109, 000181-184. Five of those were non-detect for site constituents. Recent testing of the South Lagoon yielded the same result. Ex. "3," at Angle 000009.

[2] Boyle and the City's other experts, Randy Horsak and Annette Herrin, inexplicably use both 2.25 miles and 2.5 miles as the alleged impact radius.

*Positive Amenities on Residential Real Estate Values*, JRER (2006) (hereinafter "Simons & Saginor"). "A meta-analysis is a statistical analysis of the results of a set of independent but related studies." Ex. "5," Thomas O. Jackson and Louis L. Wilde, *Plaintiff Damages Theories in Property Diminution Cases*, TOXIC TORTS AND ENVTL. LAW, at 12 (Mar. 2016). "Implicit in any meta-analysis is the assumption that the primary studies are similar enough that they can be usefully combined or analyzed." *Id.* at 13. The Simon & Saginor meta-analysis was based on 58 studies in which 184 separate disamenity (negative amenity) observations were valued. Ex. "2," Boyle Report at 12. All of the studies were based on widely varying circumstances, including transaction date, geographic location, type of property, and type of disamenity at issue. *See* Ex. "4," Simons & Saginor at Exhibit 1.

The 10.0% property value diminution for Class 2 properties is based on an hedonic price model developed by Keith R. Ihlanfeldt and Laura O. Taylor in 2004. *See* Ex. "6,"Keith R. Ihlanfeldt and Laura O. Taylor, *Externality Effects of Small-Scale Hazardous Waste Sites: Evidence From Urban Commercial Property Markets*, JOURNAL OF ENVTL. ECONS. AND MGMT., 117-139 (2004) (hereinafter "Ihlanfeldt & Taylor"). Ihlanfeldt & Taylor studied the effect hazardous waste sites had on various types of commercial property in Fulton County, Georgia (*i.e.* Atlanta) only. *Id.* at 119. Because of this limitation, Ihlanfeldt & Taylor cautioned that their "results [were] specific to Atlanta, and care should therefore be taken in applying them to other areas." *Id.* at 133.

Boyle himself did not prepare a meta-analysis or hedonic price model. Rather, to determine the alleged devaluation of Class 1 properties, Boyle simply plugged inputs into the Simons & Saginor meta-analysis. *See* Ex. "2," Boyle Report at 12-14; *see also* Ex. "7," Dent Report at ¶ 64. Boyle's analysis of Class 2 properties was even less complex; he simply adopted the property value diminution percentage from the Ihlanfeldt & Taylor study. Ex. "2," Boyle

Report at 16. Boyle "did not use any Hattiesburg sales in [his] report," Ex. "1," Boyle Dep. at 27:20-21, "did not collect any property sales data," *id.* at 53:15-16, did not base his report "on present market data or transactions," *id.* at 151:6-8, did "not interview[] anyone," *id.* at 36:2, and did not bother to visit Hattiesburg. *Id.* at 28:7-10. Indeed, the extent of Boyle's familiarity with the Hercules site and surrounding area involved "look[ing] at it on Google Earth." *Id.* at 28:13-14.

Furthermore, Boyle does not know whether any of the properties within 2.25 miles of the Hercules site are contaminated. *Id.* at 120:21-23. Naturally, he also does not know the types of contaminants at issue or the degree of any alleged contamination. *See id.* at 93:12-14, 57:8-12, & 134:4-6. None of those facts would affect his opinion. According to Boyle, the presence and degree of contamination are additional considerations that could increase his baseline percentages, *id.* at 134-35, but the baseline percentages of 15.4% and 10.0% are based merely on proximity to the Hercules site. *See, e.g., id.* at 74:15-16.

Finally, Boyle does not know when his prediction will come to fruition. Although there is no evidence of property value diminution to date, Boyle opines that his prediction will come true once the public becomes aware of the alleged contamination from the Hercules site.

> A. [T]he full effect is not there because people are not fully aware of the contamination at this point in time.
>
> Q. . . . . So we're talking about a prediction that you believe will take place in the future, that will result in diminution of these property values?
>
> A. That will be manifested when the full information of the contamination is available.

*Id.* at 24:14-24. Of course, Boyle does not know if or when that day will come. *Id.* at 37:7-10.

The plaintiffs' expert in *Blackard* made a similar prediction nearly two years ago.

> [H]ome sales prices have not been adversely affected by the contamination to date. However, we believe that will change in the near future. . . . [W]e believe

that sales prices of homes in the area will decrease as knowledge of the contamination becomes more widely known.

Ex. "8," Mem. in Supp. of Mot. to Exclude Test. of Joe Parker [320] at 16, *Blackard v. Hercules*, No. 2:12-cv-00175-KS-MTP (Apr. 18, 2014) (quoting expert report of Joe Parker). Despite the media coverage from the *Blackard* litigation, fact sheets and updates disseminated by the MDEQ and EPA, weekly construction progress reports distributed by ARCADIS, and public availability sessions,[3] recent market data shows that property values around the Hercules site actually ***increased*** over the past two years. *See* Ex. "9," Lightsey Report.

## II. STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

The party offering expert testimony bears the burden of showing that the testimony satisfies the requirements of Federal Rule of Evidence 702. *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002) (citing *Bourjaily v. United States,* 483 U.S. 171, 175 (1987)). Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

The United States Supreme Court's landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. "Under *Daubert*, Rule 702 charges trial

---

[3] *See* Ex. "7," Dent Report at ¶¶ 27-30 (citing sources).

courts to act as 'gate-keepers,' making a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 243-44 (5th Cir. 2002) (citing *Daubert*, 509 U.S. at 592-93). "This gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Id.* at 244 (citing *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999)).

Once the court determines that the proffered expert is qualified to offer opinions concerning the actual subject at issue, it must next determine whether the expert opinion is based on scientific knowledge (*i.e.* that it is reliable) and whether the expert opinion will assist the trier of fact to understand or determine a fact in issue (*i.e.* that it is relevant). *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592-93).

Testimony is reliable if (1) it is "based on sufficient facts or data;" (2) it is "the product of reliable principles and methods;" and (3) the expert "reliably applied the principles and methods to the facts of the case." FED. R. EVID. 702. A court must exclude the opinion testimony of an expert if it is not reliable. *LeBlanc ex rel. Estate of LeBlanc v. Chevron USA, Inc.*, 396 Fed. App'x 94, 101 (5th Cir. 2010) (affirming district court's exclusion of expert testimony for failing to meet *Daubert*'s reliability requirement).

In assessing whether a proffered expert's methodology is scientifically valid or reliable, the Supreme Court set forth the following non-exclusive list of factors to guide courts:

(1)  whether the expert's theory can be or has been tested;
(2)  whether the theory has been subject to peer review and publication;
(3)  the known or potential rate of error of a technique or theory when applied;
(4)  the existence and maintenance of standards and controls; and

(5) the degree to which the technique or theory has been generally accepted in the scientific community.

*Daubert*, 509 U.S. at 593-95. Given the virtually limitless contexts in which expert testimony can arise, not every *Daubert* factor will be applicable in every case; and a court has discretion to consider other factors it deems relevant. *Kumho Tire Co.,* 526 U.S. at 151.

In both pre- and post-*Daubert* cases, courts also have consistently considered the following additional factors:

(1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying;

(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;

(3) Whether the expert has adequately accounted for obvious alternative explanations;

(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting; and

(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's notes (2000 Am.) (citations omitted). A court is free to consider other factors as well. *Id.* (citing *Kumho Tire Co.,* 526 U.S. at 152 ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.")).

The proffered testimony also must be deemed relevant by the court before it may be admissible at trial. To be relevant, it must be clear that the proffered testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, nonhelpful.'" *Cole's Tool Works v. Am. Power Conversion Corp.*, 2009 WL 1298236, at *1 (N.D. Miss. May 7, 2009) (quoting *Daubert*, 509 U.S. at 591).

Even if the trial court finds the expert qualified and the proffered testimony reliable and relevant, it must examine whether the testimony should nonetheless be excluded under Rule 403 because its probative value is substantially outweighed by the danger of "confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *Previto v. Ryobi N. Am., Inc.*, 766 F. Supp. 2d 759, 771 (S.D. Miss. 2010) (quoting FED. R. EVID. 403); *see also Daubert*, 509 U.S. at 595.

### III.  ARGUMENT

Boyle's opinion should first be excluded because he is not qualified to offer an opinion about property value diminution. Additionally, Boyle assumes that values will decrease without proof of contamination. That is contrary to well-established Mississippi law. Because Boyle's opinion cannot be used to prove the future lost tax revenues sought by the City, his opinion will not assist the trier of fact in deciding any issue. Boyle's opinion also is unreliable. He applies outdated studies from other states to a specific area in Hattiesburg without adjustment. Finally, Boyle's opinion is rank speculation. Despite information about the Hercules site being publically disseminated for years without any corresponding reduction in property values in the area, Boyle opines that the public suddenly will become aware of contamination risks in the near future, at which point property values will plummet. Boyle's opinion does not pass muster under Rule 702 and *Daubert* and must be excluded.

**A.     Boyle Is Not Qualified To Offer A Property Diminution Opinion That Serves As The Basis For Lost Tax Revenue.**

Expert qualification is a "threshold" question to be determined by the court. *Rosamond v. Great Am. Ins. Co.*, 2011 WL 4433582, at *4 (S.D. Miss. Aug. 4, 2011); *Ashford v. Wal-Mart Stores, LP*, 2012 WL 6690896, at *2 (S.D. Miss. Dec. 21, 2012). Rule 702 requires not only that an expert be qualified by knowledge, skill, experience, training, or education, but also "that the

expert be qualified *in the relevant field*." *Gholar v. A O Safety*, 39 F. Supp. 3d 856, 860 (S.D. Miss. 2014) (emphasis added). "'[A] district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.'" *Id.* (quoting *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999)).

The purpose of Boyle's report is to establish decreased property values to support the City's claim for lost tax revenue. *See* Ex. "2," Boyle Report at 2 ("These predictions of property price diminutions are appropriate to compute the anticipated loss in property tax revenue to the City of Hattiesburg from diminished sale prices of properties due to contamination from the Hercules manufacturing site."); Ex. "1," Boyle Dep. at 70:20-23 ("I am saying that properties within the 2.25 [miles] are going to experience that property price diminution to be used for the basis of calculating the losses of tax revenues to Hattiesburg."). For Boyle to offer that opinion, he must "be a state certified real estate appraiser as defined in Section 73-34-3." MISS. CODE. ANN. § 27-35-165 (3)(b)(ii) & (iv). *See also* MISS. ADMIN. CODE 35-VI-2.03. However, Boyle is not an appraiser. Ex. "1," Boyle Dep. at 25:20. Therefore, Boyle is not qualified to give the opinion he proffers.

**B.     Boyle's Opinion Is Directly Contrary To Mississippi Law, Because He Assigns Property Value Diminution Percentages To Properties That Are Not Contaminated.**

Boyle's property value diminution "prediction" cannot be used to establish property value loss under Mississippi law because it assumes a decreased value for over 8,000 properties without proof that the properties actually are contaminated. To be sure, Boyle relied upon two studies to establish a percentage decrease in value for both the Class 1 and Class 2 properties. Both studies focused on how "proximity" to contaminated properties allegedly affects surrounding property values. Ex. "1," Boyle Dep. at 59:15-17 ("Simons and Saginor, all they're doing is looking at the proximity to an admitting source."); *id.* at 140 (Ihlanfeldt and Taylor

study "looked at property value effects from proximity to contaminated properties"). Accordingly, Boyle repeatedly testified in his deposition that his opinion was based solely on proximity to the Hercules site. *See id.* at 74:15-16 ("[P]roximity to contamination diminishes property values."); *see also id.* at 57:11-12, 72:16-19, 93:11-14. The actual presence of contamination has no bearing on Boyle's conclusion.

> Q. Do you know if any of these properties have hazardous waste of any kind?
>
> A. They may or may not.[4]
>
> * * * *
>
> A. It doesn't have to necessarily be on your property to diminish property values.[5]
>
> * * * *
>
> A. The formula is the distance from the contamination site. It does not have an additional variable about whether contamination was detected on individual properties.[6]

It is well settled that "Mississippi common law does not allow recovery for a decrease in property value caused by a public perception without accompanying physical harm to the property." *Lewis v. Kinder Morgan Se. Terminals, LLC*, 2008 WL 3540174, at *5 (S.D. Miss. Aug. 6, 2008) (Starrett, J.) (citing *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993)). Property owners may recover damages for reduced market value caused by "stigma" only by showing "some permanent and physical injury to their land." *Id.* (citing *Leaf River Forest Prods., Inc. v. Ferguson,* 662 So. 2d 648, 663 (Miss. 1995); *Berry v. Armstrong Rubber Co.,* 780 F. Supp. 1097, 1104 (S.D. Miss. 1991), *aff'd,* 989 F.2d 822, 828 (5th Cir. 1993); *Bradley v. Armstrong Rubber Co.,* 130 F.3d 168 (5th Cir. 1997)). In other words, proximity to a

---

[4] Ex. "1," Boyle Dep. at 120:21-23.

[5] *Id.* at 74:16-18.

[6] *Id.* at 125:5-8.

contaminated site alone does not give rise to a property damage claim.

Consistent with Mississippi law, the Court rightfully required the *Abner* plaintiffs to test their properties for contamination rather than rely on "***the proximity of the properties to the Hercules site*** and limited reports regarding the possible locations of contaminants." *Abner v. Hercules, Inc.*, 2014 WL 5817542, at *3 (S.D. Miss. Nov. 10, 2014) (emphasis added). Significantly, the Court noted that each plaintiff will "eventually be required to present scientific evidence of contaminants ***on their properties*** and the pathways by which those contaminants traveled from the Hercules site." Ex. "10," Mem. Op. and Order [73] at 2, *Abner v. Hercules*, No. 2:14-cv-63-KS-MTP (Jan. 13, 2016) ("*Abner* Order") (citing *Prescott v. Leaf River Forest Prods., Inc.*, 740 So. 2d 301, 310-11 (Miss. 1998)) (emphasis added); *see also id*. at 4 (each plaintiff will "eventually have to provide evidence of contamination"). Simply stated Boyle's opinions are irreconcilable with Mississippi law and the Court's rulings in *Abner*.[7] Boyle's testimony should be excluded.

**C.     Boyle's Opinions Do Not "Fit" With The Facts And Issues Presented In This Case And, Therefore, Are Irrelevant.**

As a condition to admissibility, Rule 702 requires that a proffered expert's testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." FED. R. EVID. 702(a). *See also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."); *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003) ("The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but

---

[7] If the *Abner* plaintiffs cannot recover damages for the decreased values of their properties without proof of contamination, it is inconceivable that the City could recover lost taxes on the same properties without similar proof. As the Court said in *Abner*, "[t]he absurdity of this argument requires no further elaboration." Ex. "10," *Abner* Order at 13.

also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue.") (citing *Daubert,* 509 U.S. at 591-92). Accordingly, the United States Supreme Court "emphasized that a district court, while acting as a gatekeeper for expert evidence, must evaluate whether there is an adequate 'fit' between the data and the opinion proffered." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). "'Expert testimony which does not relate to any issue in the case is not relevant and, ergo, nonhelpful.'" *Cole's Tool Works v. Am. Power Conversion Corp.*, 2009 WL 1298236, at *1 (N.D. Miss. May 7, 2009) (quoting *Daubert*, 509 U.S. at 591).

Boyle's opinions do not "fit" the issues in this case for a number of reasons. First, as noted above, Boyle is barred by statute from giving a property value opinion. *See* MISS. CODE. ANN. § 73-34-5 ("[I]t shall be unlawful for anyone to engage in real estate appraisal activity in this state without first obtaining one (1) of the four (4) real estate appraiser licenses as provided in this chapter."); MISS. CODE ANN. § 27-35-165 (reappraisal for adjustment of ad valorem taxes must be conducted by "a state certified real estate appraiser as defined in Section 73-34-3"). And Boyle admits his opinion cannot be relied upon by others.[8] *See* Ex. "1," Boyle Dep. at 41:2-3 ("A lender could not use an assessment of value that I did as an economist."). Thus, Boyle's opinions, which are meaningless outside of this litigation, cannot be helpful to the trier of fact in this case.

Second, as noted above, Boyle's property value diminution opinion is based solely on proximity to the Hercules site. *See id.* at 74:14-16, 57:11-12, 72:16-19, & 93:11-14. "[W]hether

---

[8] Many professions and industries require appraisals from a licensed appraisal to establish property value. *See, e.g., State ex rel. Hood v. Madison Cnty. ex rel. Madison Cnty. Bd. of Supervisors*, 873 So. 2d 85, 92 (Miss. 2004) ("MISS. CODE ANN. § 19–3–69(f) clearly establishes that appraisers with whom the county contracts for personal services must be licensed by the Mississippi Real Estate Commission.").

contamination was detected on individual properties" was not part of the equation. *Id.* at 125:5-8. Because "Mississippi common law does not allow recovery for a decrease in property value caused by a public perception without accompanying physical harm to the property," *Lewis*, 2008 WL 3540174, at *5, Boyle's opinions do not assist in determining any issue in this case.

Finally, even if the City could show that some of the properties have been contaminated by constituents from the Hercules site, Boyle's opinion is wholly irrelevant to any damage calculation recognized by Mississippi law. Mississippi follows the "before-and-after" rule. *Tolbert v. Denbury Onshore, LLC*, 2009 WL 700772, at *2 (S.D. Miss. Mar. 13, 2009) (citing *Patterson v. Holleman,* 917 So. 2d 125, 132 (Miss. Ct. App. 2005)). That is, "damage for diminution in value is calculated by determining the difference between the fair market value of the property before the alleged damage, and the fair market value of the property after the alleged damage." *Id.* In the only other case in which Boyle attempted to give the same testimony, his opinion was excluded for failing to "give the value of the properties immediately after the injuries." *See Alexander*, 2015 WL 4489185, at *2. Relying on the Simons & Saginor meta-analysis, Boyle in *Alexander* predicted that property values would decrease by a certain percentage as soon as the public became aware of the potential contamination from the defendant's site. *Id.* Like Mississippi, Oklahoma follows the before-and-after rule. *Id.* at *1 (citing *Houck v. Hold Oil Corp.*, 867 P.2d 451, 461 (Okla. 1993)). Because Boyle's "model d[id] not give the value of the properties immediately after the injuries, as required by Oklahoma law," the court held that "Dr. Boyle's opinions [were] not relevant to the issues of damages . . . and should be excluded." *Id.* at *2. This Court should do the same.

**D.    Boyle's Prediction is Unreliable and Speculative.**

Even if Boyle's methodology could be used in this case (it cannot), Boyle's prediction is unreliable and speculative. Boyle assumes that all commercial and residential properties within

2.25 miles of the Hercules site will decrease in value by 10.0% or 15.4% respectively once the public becomes aware of the attic dust samples taken from properties around the Hercules site. There are multiple reasons why Boyle's conclusion is unreliable.

As an initial matter, the alleged significance of off-site testing is inconsistent with the methodology Boyle claims to have employed. Both studies Boyle relied upon considered only how proximity to a contaminated site affected property values. *See* Ex. "1," Boyle Dep. at 59:15-17 ("Simons and Saginor, all they're doing is looking at the proximity to an admitting source."); *id.* at 140 (Ihlanfeldt and Taylor study "looked at property value effects from proximity to contaminated properties"). Accordingly, Boyle likewise based his opinion solely on proximity to the Hercules site. *See id.* at 125:5-8 ("The formula is the distance from the contamination site."). Thus, alleged off-site contamination was not part of Boyle's equation.

Additionally, Boyle erroneously assumes that all properties located near a contaminated site will experience a reduction in property value.

> Not every use of a hazardous substance results in contamination. Not every use of a hazardous substance that does result in contamination necessarily creates an environmental risk. And not every use of hazardous substance that results in contamination and results in environmental impact and environmental risk necessarily results in a real estate market impact.

Ex. "7," Dent Report at ¶ 35 (quoting Richard J. Roddewig, *Stigma, Environmental Risk and Property Value: 10 Critical Inquiries*, THE APPRAISAL JOURNAL, at 376 (Oct. 1996)). Even Simons & Saginor noted that 34 of the 228 observations considered showed no reduction in property value. Ex. "4," Simons & Saginor at 79. Therefore, Boyle's assumption that decreases in property value will occur—when admittedly are not guaranteed—is unreliable. *See Moore*, 151 F.3d at 279.

Boyle next assumes incorrectly that the results from Simons & Saginor and Ihlanfeldt & Taylor apply equally to Hattiesburg.[9] "The Simons and Saginor meta-equation was estimated using data from studies of sale prices of residential properties in communities *from various locations around the U.S.* that experienced contamination." Ex. "2," Boyle Report at 11 (emphasis added). Moreover, the underlying studies in the Simons & Saginor meta-analysis considered widely different variables.[10] *See* Ex. "7," Dent Report at ¶ 74 (citing Kathy K. Condo and Louis L. Wilde, *Expert Opinion Based on Meta-Analysis Rejected as Basis for Determining Property Value Diminution Due to Alleged Contamination*, BLOOMBERG BNA EXPERT EVID. REPORT, at 5 (Dec. 7, 2015)). Accordingly, industry experts agree that

> the models reported in Simons and Saginor cannot be used to estimate damages to a particular property or a real estate market because they can never fit the facts of either, such as the type of property and/or real estate market, the source, type and extent of contamination, the stage of remediation, if any, and the presence of other disamenities or amenities.

Ex. "11," Condo & Wilde at 4. It is like comparing "apples and oranges." Ex. "5," Jackson at 13. And Boyle did not make any adjustments for the Hattiesburg market,[11] property types or conditions,[12] or the existence, type, and degree of contamination.[13]

Similarly, the Ihlanfeldt & Taylor study is based on properties located solely within

---

[9] Boyle knows that properties must be similar for a comparison to be meaningful. For example, in his report, Boyle declined to consider studies that undermine his conclusion "because they were distant from Hattiesburg, MS." Ex. "2," Boyle Report at 16, n.5 (citing Ex. "12," Thomas O. Jackson, E*nvironmental Contamination and Industrial Real Estate Prices*, JRER (2002)).

[10] For example, the meta-analysis includes studies that measured the effects of proximity to sex offenders, shopping centers, rental properties, airports, nuclear power plants, refineries, high voltage power lines, railroads, and industrial and manufacturing facilities. Ex. "5," Jackson, at 13.

[11] Ex. "1," Boyle Dep. at 27:20-21 ("I did not use any Hattiesburg sales in my report.").

[12] *Id.* at 119-121.

[13] *Id.* at 120:21-23, 93:11-14, & 134:4-6.

Fulton County, Georgia. Ex. "6," Ihlanfeldt & Taylor at 119. Accordingly, the study cautions that its results were "specific to Atlanta" and that "care should therefore be taken in applying them to other areas." *Id.* at 133. Fulton County, Georgia, is not comparable to the Hattiesburg market in several respects:

- Fulton County's population is 20 times that of Hattiesburg;

- Fulton County has 23 times the numbers of businesses;

- Fulton County's land mass is 20 times larger than Hattiesburg's;

- Fulton County has a higher rate of homeownership;

- Fulton County's poverty rate is half of that of Hattiesburg; and

- Fulton County's median value of owner-occupied housing is twice as much as Hattiesburg's.

Ex. "7," Dent Report at ¶ 65 (citing US Census Bureau QuickFacts). Boyle nevertheless applied the percentage from the Ihlanfeldt and Taylor study without adjustment. *See* Ex. "2," Boyle Report at 16.

Boyle's own published studies demonstrate that even similar markets in sister states are not necessarily comparable. For example, Boyle co-authored two studies on the impact water quality had on lakefront property values in Maine and New Hampshire. *See* Ex. "13," Holly J. Michael, Kevin J. Boyle, & Roy Bouchard, *Does the Measurement of Environmental Quality Affect Implicit Prices Estimated from Hedonic Models?*, LAND ECONS., Vol. 76, No. 2, pp. 283-298 (May 2000); Ex. "14," Julie P. Gibbs, John M. Halstead, Kevin J. Boyle, and Ju-Chin Huang, *An Hedonic Analysis of the Effects of Lake Water Clarity on New Hampshire Lakefront Properties*, AGRIC. AND RES. ECONS. REVIEW, 39-46 (April 2002). "Despite the similarity in study methodologies," Boyle hypothesized that the results from Maine and New Hampshire would differ due to a number of factors, such as proximity to major metropolitan areas,

infrastructure, population density, and lake size. Ex. "14," Gibbs, Halstead, Boyle, & Huang, at 39. Boyle's suspicions were confirmed by the facts.

> [T]hese findings indicate there is very little comparability between the New Hampshire and Maine data, and the respective results from these studies. Specifically, the findings from Maine could not be easily transferred to New Hampshire, and an original study in New Hampshire was warranted. This conclusion likely extends to other regions of the country where real estate markets and baseline water clarity may differ.

*Id.* at 44.

An expert is required to be "'as careful as he would be in his regular professional work outside his paid litigation consulting.'" FED. R. EVID. 702 advisory committee's notes (2000 Am.) (quoting *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 942 (7th Cir. 1997)). *See also Kumho*, 119 S. Ct. at 1176 (an expert must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."). Boyle's blind reliance on Simon & Saginor and Ihlanfeldt & Taylor demonstrates his failure in this case to exercise the same intellectual rigor he does in his profession.

Finally, Boyle's prediction is rank speculation. Approximately two years ago, the plaintiffs in *Blackard* retained appraiser Joe Parker to offer substantially the same opinion that Boyle is trying to give in this case.

> [H]ome sales prices have not been adversely affected by the contamination to date. However, we believe that will change in the near future. As local residents become aware of the contamination, *many will opt to move away from the health and safety hazards associated with and perceived to be associated with toxic chemical contamination*. . . . *[W]e believe that sales prices of homes in the area will decrease as knowledge of the contamination becomes more widely known*.

Ex. "8," Mem. in Supp. of Mot. to Exclude Test. of Joe Parker (quoting expert report of Joe Parker). Aware that the appraisal guidelines prohibit appraisers, like Parker, from offering such

opinions without supporting market data,[14] the City retained Boyle in an effort to subvert that prohibition. But Boyle's report fairs no better.

At the time of the *Blackard* litigation, it was undisputed there was no evidence of decreased property values around the Hercules site, although Joe Parker opined that would "change in the near future." Ex. "8," at 16 (quoting Parker Report). Now, two years later, Hercules' expert appraiser, Stan Lightsey, updated his market research and found that property values around the Hercules site actually have ***increased***. *See* Ex. "9," Lightsey Report. The City has no proof to the contrary. Boyle's prediction that contamination from the Hercules site will cause surrounding property values to decrease is as unfounded and speculative as was Parker's prediction.[15] "It is well established within the Fifth Circuit 'that [w]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.'" *Cameron v. Werner Enters., Inc.*, 2015 WL 4459068, at *4 (S.D. Miss. July 21, 2015) (Starrett, J.) (quoting *Brown v. Ill. Cent. R.R. Co.,* 705 F.3d 531, 537 (5th Cir. 2013)).

---

[14]     Environmental stigma for the appraisal profession is the product of uncertainty and adverse perceptions of the market but is ***always measured on the basis of actual market data and transactions*** that reflect these perceptions. The appraiser is cautioned that ***not all uncertainty and increased concern and perceptions in the market may reduce property values***, and that any analysis of risk effects and stigma must be based on actual data from the relevant market or submarket ***and should not be assumed to occur without such evidence***.

Ex. "14," Guide Note 6, *Consideration of Hazardous Substances in the Appraisal Process*, APPRAISAL INSTITUTE (emphasis added). *See also* Ex. "15," Advisory Op. 9; Ex. "6," Dent Report at ¶ 69 ("'No matter how compelling or logical the argument, the reliable measurement of the effects of contamination on market value must be based on market data. A credible valuation opinion cannot be produced in the abstract without clear, direct market support and evidence.'") (quoting Thomas Jackson, *Methods and Techniques for Contaminated Property Valuation*, THE APPRAISAL JOURNAL, at 313 (Oct. 2003)).

[15] Even more speculation would be required to conclude that tax revenues will decrease. Indeed, such a decrease would require the tax assessor to reassess the values of all 8,000 properties. Moreover, the Mississippi Department of Revenue would have to approve the City's reappraisal plan. *See* MISS. CODE. ANN. § 27-35-165(1). There is no evidence the City has done so.

## IV. CONCLUSION

For the foregoing reasons, the testimony of Kevin Boyle should be excluded.

This the 1st day of April, 2016.

                        Respectfully submitted,

                        HERCULES INCORPORATED

                        By Its Attorneys,
                        BAKER, DONELSON, BEARMAN,
                          CALDWELL & BERKOWITZ, P.C.

                        By: */s/ William N. Reed*
                              WILLIAM N. REED

Richard F. Yarborough, Jr. (MS Bar No. 6628)
William N. Reed (MS Bar No. 4689)
Amy L. Champagne (MS Bar No. 102447)
James L. Jones (MS Bar No. 3214)
Ashley C. Tullos (MS Bar No. 101839)
D. Sterling Kidd (MS Bar No. 103670)
Michael V. Bernier (MS Bar No. 103960)
Samuel Gregory (MS Bar No. 104563)
BAKER, DONELSON, BEARMAN,
  CALDWELL & BERKOWITZ, PC
P. O. Box 14167
Jackson, MS  39236
Telephone (601) 351-2410
Facsimile  (601) 592-2410
ryarborough@bakerdonelson.com
wreed@bakerdonelson.com
achampagne@bakerdonelson.com
jjones@bakerdonelson.com
atullos@bakerdonelson.com
skidd@bakerdonelson.com
mbernier@bakerdonelson.com
sdgregory@bakerdonelson.com

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the ECF system, which served a copy upon registered participants.

This the 1st day of April, 2016.

                                            */s/ William N. Reed*
                                                     WILLIAM N. REED